1          IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF TEXAS
2                  MARSHALL DIVISION

3   MYPORT, INC.,                (  CAUSE NO. 2:22-CV-114-JRG
                                 )
4          Plaintiff,           (
                                 )
5   vs.                          (
                                 )
6   SAMSUNG ELECTRONICS CO., LTD., (
    et al.,                      )  MARSHALL, TEXAS
7                                (  JANUARY 4, 2024
           Defendants.          )  2:00 P.M.
8   _____

9

10

11  _____

12                   PRETRIAL CONFERENCE

13       BEFORE THE HONORABLE RODNEY GILSTRAP
           UNITED STATES CHIEF DISTRICT JUDGE

14  _____

15

16

17

18

19

20

21

22            SHAWN McROBERTS, RMR, CRR
               100 E. HOUSTON STREET
23            MARSHALL, TEXAS  75670
                 (903) 923-8546
24        shawn_mcroberts@txed.uscourts.gov

25

1                    A P P E A R A N C E S

2        FOR THE PLAINTIFF:    SKIERMONT DERBY, LLP
                                633 WEST FIFTH STREET
3                               SUITE 5800
                                LOS ANGELES, CA 90071
4                               (213_ 788-4500
                                BY: MR. JOHN LORD
5
                                SKIERMONT DERBY, LLP
6                               1601 ELM STREET, SUITE 4400
                                DALLAS, TEXAS  75201
7                               (214) 978-6602
                                BY:  MR. MICHAEL RICKETTS
8                                    MR. STEVEN HARTSELL

9        FOR THE DEFENDANTS:   GREENBERG TRAURIG, LLP -
                                MCLEAN
10                              1750 TYSONS BLVD, SUITE 1000
                                MCLEAN, VIRGINIA  22102
11                              (703) 749-1300
                                BY:  MR. ANDREW SOMMER
12
                                GREENBERG TRAURIG, P.A
13                              ONE VANDERBILT AVENUE
                                NEW YORK, NEW YORK  10017
14                              (212) 801-2282
                                BY:  MR. RICHARD EDLIN
15                                   MR. THOMAS PEASE

16                              GREENBERG TRAURIG, LLP - NY
                                200 PARK AVENUE, 38TH FLOOR
17                              NEW YORK, NEW YORK  10166
                                (212) 801-9200
18                              BY:  MS. WEN XUE

19                              GILLAM & SMITH, LLP
                                102 N. COLLEGE, SUITE 800
20                              TYLER, TEXAS  75702
                                (903) 934-8450
21                              BY:  MR. TRAVIS UNDERWOOD

22       OFFICIAL REPORTER:    SHAWN M. McROBERTS, RMR, CRR
                                100 E. HOUSTON STREET
23                              MARSHALL, TEXAS  75670
                                (903) 923-8546

24

25

1          THE COURT:  Be seated, please.

2      All right.  This is the time set for pretrial matters

3  before the Court in the case of MyPort versus Samsung, et al.

4  This is Civil Case No. 2:22-CV-114.

5      The Court will ask for announcements at this time.

6      What says the Plaintiff MyPort?

7          MR. LORD:  Good morning, Your Honor.  John Lord on

8  behalf of Plaintiff MyPort, Inc.  And with me today are my

9  colleagues Steven Hartsell and Mickey Ricketts.  And we also

10  have a client rep, Mr. Michael Malone, who is the CEO of

11  MyPort, Inc.

12          THE COURT:  You're ready to proceed?

13          MR. LORD:  Ready to proceed, Your Honor.

14          THE COURT:  Thank you, Mr. Lord.

15      What's the announcement for the Defendants?

16          MR. UNDERWOOD:  Good morning, Your Honor.  Travis

17  Underwood on behalf of the Samsung Defendants.  With me this

18  morning is Rich Edlin, Tom Pease, Andrew Sommer, Wen Xue, and

19  we also have our client representative Jong Choi.  And we're

20  ready to proceed.

21          THE COURT:  All right.  Thank you, Mr. Underwood.

22      Counsel, before we get into the disputed pretrial motions

23  and other matters, I want to go over some housekeeping

24  information with you.

25      As you're aware, this case is set for jury selection and

trial on February the 5th of this year.  At the time we select

the jury, I'm going to afford each side 30 minutes per side to

address the panel as a part of the voir dire process.

I'm going to follow my usual practice, which is that each

side may, if they choose, but they're not required to, but if

they choose they may use up to the first three minutes of

their time addressing the panel to give a high-level,

non-argumentative overview of the issues in the case, the

factual disputes in the case.  Let me stress that if you do

that, it needs to be very generic and very non-argumentative.

If I sense it's becoming argument, I will stop you and

probably embarrass you in front of the panel.  So I doubt you

want me to do that, so be careful that you keep it

non-argumentative and high-level.

I'm going to seat eight jurors to hear the evidence in

this case, and I'm going to afford each side four peremptory

challenges.

I'm going to afford the parties 11 hours per side to put

on their evidence, not including jury selection, opening

statements, and closing arguments.

Each side will be afforded 30 minutes per side for

opening statements.  And let me just remind you, opening

statements are not opening arguments; they are intended to

give the jury a roadmap of where the evidence is supposed to

go, not argue your ultimate conclusions before the evidence is

put on.  But nonetheless, 30 minutes per side for opening

statements.

Forty minutes per side for closing arguments.  The

Plaintiff may divide its closing argument as long as it uses

at least 50 percent of its total time in its first closing

argument, so in this case at least 20 minutes in the first

closing argument.

I'm going to require that you follow the Court's usual

practice with regard to an ongoing effort to meet and confer

throughout the trial.  I want to know about overnight

objections in advance.  The Court will make itself available

to you each day during the trial at 7:30 in chambers.  I

usually start with the jury after the first day at 8:30, so

that intervening hour before we start with the evidence each

day is there to maximize and streamline your designated trial

time by allowing me to meet with you if needed and take up any

unresolved overnight disputes and give you guidance on those

before we get into the courtroom before the jury.

Obviously if there aren't overnight disputes, that's not

a problem; it's welcome with the Court; but it's often the

case that there are disputes that, despite the ongoing

obligation to meet and confer, survive that and need to

receive the Court's guidance the next morning.  You'll need to

report to my staff by 10:00 each evening as to where you are

on any overnight disputes.  And that 10:00 report is not a

1  signal to stop and go to bed; you still get to keep and have

2  to keep meeting and conferring in trying to resolve those

3  disputes.

4      If by 7:00 the next morning there are still overnight

5  disputes that haven't been worked out, then both sides are

6  jointly to prepare and produce at chambers not later than 7:00

7  a three-ring binder containing a representative of what's in

8  dispute and a one-paragraph narrative from each side about

9  what the different positions between the parties are on that

10  dispute.  For example, if there is a demonstrative slide that

11  is objected to by one side, I need to see a picture of the

12  demonstrative slide.  I also need a paragraph from each side

13  about why there is a dispute about it that hasn't been able to

14  be resolved overnight.  You would be amazed at the times I get

15  a binder with a group of slides in it and no indication in

16  writing as to what the dispute is.  That doesn't help me very

17  much, and that makes the use of the time we have before we

18  start the trial that day not nearly as effective as it could

19  be.  So make sure I know what the dispute is as to whatever it

20  is that is in dispute.

21      I'm going to require -- I'm not going to require.  I'll

22  say it that way.  I'm not going to require that any and all

23  deposition designation disputes or counterdesignation disputes

24  be presented at the beginning of the trial.  I'm going to take

25  those on a rolling basis, as long as you make sure that any

disputes over deposition clips get to me not later than the day before the day that evidence is intended to be presented. I do not want to risk having to delay the trial for technical issues because those disputes require tape to be recut or other technical steps to be taken and there's not enough time to do it. So make sure that they get to me -- those type disputes get to me not later than the day before the day that they're going to be presented.

I'll defer argument -- presentation rather and argument on any motion from either party under Rule 50(a) until all the evidence has been presented. I won't take those up at the close of the Plaintiff's case in chief, but I'll do that after both sides have rested, subject to the Court's final instructions to the jury, and it's that's the point at which I'll take up motions under Rule 50(a).

Once I've heard and ruled on motions from Rule 50(a) from either side, then I'll conduct an informal charge conference with counsel, typically in chambers, where we will discuss informally the most current iteration of the proposed final jury instruction and verdict form. That's intended to be informal and free-flowing, and not only will we discuss areas where the parties are in disagreement; there may be areas that neither side has flagged that I want to talk to you about. So anything and everything will be on the table during that informal charge conference. We'll take as much time as the

1    Court thinks we need to to cover the waterfront.

2         Then once I've completed the informal charge conference

3    with you, I'll consider all the input that's been received

4    through that process and then I'll generate what I believe to

5    be the appropriate final jury instruction and verdict form to

6    be used with the jury.  I'll furnish those to each side with

7    an adequate time to review them.  And once that is complete,

8    I'll hold a formal charge conference on the record where

9    either side may raise such objections that they think are both

10   appropriate and necessary.

11        I suspect most of you are aware of this.  There may be

12   some of you and some of your trial teams that have not

13   practiced before me before.  It's my practice, and I will

14   follow it in this trial, that both counsel and the witnesses

15   are precluded from identifying or talking about individuals by

16   first name only.  Personally, I think referring from the

17   witness stand and on the record or from the podium on the

18   record in front of the jury as to individuals by first name

19   only is inherently confusing in the record, and part of the

20   Court's job, as I view it, is to protect the clarity and

21   accuracy of the record in this trial.  Also, I don't think

22   that referring to individuals by first name only is in keeping

23   with the necessary decorum for a United States District Court.

24        I once tried a case in state court many years ago.  There

25   were three people named Jim, and by the time we got to the

Court of Appeals, nobody knew which Jim had done what, when,
or where, or to whom, and we're not going to risk that kind of
confusion in the record here.

So counsel, don't refer to any individual by first name
only in front of the jury, and make sure your witnesses are
aware of that.  If your witnesses don't follow that
instruction, you will get credit with me for having not
instructed them properly.  So everybody's on notice of that.

With regard to any proprietary or confidential
information that may be necessary to be presented during the
trial, I'll refer you to the Court's standing order on
protecting that information through the process of sealing the
courtroom which also seals the record.  I will say this:  Some
counsel, once the courtroom has been sealed and confidential
information is being presented to the jury, some counsel that
are not examining the witness seem to think that's their cue
to get up and leave and go to the restroom or do whatever they
need to do outside the courtroom.  If you leave the courtroom
while it's sealed, you will not be allowed back in until it is
unsealed.  The lawyers don't get to come and go when the
public doesn't get to come and go.  So keep that in mind
during those periods of time when the courtroom's going to be
sealed to protect confidential information.  Otherwise, I'll
refer you to the Court's standing order on that issue.

We're going to use a juror questionnaire as a part of the

1    jury selection process here.  As I sit here, I don't recall

2    the exact status of that whether it's been submitted yet or

3    not, but my staff will work with you to make sure that we have

4    that to Ms. Clendening within the time required.

5        With regard to use of the answers to those jury questions

6    that will be done in writing and in advance of voir dire, I'll

7    refer you to Ms. Clendening, the Deputy Clerk-in-Charge for

8    this division, with regard to access and use of those juror

9    questionnaires.  I will simply remind you of this:  We

10   encourage members of the public who are summoned for jury duty

11   to be candid and forthright in their answers to those written

12   questions in those questionnaires, and we do that by telling

13   them they are not going to need to be worried about their

14   answers being saved in some law firm's database or showing up

15   on the database of some jury consultant five years down the

16   road.

17       In other words, you are able to use that information, but

18   you are not to retain it, reproduce it, copy it, transmit it,

19   or handle it in any similar fashion.  That typically

20   translates into you being given hard copies of the answers,

21   the completed questionnaires by Ms. Clendening, and then you

22   turning those hard copies back into her after the jury is

23   selected.  But in the meantime, if you've got a jury

24   consultant and they want to participate with you in voir dire,

25   they need to be here.  You're not going to scan those

1    questionnaires and send them miles and miles away and then

2    have the jury consultant look at the realtime transcript.

3    They're going to have to be here because we're not going to

4    scan or copy or retain any of that information.  So I don't

5    want anybody to be surprised or placed in a position that they

6    regret because they don't know that's the practice to be

7    expected.  But because we encourage people to be candid and

8    forthright by telling them that they don't need to worry about

9    that information being retained, you need to know that's what

10   will be expected of you.  But otherwise, I'll defer to

11   Ms. Clendening with regard to delivery and recovery and use

12   and anything else relating to those juror questionnaires and

13   the venire members' answers contained therein.  Whatever she

14   tells you you can take as coming from me.

15        As a part of the pretrial process today, we are going

16   to resolve any outstanding disputes as to admissibility of

17   intended exhibits so that we begin the trial with a known and

18   established universe of pre-admitted exhibits that either have

19   not drawn an objection from the other side or have been

20   considered by the Court and any objections have been overruled

21   as to their admissibility.  Those documents are considered

22   pre-admitted.  Once they're used in any fashion during the

23   trial before the jury, then they are considered as admitted

24   exhibits and a part of the record evidence.

25        To make sure that the record is clear on that, beginning

1    with the second day of the trial before I bring the jury in

2    you can expect that I will instruct each side to go to the

3    podium and read into the record any items from that list of

4    pre-admitted exhibits that they have used in the preceding

5    day's portion of the trial.  That way we keep a running record

6    clearly established in the transcript or in the record of the

7    trial as to what has been used and is an admitted exhibit as

8    opposed to what has been pre-admitted but never used and is

9    consequently not a part of the record evidence in the trial.

10   So have your trial teams prepared to do that each morning

11   before I bring the jury in.

12        And obviously that's something you need to meet and

13   confer about so if there are any possible disputes about what

14   did get used and what didn't get used, you work those out and

15   make clear both sides have the same list for themselves and

16   the other side before I come in and ask you to read those into

17   the record.

18        I'm going to present to the jury during jury selection a

19   juror notebook for their use.  After they've been selected, I

20   should say.  I'll present to them a notebook for their use

21   during the trial.  Those juror notebooks need to be jointly

22   prepared by counsel and delivered to chambers not later than

23   noon on Wednesday, January the 31st of this year.  You need to

24   deliver 12 copies of these juror notebooks, which I'm sure

25   several of you are familiar with, but in case any of you are

not, those are typically three-ring binders that include
copies of -- complete copies of the patents-in-suit--and I
prefer those to be single-sided, not double-sided copies of
the patents-in-suit--followed by the chart that includes any
claim language that's construed -- been construed by the Court
during the *Markman* process with the Court's adopted
construction on the corresponding other side of that sheet.
It's effectively a ledger with claim language construction,
claim language construction side-by-side in two columns; no
analysis, nothing from the claim construction order other than
the construed claim language and the adopted construction side
by side.

Then beyond that, there should be a section where for any
potential witness, either live or by deposition, there is a
tabbed page for that witness with their name on the tab so
they can easily be found.  And then on that page you should
superimpose a head-and-shoulders photograph of the witness
near the top of the page with their complete name underneath
the photograph.  You're not to characterize the witness when
you identify them by name.  In other words, Mr. John Smith is
fine, Dr. Alice Jones is fine if there is a terminal degree
that's been earned, but not Dr. John Smith, Plaintiff's
damages expert, or anything that characterizes them.  The
remainder of those pages should be simple ruled lines for
note-taking, and then behind this tabbed section with witness

1    pages there should be a new three-ring -- or three-hole punch

2    legal pad inserted for additional note-taking that the jury

3    may wish to take beyond what's otherwise afforded to them in

4    the notebooks.

5         And then you should make sure that there is a pen in the

6    front pocket of those notebooks in case any of the jurors

7    don't have their own pens they want to use.  And not to be

8    trite about it, but please make sure that it is not a clicking

9    pen that goes in the front pocket.  I have had jurors spend

10   weeks clicking pens in a jury box and it gets annoying, so

11   give them something they can't click.

12        And again, those notebooks are to be delivered to

13   chambers not later than noon on July the 31st.

14        I will touch on this briefly, given the nature of the

15   case.  This case will obviously involve competing expert

16   witnesses, and those experts will be relying on lengthy and

17   multiple reports that they've generated in writing prior to

18   their testimony being presented to the jury.  Consequently,

19   there is always the possibility that the need will arise

20   during the trial for counsel to object to an expert witness by

21   raising the issue of whether or not that witness has gone

22   beyond the four corners of their expert report in their

23   purported testimony.

24        Let me be clear.  Expert witnesses are confined to the

25   four corners of their expert reports, and it is not proper for

1    an expert witness to offer testimony that's not supported by

2    the contents of their reports.  However, an objection from

3    opposing counsel that an expert is purporting to testify

4    beyond the scope and content of their reports is a highly

5    disruptive objection.  These reports, as you know, are often

6    hundreds of pages long, there are multiple reports per expert,

7    there are multiple experts in a case like this.  I am not

8    going to have everything in those reports memorized, and I may

9    not have all of the reports right at my fingertips.  I try to

10   have my staff bring me those reports in anticipation of each

11   of the expert witnesses testifying, but it's not uncommon for

12   me to finish a patent infringement trial like this with a

13   four-foot high stack of notebooks back here that not only

14   relate to witnesses but expert reports and other type matters.

15        If there is such an objection raised, which is often

16   completely proper, it unavoidably is going to necessitate

17   sending the jury out, finding that report, hearing argument

18   from the objecting lawyer about where and how the expert is

19   purported to go beyond the bounds of that report in their

20   testimony, and then hear responsive argument from the other

21   side.

22        It's going to take time.  It's going to be disruptive.

23   And it may be necessary.  I'm not telling anybody that if it's

24   necessary it shouldn't be raised.  Certainly if we get a rogue

25   expert that decides to just ignore the boundaries of his or

1    her report and start offering opinions from the witness stand

2    or testimony that's not supported by that report, then it's

3    highly appropriate and necessary to object.  But by the same

4    token and at the other end of the spectrum, I have had counsel

5    in other cases--I don't expect it in this case but just so

6    you'll be on notice--I have had counsel raise that type of

7    objection for strategic purposes; opposing counsel is really

8    making good headway with an expert witness, so you make that

9    objection, and I've got to send the jury out and it breaks the

10   rhythm, it breaks the presentation, it causes a break in the

11   time, and once it's overruled I've got to bring the jury back

12   and we got to start the process all over again.

13        It sometimes is tempting to use that objection for a

14   non-substantive strategic purpose.  That's improper, in my

15   view, and if I sense that anybody is raising that objection

16   for its disruptive nature rather than the substance of what's

17   going on, i.e., that it's strategic in nature, then I'll

18   consider that a sanctionable offense and I will take

19   appropriate action depending on the particulars of what

20   actually happens.  I have reduced lawyers' trial time, I have

21   reduced closing argument time, I've done whatever I need to do

22   to be -- I've done whatever is necessary to make sure that the

23   temptation to use that highly disruptive objection for

24   strategic purposes is avoided.

25        So I'm not expecting that in this trial, but I want

everybody to be on notice that's something I watch for, and I

will not hesitate to jump in and take whatever appropriate

action I need to take if that becomes apparent to me.  So use

it as you need it.  Make sure you have a good basis for it.

That's all I ask of you.

All right.  In that vein, at the time you deliver the

juror notebooks to chambers on the 31st, I want you to also

deliver to me updated copies of the experts' reports so that

I'll have those.  I want a hard copy delivered.  And this is

the joint responsibility of both parties.  The notebooks for

the jurors are a joint responsibility, so jointly produce a

hard copy of each expert's reports, and also deliver that same

material as to those expert reports in either a secure

electronic transfer, a zip file, or whatever you need to do so

I have it digitally as well as in hard copy form.  And do that

at the same time you deliver the notebooks on January 31st.

And for those of you who don't know my particular likes

and dislikes, the hard copy needs to be single printed pages.

I don't like double-sided printing; just a personal

idiosyncrasy.  So if I'm going to work with it in hard copy

form, I'd rather have it be single-sided printing.  I've been

known to say that we grow pine trees and produce a lot of

paper in East Texas, so don't worry about how much paper it

takes.

All right.  Are there any questions about any of these

1    housekeeping matters from either side?

2        Any questions from the Plaintiff?

3            MR. LORD:  No, Your Honor.

4            THE COURT:  Any questions from Defendants?

5            MR. EDLIN:  None, Your Honor.

6            THE COURT:  All right.  Let's turn to the

7    substantive pretrial motions that are before the Court.  We'll

8    work our way through all the disputed motions, then I'll turn

9    my attention to any disputed motions in limine as a separate

10   category.  Once we've covered disputes regarding motions in

11   limine, then we'll turn to any disputes regarding proffered

12   exhibits to be considered pre-admitted, as I've already

13   discussed with you.

14       So I'll try to follow the list that counsel submitted

15   overnight as to their preferred order in taking these matters

16   up, which means we'll start with Document 117, Samsung's

17   motion for summary judgment of limitation on damages for

18   failure to mark.

19       And let me hear from the moving Defendants on this first.

20           MR. EDLIN:  I'm sorry, Your Honor, just -- that's

21   fine.  The first order that we had was invalidity.  Was that

22   an intent to move that down?

23           THE COURT:  All right.  Are you talking about the

24   § 101 matter?

25           MR. EDLIN:  It's Docket -- yes, Your Honor.

1          THE COURT:  So that would be Document No. 122?

2          MR. EDLIN:  Yes, Your Honor.

3          THE COURT:  I don't have that at the top of my list,

4    but I'm happy to take it at the top if that's what you prefer

5    to do.

6          MR. EDLIN:  Well, it was what was submitted.  If

7    that's all right, we'll go with that.

8          THE COURT:  Okay.

9          MR. EDLIN:  Thank you, Your Honor.

10         THE COURT:  I'm looking at the wrong list.  I had a

11   different list.  I need to have the one that came in from

12   you-all overnight.  That's what I've got.

13      Okay.  We'll take them in that order, then.  Let's turn

14   to Document 122.  And this is the motion for summary judgment

15   under 35 U.S.C. § 101 proffered by the Defendants.

16      Let me hear from the Defendants, please.

17         MS. XUE:  Good morning, Your Honor.  May it please

18   the Court.  My name is Wen Xue.  I'm with the law firm

19   Greenberg Traurig, and I'm here to argue the § 101 motion on

20   behalf of Defendant Samsung.

21         THE COURT:  Please proceed.

22         MS. XUE:  Your Honor, before I proceed, may I please

23   have your permission to publish some slides on the elmo?

24         THE COURT:  Certainly.

25         MS. XUE:  Your Honor, MyPort has an *Alice* problem

here we have a problem because if you take a look at the

claims all they're doing is taking a bunch of well-known

pieces of hardware and making up names for software, like 'the

first data converter', 'the second data converter', and say if

you put all of these together, image tag will go faster.  But

the problem with their claim is that there's nothing that

humans haven't done before.

       If you go to any old library, you'll likely be able to

find a library catalog cards that describe all the information

you need about a certain book, and that is tagging for the

book.  And Mr. Malone, the inventor and owner of MyPort has

also testified that the court reporter is doing speech-to-text

conversion as she typed down every word he say.

       So all of these claims are doing is taking what humans

have always been doing and say they'll go faster on the

computer, and that's classic *Alice*.  MyPort hasn't invented

anything and it has built nothing.  Having tried to build

something, like Samsung did, they may actually encounter some

obstacles during the way and may actually learn something that

could potentially be patentable, but that's not what they did.

All they did was write up some claims with hardware and

software names.

            THE COURT:  Let me stop you for a minute, counsel,

and ask a question.

       This motion, as I read it, goes to all three of the

1  patents-in-suit, the '070, '067, and '066, and yet I don't

2  find anywhere in your briefing where you identify clearly a

3  representative claim that you believe runs afoul of the § 101

4  requirement.  And that is representative of the other issues,

5  the other claims in the patents-in-suit.  You seem to

6  hopscotch around from this claim in this patent to this claim

7  in this patent and an element here and an element here to make

8  your § 101 argument.

9       I'm typically presented in a motion like this with what

10  is either agreed to or argued to be a representative claim

11  that we can focus on the specific language of a specific claim

12  within the context of the § 101 arguments.  I don't really

13  have that here, and I don't know if that means that I now have

14  to look at every element in every claim in all three patents

15  on an individual § 101 analysis basis since I don't have

16  something that everybody can agree is representative of the

17  totality of the claims at issue here.

18       Can you explain to me why I don't have that and how we're

19  supposed to proceed?  I can't imagine that a motion that, to

20  use my language, hopscotches around from element to element

21  and claim to claim among three different patents is an

22  appropriate way to present a § 101 argument.

23       MS. XUE:  Yes, Your Honor.  I apologize for not

24  making that clear.  I would propose that we would focus on

25  claim 6 of the first patent, which is the '017 Patent.

1           THE COURT:  And I know that claim 6 in all three

2    patents is independent and claim 13 in all three patents is

3    independent and the claim language is fairly similar in all

4    three of the patents between those independent claims, but

5    again --

6           MS. XUE:  Yes, Your Honor.

7           THE COURT:  -- this typically comes to me with a

8    representative claim that people can agree on and then we

9    argue about the intricacies of that claim, and I just didn't

10   find that in any of the briefing here.

11          MS. XUE:  That's right.  And I apologize for that,

12   and if I may explain the reason.

13      Each of these claims has some additional limitation that

14   doesn't really do anything.  So, for example, claim 6 has an

15   additional limitation of a combiner, which doesn't really

16   appear in the rest of the claims.  But if we're looking at the

17   nature of the claims and what they're directed to in general,

18   I believe claim 6 could be representative, aside from this

19   particular limitation that I believe is insignificant for the

20   purpose of § 101.

21          THE COURT:  You want me to look at claim 6 of the

22   '017.  Right?  Go ahead and give me your arguments within that

23   context.

24          MS. XUE:  Yes, Your Honor.

25      And as I'm sure we're all familiar, image tacking is a

1  long-standing human practice.  When you take a picture and you

2  write some words next to it to describe the picture, that's

3  tagging an image.  And we're all familiar with the library

4  indexing system, which the Federal Circuit has found in 2016

5  that that is long-standing conduct that existed well before

6  the advent of computers and the internet.

7       And if we look at the language of claim 6, which is, in

8  general, representative of other claims, we believe -- the

9  claims -- the limitations generally fall into two categories.

10  One category is directed to tagging images and the other

11  category is directed to using computer to do that tagging

12  faster.  And I've highlighted the limitations of the first

13  category here on the slides.

14       So you have internal storage of a capture device, and

15  that can be the memory of a mobile phone; and you have a

16  camera that you can use it to take a picture and store digital

17  image; and then you have a media data converter that's here in

18  purple, and then that's associating tags with a digital

19  image--and here the tags are called 'context tags'; and

20  lastly, in the internal storage, the digital image and their

21  tags are stored in association, and that's exactly how humans

22  have been doing image tagging for all these years, and just

23  applying that in a digital context is typical *Alice*.

24       So MyPort has stated this in the patent specification and

25  again in their opposition brief that the problem that the

patent was trying to solve is when you have a large number of
media items and it becomes very time consuming and very
burdensome for a person to manually describe and index every
media file, so what you're left with is a bunch of media files
and the person doesn't have the time to do a tagging.  That is
not a technical problem; that is a human problem.  The problem
existed before the advent of computers, because when you have
a library, someone has to manually do the tagging.  And if
you're a collector of music files or a photographer, you have
a lot of media files on your computer.  That's also a problem
for the user to manually tag all of them and spend all that
time.

THE COURT:  Let me ask you this, counsel.  I'm aware
of the line of cases that holds that if there is something
that's a traditional human action and through the improvements
presented by the patent in question the process moves quicker
and more efficiently and you get more of what was previously
done by a human done, that's not sufficient to pass the § 101
test.  But there's also --

Let me ask you this.  Is there not also the possibility
that something that previously was done by humans can be done
at such a faster rate that a human could never have done it
that way, and doesn't it at some point cross a threshold where
it becomes something new because it is of such an increased
volume that a human could never have done it that way?  It may

be the same thing, but there must -- there could be such an

improvement in speed and volume that it is, in fact, something

that was not humanly possible before.

Would that put it beyond the § 101 attack or § 101

complaint if it was, in fact, of such a volume and speed that

it exceeded human capabilities?  Or is it just because it in

it's innate nature could have been done by a human, that's the

end of the inquiry?

MS. XUE:  Your Honor, I believe for -- based on the

case law that I've seen for most of the cases, like Your Honor

has observed that the court would have found if an activity

was a traditional human activity and just do it with computer

and do it faster, that's not enough to cut it for § 101

purposes.

THE COURT:  I think that's pretty clear.

MS. XUE:  But there are some case law indicating

that when someone's using the computer to do something that

humans traditionally do but do it in a way that's so different

from how humans do it, then that could be § 101 eligible.  And

in the example I think is the Federal Circuit *McRO* case.  I

don't believe that's cited in this case, but the idea is the

computer is doing something that's so different in such a

different way from how humans do it.  It's not an improvement

in speed or volume because computers just do things so much

faster than human brains can, and that's not an actual

1    technological improvement if you're just using generic

2    computers to do human things faster.

3         But there are cases saying if the computer is doing

4    things very differently, in a very different way -- for

5    example, the *McRO* case, the computer is applying completely

6    different rule from how humans would apply lip syncing, and

7    the court has found that was directed to eligible subject

8    matter.

9         But I would submit that that's not analogous here

10   because had Mr. Malone actually invented the technology of

11   doing speech-to-text conversion, which is something humans

12   traditionally do, and that's a -- that was not previously

13   available then, that may be patent eligible.  And if the claim

14   is drafter in the correct way and in all other patentability

15   standards.  But that's not the case here.  Mr. Malone did not

16   invent speech-to-text conversion; he merely heard about the

17   technology and thought it's a good idea to apply it in this

18   context to make it faster.  So that would not take the claim

19   out of the realm of actual idea.

20             THE COURT:  All right.  What else do you have for

21   me?

22             MS. XUE:  If I may quickly go through some of the

23   step 1 slides, or I can fast forward to step 2 if Your Honor

24   is satisfied with the step 1 inquiry, which is all we're doing

25   is applying something that humans have always been doing and

1    doing it on the computer and slightly faster.

2          THE COURT:  I would not say I'm satisfied with step

3    1, but I think I understand your arguments on step 1, so for

4    efficiency's sake why don't you move to step 2.

5          MS. XUE:  Yes, Your Honor.

6       Before I move to step 2, may I address two of the

7    arguments that MyPort has made in step 1 in terms of what they

8    believe the patent is directed to?

9          THE COURT:  Certainly, counsel.  This is your

10   motion.  I want you to present whatever you think you need to.

11         MS. XUE:  Okay.  So MyPort has made a couple of

12   arguments and theories about what the patents indeed are

13   directed to, and I would like to address two of the arguments

14   here.

15      And one of the arguments is that the inventions are

16   directed to saving storage space by using image tagging as

17   opposed to sorting images into folders, and I would submit

18   that this is a red herring argument because that's simply

19   nowhere in the patent or the existing prior art.  The patent

20   made it clear the goal of the patent is to speed it up for

21   image tagging, not to invent image tagging to replace

22   something that's originally in the art.  So Mr. Malone didn't

23   invent the idea of image tagging for this purpose.

24         THE COURT:  All right.

25         MS. XUE:  And then the second argument I would like

1    to address is MyPort's argument that the claims are directed

2    to solving the problem of when you transport or transmit the

3    files -- the images from one computer to another, the tags or

4    index information may be lost in that process.  And that is a

5    problem that was described in the patent.  That's one of the

6    problems in the prior art.  But none of that benefit is

7    captured in the asserted claims.

8         So if I may just put the language back up on the elmo,

9    it's right here, and you'll see all the claim requires is the

10   media data converter to associate the tags with the digital

11   image and then store the digital image in association with the

12   tags in the internal storage of the capture device.  So

13   that's, you know, storing information in the memory of a

14   mobile phone.  It doesn't say anything about when you send the

15   digital image out of our mobile phone does the tag go with it

16   or not.  It's completely silent on transmission or keeping the

17   information together during the process of transmission.

18        So with respect to step 2 of the *Alice* analysis, the idea

19   of *Alice* step 2 is you look at the claim -- if Your Honor

20   believes that the claims are directed to an abstract idea,

21   then at step 2 you look at the claim and see if there's

22   anything additional, any additional element that's outside the

23   realm of the abstract idea that could possibly salvage the

24   claim.  And there is none.

25        Myport does not dispute that the microphone and cameras

1    are conventional, well-known components.  And between MyPort's

2    two experts and Mr. Malone himself, they have admitted that

3    each of the software components such as the confiner, the

4    first data converter, the media data converter, they're all

5    conventional software or hardware components that just perform

6    the functions that are recited in the claim.

7        And those functions are conventional computer functions,

8    such as turning audio into digital -- turning sound into

9    digital audio or associating information or performing image

10   recognition or performing speech-to-text conversion.  All of

11   that Mr. Malone didn't invent.  They are all conventional

12   activities that already existed in the realm of technology.

13       And Doctor Bang, who is MyPort's expert, admitted that

14   the first data converter was conventional and well-known.  And

15   we have some evidence showing that the media data converter

16   was also well-known.  The image recognition and the speech

17   recognition was well-known in the art at the time.  And

18   Mr. Malone certainly didn't do anything to improve on those

19   technologies.  His patent just referred to those technology as

20   something that may be used to automate the process, and he

21   hasn't even used the speech-to-text software that was referred

22   to in the patent.  He merely heard of it and decided to

23   incorporate as a reference.

24           THE COURT:  The fact that these elements are

25   pre-existing and well-known, how does that fact preclude the

1  possibility that the combination and use of those prior

2  elements, those well-known elements, doesn't yield something

3  creative, innovative, inventive that gets you past step 2 of

4  the *Alice* analysis, or at least for summary judgment purposes

5  raises a fact question about it?  Just the fact that those

6  elements together were known before the patent was issued

7  doesn't necessarily foreclose the step 2 question, in my view.

8         MS. XUE:  Yes, Your Honor.

9     My comment to that would be the step 2 analysis requires

10 the Court to look at the claim and anything that's not already

11 an abstract idea.  So the first data converter and the second

12 data converter, when you put them together all they're doing

13 is doing speech recognition and image recognition and then

14 image tagging.  All of them are abstract ideas that humans

15 have been practicing for a long time, because it was just

16 taking human voice and turning it into digital audio and turn

17 that digital audio into text files and doing recognition of

18 the images.  None of that are new, and Mr. Malone didn't

19 invent any of that technology.

20    Now, if we're going to combiner -- as I said at the

21 beginning, the combiner is a limitation that appears only in

22 claim 6 of '017 Patent, and it doesn't really appear in the

23 remaining of the patents.  And the combiner is a random piece

24 of software that just creates an association between the image

25 and the file and the audio file.  It doesn't really do

1    anything or create any benefit from it.  It's an insignificant

2    limitation that's added to the claim.

3              THE COURT:  All right.  What else do you have for

4    me?

5              MS. XUE:  Just the final slide of some case law

6    showing, you know, when you're doing the step 2 analysis, the

7    court typically exclude the consideration of whatever's the

8    component of the abstract idea and, you know, just using the

9    natural consequence of carrying out the abstract idea, which

10   is what MyPort's patents are about is insufficient to take it

11   out of the realm of abstract idea.

12             THE COURT:  All right.  Thank you for your argument,

13   counsel.

14        Let me hear from the Plaintiff in response, please.

15             MR. LORD:  Good morning, Your Honor.

16        We have slides.  May I approach and present them to you?

17             THE COURT:  You may.

18             MR. LORD:  How many slides would you like?  Is four

19   copies okay?

20             THE COURT:  One copy for me is fine.  What you do

21   with the rest of them, I don't care.

22             MR. LORD:  Good morning, Your Honor.

23             THE COURT:  Good morning again.

24             MR. LORD:  I'm going to go through slides and

25   respond to counsel's argument.

1     The claims of the asserted patents provide a technical

2     solution to a technical problem that's directed to the

3     improvement of computer functionality.  The claims are not

4     abstract under *Alice*, Your Honor.

5     We placed a slide here which is the cover page of the

6     '017 Patent, and you can see the title of the invention.  Now,

7     the title of the invention is intrinsic evidence.  It's the

8     essence of the invention, and I'd like to read it for Your

9     Honor.  The title of the invention is "An apparatus for

10    personal voice assistant, location services, multimedia

11    capture, transmission, speech-to-text conversion, photo/video

12    image/object recognition, creation of searchable meta tags,

13    contextual tags, storage, and search retrieval."  Counsel

14    characterizes this invention as creating tags, but as you can

15    see just from the title alone, image tags is a part of the

16    invention; it's not the whole invention.  There are other

17    inventive aspects.  This is the '017 Patent.

18    If you turn to -- let's go to slide 4, Mickey.

19    The '067 Patent has the same title, and you can see the

20    inventors, Mr. Michael Malone, the sole inventor.  And if you

21    look at the next slide, you'll see the same title for the '066

22    Patent with the same inventor.

23    Now, if you go to the next slide, I mentioned earlier

24    that the patents provide a technical solution to a technical

25    problem.  So it's important to look at, well, what were the

1   problems at the time of the invention.  The time of the

2   invention here is 2007.  They don't dispute that.  So if you

3   go back in 2007, what were the technical problems in this art?

4   The patent explains that.

5        So if you look here on claim 2--this is the '017 Patent,

6   which is Exhibit 2--identifies the first problem is the

7   ability to store unlimited number of media files.  And so

8   Mr. Malone recognized that with the advent of the smartphone

9   there's going to be unlimited number of photos, and how can we

10  categorize and organize them.  The way the prior art had done

11  it was to take them with -- manually make tags and put them

12  into different folders.  So you have a photo with a dog and

13  you put that in your animal folder, and you have a photo with

14  a boot and you put that in the shoe folder, and so forth.  So

15  you're creating all these different folders and you're

16  duplicating; you're duplicating the photos into different

17  folders, and that's unworkable.  That's one problem that

18  existed in the art in 2007, as described here in the patent.

19       The second problem was that users upgrade their computers

20  all the time, and so were you to transfer your file or images

21  to another device, you would lose any tags that were created.

22  That's the second problem that the patent identifies.

23       If you go to the next slide.

24       There's two more problems.  The third one is similar

25  about transferring files, and the fourth one really highlights

1    it about the tags being removed when the images are

2    transferred from one device to the next, and the receiving

3    party would not have the ability to search for the photos

4    after they're transferred.

5        So these are the problems that the patent identified in

6    the 2007 time frame.

7        So what's the solution?  I picked up claim 13.  Your

8    Honor was correct that their motion was unclear as to which

9    claims were representative, but they did talk about claim 13,

10   so we can focus on claim 13 or claim 6.

11       If you look at the next slide, Your Honor, which is slide

12   8, this is claim 13 of the '017 Patent.  You'll see there's

13   six elements on how to solve the problem.  It's not just

14   tagging images, as counsel has characterized the invention to

15   be; it explains how to do it.  And if you look at the

16   preamble, it's a system for capturing image and audio

17   information.

18       So the first element, internal storage, that's important

19   because the patents discuss how to save storage space and

20   eliminate redundant storage.  The second and third are

21   elements are just the microphone and the camera.  Then you

22   have the first data converter which processes the external

23   audio information, which is the voice, and then converts it

24   and stores the image.

25       Then you have the second data converter which creates a

1    searchable text context tag in addition to creating an image

2    tag, and then associates those tags with the images.  And then

3    the last step you have the storage--or the last element,

4    rather--that stores the image in association with the text and

5    image tags.

6        If you go to the next slide, it actually -- we created

7    the slide to summarize the technical solutions as claimed by

8    the patents.  It allows the users to more quickly tag the

9    their images in a searchable format and actually use the

10   phone.  So it improves the functionality of the phone as an

11   image storage and retrieval device.

12       THE COURT:  Let me ask you this, counsel.  Are these

13   arguments directed to step 1 or to step 2?  Because, quite

14   honestly, it sounds like what you're arguing to me is more

15   about something new and inventive coming out of this process.

16   For example, saving the tags and keeping them from being lost

17   when they're transferred from computer to computer is not

18   something that existed under the Dewey Decimal System and the

19   card file catalog in the old library that Defendants used as a

20   demonstrative; it's something that didn't exist then, and may

21   have been, in fact, something new and inventive that came out

22   of this patent.  But that's step 2, and I'm not sure that

23   that's really what you intend this to go to.

24       Can we try to categorize the arguments as to whether they

25   are aligning to step 1 or step 2 or, if possible, both at the

1    same time?  But try to steer me in the direction you're

2    arguing, if you will.

3              MR. LORD:  Sure, Your Honor.  Yes, I think these

4    elements improve the functionality of a computer, which go to

5    step 1; but Your Honor is right--they also claim inventive

6    aspects which show that they're not well-understood, routine,

7    or conventional, which go to step 2.  But let me separate them

8    out.  So we can start with step 1.

9         You can go to slide 14.  Okay.  So if you look at the

10   next slide.

11        So how does the invention improve the functionality of

12   a computer, which is a test for step 1?  It uses image

13   recognition to create image tags that improves the

14   functionality of the computer, it improves search and access,

15   save storage space, and allows the associating files with key

16   index words.  And we cited in our brief expert reports from

17   our expert, expert testimony from Samsung's expert, Malone

18   testimony, even a Samsung 30(b)(6) witness Mr. Shin who

19   acknowledged that its saves storage space, and those are cited

20   in our brief.

21        If we go to the next slide.

22        Samsung mentioned that this -- in the brief that this is

23   just collecting data and tagging images.  The patent claims

24   are much more specific than that.

25        Go to the next slide.

1    We spoke about claim 13 before.  Trying to be as

2  efficient as possible, Your Honor, so I won't go through every

3  slide.

4          THE COURT:  Let me ask you this, Mr. Lord.  In most

5  of the cases that I've read where the Federal Circuit has

6  found that something was not primarily directed to an abstract

7  concept, step 1, the patent at issue has not only talked about

8  what to do but has given specifics about how to do it.

9      In reading these patents-in-suit, I see the 'what'; I'm

10  not sure I see the 'how to do it', and I'm not sure there have

11  been many cases where the Federal Circuit has affirmed a trial

12  court not finding an abstract concept without there being a

13  'how to do it' in the particular patent at issue.

14      Can you point me to where the 'how to do it' is in these

15  patents.

16          MR. LORD:  Sure, Your Honor.

17      So looking at this slide 2, claim 13 explains how to do

18  it.  You have a system so how do you create that system you

19  have a device that has internal storage, then you add a

20  microphone, then you add a camera, and then you add the first

21  data converter which is a combination of hardware and

22  software, we found these in the accused products, the

23  processing the captured audio information which is the human

24  voice stores it in a first digital audio format within the

25  capture device which is a smartphone here and then the camera

that also takes the image then you have the second data
converter this is how to do it.  It converts the audio to a
text based searchable as a text context tag that's how you do
it and then it creates automatically through AI or other
sources a image recognition searchable context tag so at this
point there's two tags there's the text context tag from the
human voice and an image recognition tag then that they aren't
associated with each other and attached to the image and then
are stored in association with the image in the tags.  This is
the claim language of course the specification provides more
detail but the claims do not just say tag images and move on
it explains exactly how to do it and the patent discusses that
at claim 13 at claim 6 an throughout the specification.

What Samsung is doing here, Your Honor, is what many
litigants do --

If we can turn to slide 19.

-- is that they're oversimplifying the claim language,
and the Federal Circuit has repeatedly admonished litigants
from doing that.  In the *McRO* case, which counsel cited, the
Federal Circuit stated against oversimplifying the claims by
looking at them generally in failing to account for the
specific requirements of the claims.  That's what Samsung's
doing here.

In the *Enfish* case, the Federal Circuit warned,
"Describing the claims at such a high level of abstraction and

untethered from the language of the claims all but ensures

that the exceptions to § 101 swallow the rule."  And there's

many cases.  Another one, the *Thales Visionix* case, "We must

articulate what the claims are directed to with enough

specificity to ensure the step 1 inquiry is meaningful."

And so describing the invention as just tagging images

like the Dewey Decimal System really doesn't do it justice

considering the level of specificity that's found in the

claims.

So we believe, Your Honor, that claim 1 and the inquiry,

there's no need to go to claim 2.  Of course we'd like to

address claim 2 as well.

So if you go to the next slide.

We'll talk about step 2.  Claim 6 and 13 are similar.

Claims 6 adds a combiner, which we spoke about -- which

counsel spoke about.  Our arguments in the brief is that the

combiner is not well-understood, routine, or conventional.  We

have expert testimony on that.  We have evidence on that.  If

anything else, this is a question of fact, we believe, Your

Honor, as to whether or not these elements are well-

understood, routine or conventional.

The IPR, for what it's worth--and this came up in the

motion to stay--identified the combiner as an element to hold

that it would not be reasonably likely to prevail with respect

to certain arguments.  So if you look at the claim as a whole,

1    it's not well-understood, routine, or conventional.

2        One thing I'd like to mention, Your Honor, about

3    components --

4        If we can turn to slide 26, please.

5        Counsel did put up on the elmo various components saying,

6    Well, this is -- a microphone's been around, and Mr. Malone

7    didn't invent the microphone, and so forth, and Samsung argued

8    the same in its brief that this invention is implemented using

9    only generic computer technologies, cameras and microphones

10    were conventional, and so forth.  The Federal Circuit has

11    recognized these arguments and really dismissed them.  This is

12    the *Cooperative Entertainment* case where the defendant argued

13    that the patents, "Do not claim anything inventive because the

14    P2P networks are -- and CDNs are conventional."  The Federal

15    Circuit said that this argument --

16            THE COURT:  Slow down a little bit, please.

17            MR. LORD:  Yes, Your Honor.  I apologize.

18        The Federal Circuit stated that "useful improvements to

19    the networks are patentable regardless of whether the network

20    is comprised of standard computing equipment."

21        So just looking at the components individually doesn't

22    satisfy any of the *Alice* test.  You need to look at the

23    invention as a whole.  And even if some of the elements are in

24    isolation generic does not mean that the invention or the

25    ordered combination as a whole was not well-understood,

1    routine, or conventional.

2         Slide 24, please.

3         I brought this case up, Your Honor--it's cited in our

4    brief--is that it's not just the claims, it's also the

5    specification that can recite an improvement.  And so here the

6    Federal Circuit said the claims and the specification recite

7    an improvement.  So even though we've just been looking at the

8    claims, the patent specification, which we showed earlier, do

9    contain inventive concepts, and it's not just an inquiry of

10   the claims; you can look at the specification as well, Your

11   Honor.

12        Just quickly, two last slides.

13        If we can go to slide 23, please.

14        So the *Berkheimer* case is interesting, Your Honor,

15   because this case --

16             THE COURT:  I've read this case several times.

17             MR. LORD:  Okay.  Well, Your Honor's familiar with

18   this case.  And one of the elements that the Federal Circuit

19   found was the ability to save storage space and reduce

20   redundant storage as an element to be considered inventive.

21   And here we have that same idea, Your Honor.  We have the

22   patents benefit save storage space and eliminates redundant

23   storage.  So you have a very similar type of improvement to

24   the system that the Federal Circuit found to be eligible in

25   *Berkheimer*, and we submit the same should occur here, Your

Honor.

I have other slides, but I understand -- I believe you understand our argument.  If you have any other questions, I'm happy to address them.

THE COURT:  I don't have additional questions at this point, counsel.

MR. LORD:  Thank you, Your Honor.

THE COURT:  Anything further from Samsung on this?

MS. XUE:  Yes, Your Honor.

THE COURT:  What additional have you got for me, counsel?  I don't want to hear the same thing argued over again.  Something new, something you haven't argued before I'll be happy to hear.

MS. XUE:  Your Honor, I would just like the opportunity to respond to some of the things that Mr. Lord had argued.

THE COURT:  Go ahead.

MS. XUE:  Provide a direct response.

Because Mr. Lord argued a lot of things, so it will probably be some -- quite some rebuttal, if that's okay with Your Honor.

THE COURT:  Well, let's see where it goes.  'Quite some rebuttal' is fine if it's five or six minutes; 'quite some rebuttal' is not fine if it's five or six hours.  We don't have time for that.  So you start, and if I have a

1  problem I'll stop you.

2            MS. XUE:  Please feel free to.

3            THE COURT:  Don't worry; I do.

4            MS. XUE:  Your Honor, counsel for MyPort has put up

5  the specification, the title of the claim of the patent, and

6  put up some language from the background section of the patent

7  saying the patents are directed to this problem, that problem

8  in the prior art, but the problem is the MyPort patents, the

9  three patents that are asserted in this case, came from a long

10  history of at least 10 patents that have the same

11  specification.  So not all of the aspects that are described

12  in the specification are captured in the claims that are

13  asserted here.  And I haven't seen Mr. Lord pointing to the

14  claims to show that, for example, how that shows transmission

15  of files.  That's simply not in any of the claims.

16       And as I've already said in my opening argument, the

17  claims are also not directed to addressing the problem of

18  inventing image tagging in replace of sorting images into

19  folders.  That simply did not exist anywhere.

20            THE COURT:  Let me save you some time.  I'm going to

21  make my decision based on the claim language and the

22  specification, not the title of the patent.

23            MS. XUE:  Thank you, Your Honor.

24       And I would also like to address this slide that says the

25  patented invention improves the functionality of a computer.

1    And as you'll notice if you go through each of the benefits,

2    use of image recognition to create image tags, that's an

3    abstract idea of image recognition.  The second one improves

4    search and access.  That's a result of image tagging.  The

5    third one save story space, I've already addressed that.

6    That's not a benefit of anything that's claimed in this case.

7    And the fourth one, allowing associating files with key index

8    words, I think this may be talking about image tagging;

9    tagging of images with index words.  So all of these are one

10   of the abstract ideas that we've already addressed in my

11   opening.

12       And in response to Mr. Lord's argument about Samsung's

13   brief about collecting data, and the patent claim doesn't

14   mention collecting data, but the patent does -- claims does

15   mention capturing digital images and capturing voice and

16   that's collecting data.

17       And I believe Your Honor asked the question during

18   Mr. Lord's argument about how Mr. Malone's patent have

19   improved anything, how it has improved the way, you know,

20   speech-to-text conversion or image recognition has been

21   conducted, and the answer is there is none.  The entirety

22   of the patent specification describing those speech-to-text

23   conversion or image recognition are captured in two little

24   paragraphs, that I would like to put on the elmo now.

25               THE COURT:  This is column 7 and 8 of the patent?

1          MS. XUE:  That's correct.

2      So one place is here, it says one type of audio-to-text

3  converter, and it has an example of Dragon Naturally Speaking

4  system, and Mr. Malone has testified in deposition that that's

5  something he heard of and he has never used, and he

6  incorporated it in these patents as simply a form of

7  reference.

8      Okay.  The other place where it actually talks about

9  speech-to-text image recognition is in column 5.  So it's this

10  paragraph.  It talks about "equipment analyze the data

11  elements" -- that's in column 5 starting from row 47.

12  "Equipment analyze the data elements, for example,

13  photographs, and create a set of appropriate tags."  So here

14  is the patent, how it talks about speech-to-text recognition

15  and image recognition.  It says, "for audio files, this may

16  include a speech-to-text algorithm for still or moving images.

17  It may include image recognition and identification."  And it

18  keeps talking about it, and then it goes to about line 55, it

19  says, "presume that image and voice recognition improve, this

20  task can be fully automated and, therefore, the preferred

21  embodiment is to have the task automated."  That's the

22  entirety of the patent's description about the speech-to-text

23  conversion or image recognition technology.

24      Mr. Malone -- so this shows Mr. Malone hasn't done really

25  done any improvement to, you know, these technologies at all.

1          THE COURT:  All right.  What else?

2          MS. XUE:  I will try to hurry up.

3      So Mr. Lord had argued that the combiner element that

4  appeared in claim 6 is something that's not conventional, but

5  our argument would be that the combiner, which the patent

6  talks about, is something -- a software element that

7  associates the image files with the audio files, and that's

8  all it does.

9      And associating image with audio is something that humans

10  have always been doing because our brains are naturally

11  adapted to associate image with sound.  If we're looking at a

12  campfire and we hear the sound of the fire, we naturally

13  associate and we understand where that sound comes from.

14      And another example is movies.  Every movie is an

15  association of images with sound so that they can be

16  coordinated to describe the same scene for the viewer.  So

17  associating images with files is something that's -- you

18  know, human have been doing and it's conventional and

19  well-understood and routine.

20      I would also like to respond to some of the case law that

21  Mr. Lord had argued.

22          THE COURT:  I've read the cases in the briefing.  I

23  almost -- I stopped him on one of them.  We don't have time to

24  go through all the cases.  If you have something else, I'd be

25  happy to hear it, but you can assume I'm familiar with the

1    case law cited by both sides.

2         MS. XUE:  I believe I've gone through all my

3    responses.

4         THE COURT:  All right.

5         MS. XUE:  Thank you, Your Honor.

6         THE COURT:  Thank you, counsel.

7       With regard to Document 122, Defendants' motion for

8    summary judgment of invalidity under 35 U.S.C. § 101, after

9    considering the briefing and the arguments of counsel, the

10   Court's persuaded that these patents are primarily directed

11   under the step 1 analysis to something that is functional and

12   perhaps an improvement over prior human conduct, but not

13   something that deviates from prior human conduct to an extent

14   that would keep it from being primarily directed toward an

15   abstract concept, so I conclude that these patents are

16   primarily directed toward an abstract concept under step 1.

17      However, as to step 2, I think there is a material

18   question of fact as to whether or not these patents result in

19   something that is unconventional, new, inventive, and I am

20   persuaded that that is an issue that must be resolved by the

21   fact finder and not the Court, and I don't think it's

22   appropriate to grant summary judgment on that basis.

23      So the motion is granted as to step 1, but it's denied

24   as to step 2.  And the step 2 issue is something that I think

25   is appropriate for submission to the jury at the conclusion of

1    a trial.  So that's how the § 101 issue is going to be

2    handled.  And that will be the Court's ruling on this motion.

3         So with that, let's move to Samsung's motion for summary

4    judgment on marking.  That's Document 117.

5         And let me hear argument from Samsung on this, please.

6         MR. SOMMER:  Good morning, Your Honor.  Andrew

7    Sommer from Greenberg Traurig on behalf of Samsung.

8         THE COURT:  Please proceed.

9         MR. SOMMER:  Thank you very much.

10         There is no question that these patents were licensed by

11    MyPort to Motorola Mobility, Inc., in November 2011.  I

12    believe that MyPort actually contests the fact because there's

13    a long and complicated prosecution history, but insofar as

14    there is any dispute, and we submit, Your Honor, there is

15    none, that's a question for the Court to resolve as a matter

16    of contract interpretation.  And the contract is clear.  It

17    says that MyPort IP patents as listed in the agreement are

18    licensed, and any continuations of them, all three patents,

19    are continuations of the listed patents.

20         THE COURT:  Now, with regard to the three

21    patents-in-suit, only the '017 and the '067 are challenged

22    under the marking statute.  Correct?

23         MR. SOMMER:  That is correct.

24         THE COURT:  The '066 is wholly method claims?

25         MR. SOMMER:  That is correct, Your Honor.

1          THE COURT:  Okay.

2          MR. SOMMER:  So this motion is limited entirely to

3    the '017 Patent and the '067 Patent.

4          And, you know, for the -- kind of the first point in this

5    whole thing is a patent -- a patentee and its licensees must

6    ensure that they've complied with the obligation to mark if

7    they practice the patent.  And so point one is Motorola

8    Mobility is a licensee, so it falls under the ambit of the

9    statute, and Motorola needed to mark any patent practicing

10   products, or a substantial number of them, with the numbers of

11   these particular patents.

12         The briefing then goes on to say, Look, there is no

13   dispute that we identified 14 specific models of Motorola

14   products that based on the allegations of infringement in this

15   case needed to be marked.  There is no evidence whatsoever

16   that there has been any marking by Motorola Mobility.

17         Now, MyPort's response to this is, well, look at the

18   agreement.  There is this clause in the agreement that says --

19         THE COURT:  The no admission clause.

20         MR. SOMMER:  The no admission clause.  And there's

21   four cases that they cite about this no admission clause, and

22   I think those cases are readily distinguishable, but I think

23   we can start with the clause itself and what it says.  It

24   says, "The terms, provisions, and payments set forth in this

25   agreement shall not be construed as an admission by Motorola

1    Mobility that it is infringing."

2           THE COURT:  Let me ask you this, counsel.  Are you

3    taking the position that this no admission clause is not

4    applicable to these continuation patents because they hadn't

5    issued at the time of the license agreement?

6           MR. SOMMER:  Yes; absolutely, Your Honor.  That is a

7    position that we've taken in the briefing.

8           THE COURT:  So on the one hand you're telling me

9    that the obligation to mark applies to these continuation

10   patents that weren't issued and weren't in existence at the

11   time the original license to Motorola Mobility was given, but

12   on the other hand you're telling me that a provision in that

13   license agreement doesn't relate back to the continuation

14   patents that were issued at a later date because they weren't

15   in existence then.

16      It seems like to me you're blowing hot and cold at the

17   same time.  You're telling me this part of the Motorola

18   license applies back, the obligation to mark, but this other

19   part of the Motorola license doesn't apply to the future

20   issued continuation patents because they didn't exist then,

21   and I'm not sure how you can argue that both ways.  It seems

22   inconsistent to me.

23          MR. SOMMER:  So, Your Honor, the way that we'd

24   resolve that apparent inconsistency is that the license

25   granted at the time, those rights are fixed.  Right?

1    Motorola, regardless of what patents come into existence

2    later, they had these rights.  This agreement provided them

3    those rights.  So as those patents came into being, Motorola

4    couldn't have known what they said so they couldn't have made

5    any kind of a judgment call one way or another whether they

6    infringed it or not.

7        So the no admission clause can't relate back six years to

8    what Motorola said in the agreement.  But I think actually if

9    you read the language of the agreement, we're not using it as

10   an admission of infringement.  We are not doing anything that

11   runs afoul of the no admission clause.  And why not?  Because

12   we have evidence that in 2021 Mr. Malone was saying, Every

13   Android manufacturer in the country is infringing my patents.

14   I don't need Motorola to admit or to do anything, tacit or

15   otherwise, to say that they're infringing.

16       This is in the record at my declaration Exhibit 5.

17   There's a list.  It includes all of the patents-in-suit, and

18   it says, "a partial list of the companies that are infringing

19   my patents:  All the U.S. Android smartphone and tablet

20   manufacturers, Google Photos."  I don't need the agreement to

21   admit that Motorola is infringing or not; I have Mr. Malone's

22   words for it.

23       And because of that, we think those cases that are cited

24   in the briefing are inapposite, because if you look at what's

25   going on in those cases, those cases were a situation where

plaintiff sues for patent infringement, results in a

supplement, the settlement says, I don't admit liability; I'm

just resolving the case. That's fine. The later defendant

comes along and points to all of that and said, Well, you said

their products patent -- practice the claims and then there's

a license. You need to now go and show that all those

licensed products under that agreement from that prior lawsuit

are marked, and the courts have fairly uniformly said, No, no,

that's not how it works. That's not what we're doing here.

This agreement was entered into in 2011. We're not

pointing to any products in 2011 that were practicing the

patent. These are products from 2017 to 2022 that Motorola

Mobility was selling on the open market while Mr. Malone was

saying they infringed his patents. So that's the distinction

that I would make on the no admission clause.

THE COURT: Well, I'll just say this. I don't think

you have a good argument that the no admission clause doesn't

apply to these continuation patents because they weren't in

existence at the time of the original license. That's not

persuasive. And I don't think you can take part of the

original license and apply it and part that you don't like and

not apply it.

But I'm not, on the other hand, at all saying that a lack

of an admission is the same thing as an affirmative statement

of non-infringement, and so I think there's an argument as to

whether this no admission clause does or doesn't save the

Defendant--excuse me--the Plaintiff here, but I don't think

there's a good argument that it doesn't apply at all.

So I'd really want to hear your arguments on why it

doesn't save the Plaintiff with its application, because,

quite honestly, you're not going to persuade me that it

shouldn't apply in the first place.

MR. SOMMER:  Understood, Your Honor.  And I

appreciate the feedback.

In terms of the actual language of the provision, number

one, all it says is, We don't admit liability.  So we're not

actually using it -- the agreement itself or otherwise, as an

admission of any form of liability.  That's not why it's in

the record.  It's simply in the record to show Motorola

Mobility has a license to these patents.  Right?  And

therefore, the marking obligation at least should be, you

know, triggered.  Right?

And so when we listed out under *Arctic Cat* these products

based on the definition of accused products in this case that

every product that includes a microphone and speech

recognition and a camera and photo management software

infringes the patents, we got documents showing that

Mr. Malone was out there saying Google Photos which is on

these Motorola phones and Android phones, they all infringe,

they had to come back with some evidence because it's not our

1    burden to prove the lack of marking; we just have to identify

2    products that we contend should have been marked.  And we did

3    so; we identified them by model name.

4        So in terms of the evidentiary record on this particular

5    issue, we think that that at least flipped the burden to the

6    Plaintiff to come forward with some evidence as to whether or

7    not these products were marked.  And there is no evidence.  In

8    fact, Doctor Balakrishnan, and I'm not exactly sure why this

9    is in his report, but he claims he did no analysis of Google

10   Photos or any Google software to figure out if there -- if

11   they practiced the patents or not.  I'm not sure why that's

12   there, but it's a gratuitous admission, in our view.

13       In terms of practicing the claims, there is some debate

14   in the briefing over whether or not there was a marking

15   obligation as to claims 6 and 13 that are asserted in the

16   case.  But kind of rewinding the reel here back to the

17   beginning of this case when infringement contentions were

18   served last September--or September 2022 at this point--claim

19   1 was asserted as well.  Claim 1 got disclaimed as a result of

20   proceedings at the Patent Office.  But nevertheless, under

21   Federal Circuit precedent, the *Rembrandt* case, they have to

22   prove that that product did not practice that claim either,

23   and there's no argument in the brief whatsoever about claim 1.

24       There are statements in MyPort's briefing that suggest

25   that whether adequate notice under *Arctic Cat* was provided

1    is -- you know, results in a question of fact.  As we

2    understand the *Arctic Cat* decision, this is not a burden of

3    proof or something that we need to have the jury get an

4    instruction on, Did you provide sufficient notice to the

5    Plaintiff in order to trigger their obligation to produce

6    evidence on this issue; this is a minimal burden set forth by

7    the Federal Circuit in the *Arctic Cat* case that says all we

8    need to do is identify the products that we contend should

9    have practiced the patent.  It's not a question for the jury.

10              THE COURT:  I don't disagree with that.

11              MR. SOMMER:  And then there is one argument at the

12   end of the opposition that says, you know, how could the

13   statute require Mr. Malone to mark in this particular scenario

14   given that the patents hadn't issued.  And really if you look

15   at the purpose of the marking statute to begin with, it's a

16   public notice function.  Right?  It's a public fairness,

17   public notice; if you're not going to provide constructive

18   notice for your patents and you're not going to require at

19   least your licensees to mark a substantial number of their

20   products, whatever that happens to be, here we have none, so

21   none can't be a substantial number if there was no effort

22   whatsoever made to try to mark any of the products.

23        The question is answered by the statutory language, Your

24   Honor.  Patentees and those making products under them have an

25   obligation to ensure that their products are marked.  And

1  absent that, you need to provide actual notice to the

2  infringer, and that actual notice came to Samsung two days

3  before this lawsuit was filed.  So we think that that question

4  isn't one for the jury either; it's resolved based on the

5  plain language of the statute.

6       So unless Your Honor has any other questions.

7          THE COURT:  What in your understanding and your

8  reading of the briefing from the other side, beyond the no

9  admission clause from the license to Motorola Mobility, what

10 other comeback does MyPort have to their failure to ensure

11 some type of marking takes place?  Is it simply the no

12 admission clause or is there something more here?

13         MR. SOMMER:  So the way that I view the briefing,

14 Your Honor, is the no admission clause is kind of their

15 overarching thing that they've identified as the thing

16 defeating the motion.  We disagree for the reasons I've

17 already stated, but they have also pointed to factual matters

18 regarding claim 6 and 13.  There is some witness testimony

19 about how Google Photos works and sends things off to a server

20 to do image recognition, and I think they contest that they

21 -- that there's actually practicing of those claims by

22 Motorola or Google.

23      They also raise an issue about whether Google is

24 licensed, but for the purposes of my argument here today, I

25 think it's sufficient that one licensee has not marked any

products, and that they're not going to try to show that

Google licensed any products.  There is a debate through their

brief about is Google licensed at all.  I don't think you need

to resolve that to resolve our motion.  I think you can

sidestep that and look solely at Motorola, unless they're

going to come and say, Yeah, we actually -- you know, either

Google is not licensed so it's irrelevant, which is what

they're saying, or Google marked a substantial number of their

products so we're in the clear, that would change the game,

too, but that's not what they're saying.

THE COURT:  All right.  What else do you have for

me?

MR. SOMMER:  That is it, Your Honor.

THE COURT:  All right.  Let me hear from MyPort in

response.

MR. SOMMER:  Thank you.

MR. LORD:  Good morning, Your Honor.

The slides I previously approached to the bench, there's

a few slides on this issue, so slide 30 is also in your

packet, Your Honor.

So here Samsung's entire marking defense and MSJ rests on

the MMI license, which is the Motorola Mobility license.  And

Your Honor was correct.  This no admission clause we believe

does apply to continuation patents.  It's listed here at

paragraph 4.  You asked counsel what else is there besides the

1   no admission clause, and he said, Well, Mr. Malone;    Mr.

2   Malone testified that Motorola and Google infringe his

3   patents, but that's not what he said.

4        If you go to slide, please, 33.

5            THE COURT:  Before you change slides, let's cover

6   the no admission clause in its entirety before we go on.

7            MR. LORD:  Sure.

8            THE COURT:  What is there about this clause,

9   assuming it does apply to these continuation patents, that

10  meets the burden you have here under *Arctic Cat* to show that

11  you don't believe there's any infringement here; therefore,

12  there was no need to mark?  How is saying, We don't admit to

13  X the same thing as saying we don't do X?

14           MR. LORD:  Your Honor, if you look at *Arctic Cat*,

15  it creates a different definition for how the patentees ensure

16  compliance with licensees, and it talks about the rule of

17  reason.  And so here we have a licensee's compliance, which is

18  Motorola's compliance.  At the time of this agreement in 2011,

19  these patents hadn't even been applied for.  They didn't issue

20  until 2017.  And so when you talk about an authorized licensee

21  of the asserted patents, that obligation didn't exist until

22  the patents issued, and they didn't issue until 2017.

23       So the question under the rule of reason here is was

24  Mr. Malone -- what was Mr. Malone supposed to do six years

25  later when these patents issued.  They argue that he was

1  supposed to notify Motorola and determine if Motorola's

2  products practice these newly issued patents.  Actually I have

3  a slide on that, if you don't mind.

4       If we go to slide 31.

5       This is in their brief.  Samsung's argument is, "Instead,

6  once the '017 and '067 Patents issued and MMI was selling

7  products that MyPort said infringed those patents"--which

8  MyPort didn't say, but I'll get to that in a minute--"MyPort

9  was obligated to undertake reasonable efforts"--that's rule of

10  reason--"to ensure those products were marked.  It did not do

11  so, and § 287 precludes recovery."

12       There's no legal citation to this, and the reason why is

13  there isn't legal support for this.  They're arguing that when

14  these patents issued in 2017, Mr. Malone is supposed to call

15  up MMI and say, Hey, we just have these new patents; we want

16  to know if these MMI products, these Motorola products, are

17  practicing the patent; I need your source code.

18            THE COURT:  Well, before anybody calls up Motorola

19  Mobility, there's a communication from Samsung to MyPort that

20  says these are the products that we think are infringing or

21  these are the products that need to be marked, and they've

22  disclosed those to you in a fairly straight forward list.  So

23  it's not just that you have to call Motorola Mobility out of

24  the blue with a cold call; you've been put on notice under

25  *Arctic Cat* of Samsung's position as to what they believe the

1  products that would require to be marked, so you at least have

2  that knowledge.  And I'm not seeing any serious dispute that

3  Samsung didn't meet its relatively low burden to put you on

4  notice of that.  The real question is what happened after that

5  and what impact does this no admission clause have, as I see

6  it.  If you see it differently, you tell me.

7          MR. LORD:  Yes.  The no admission clause is

8  important and it is impactful.  This, Your Honor, predates the

9  litigation.  What Samsung is arguing is once the patents

10 issued in 2017, myPort was obligated to undertake reasonable

11 efforts.  And our point was under the rule of reason, because

12 there was a no admissions clause and because Mr. Malone didn't

13 have access to Motorola's code, there was really no way for

14 Mr. Malone or MyPort to identify whether even the Motorola

15 products were practicing the patent back in 2017.  That's what

16 I'm talking about.

17      I understand in this litigation, just this year actually,

18 or in 2023, myPort received identified products from Samsung,

19 but their argument is back when these patents issued Motorola

20 was -- MyPort was obligated to ensure those products were

21 marked.  But the only marked products if they practice the

22 patent, A, Motorola had a no admission clause that applied not

23 just to those patents but to the continuation patents, and Mr.

24 Malone is on record in his deposition saying that he doesn't

25 know, he never knew if the Motorola products practice the

1   patent.

2       And so under the rule of reason, there really isn't a lot

3   of case law on this when you don't have patents that were in

4   existence at the time of the agreement.  And so under *Arctic*

5   *Cat*, yes, there's --

6           THE COURT:  So what you're saying is that

7   subsequently-issued continuation patents that are on their

8   face licensed by the language in the Motorola agreement, which

9   specifically calls out continuations of the identified patents

10  as being licensed, that there could never be a marking

11  obligation on those continuation patents because at the time

12  of the original license the patentee of those continuation

13  patents in the future wouldn't know who to call or what to

14  say.  Is that --

15          MR. LORD:  That's not a general rule, Your Honor.

16  I'm talking with respect to this case.  And so this case you

17  have a no admissions clause, so Motorola has already admitted

18  they didn't practice the patents.  Plus, this is a software

19  patent, and so if it's a mechanical device or a medical device

20  or something that can be easily reverse engineered, then,

21  sure, the patentee has an obligation to look at the products

22  that are newly issued, look at the patents, and --

23          THE COURT:  How is the no admission clause an

24  admission that they don't practice the patents?  It's just a

25  statement, We don't admit anything.  How is it an affirmative

1    admission or statement that, We do something when, in effect,

2    it just says, We don't admit X, Y, Z or anything else.  I

3    mean, a statement that you are not admitting anything is not

4    the same as a statement that, We do not practice this or we do

5    not do that, as I see it.  That to me is the issue with your

6    no admission clause.

7           MR. LORD:  Well, and the no admission mentions the

8    word 'infringement', and it says, "this shall not be construed

9    as an admission by MMI of the infringement, validity, or

10   enforceability of the MyPort IP patents," so we do believe

11   when Motorola says, We aren't infringing your patents, it's

12   essentially, We're not practicing your patents--it's one and

13   the same.  It implies not just to the continuation patents

14   that existed in 2011, but to the future patents.  So I do

15   believe that it's more than just a non-admission; it's that we

16   don't infringe these patents that are in existence today and,

17   by extension, the continuation patents that were at issue

18   years later.

19       And so we believe the no admissions clause coupled with

20   Mr. Malone's testimony, which they didn't cite any deposition

21   testimony in their briefs, and there's a reason why, because

22   Mr. Malone was very clear that Google or Motorola did not

23   infringe its patents; they are citing to one document where he

24   identifies dozens of potential targets, but that's not

25   supported by the case law.  So if you couple that with what

1    was under the rule of reason -- because, again, we're not

2    talking about MyPort's own products; this is a licensee's

3    products.  And so *Arctic Cat* does -- if we can -- I know the

4    Court's familiar with the case, but it did say on -- at 1366,

5    "Recognizing that it may be difficult for a patentee to ensure

6    his licensee's compliance...the rule of reason inquiry

7    applies."  And so if you put that all together, Your Honor, we

8    believe that Samsung has not met its burden here, given where

9    we are.

10            THE COURT:  All right.  What else, Mr. Lord?

11            MR. LORD:  We did identify Google Photos.  There's

12   testimony from Samsung's witness that Google Photos needs a

13   server, and that does not practice claim 6, and so there is a

14   distinction we're making that not all the claims are practiced

15   by these products.  We understand that there's a split of

16   authority on that point, but it's something that we believe

17   could be important so we raised that in our brief.

18        And --

19            THE COURT:  We have a separate motion on the issue

20   of adding the server, don't we?

21            MR. LORD:  In part on the non-infringement, yes,

22   Your Honor.

23            THE COURT:  Okay.

24            MR. LORD:  It touches upon that.

25        I believe that's it, Your Honor.

1          THE COURT:  All right.  Thank you.

2      Anything further from Samsung, Mr. Sommer?

3          MR. SOMMER:  Very briefly, Your Honor.

4      So § 287(a) of the patent act doesn't beg of an exception

5  about, well, if the patents aren't mentioned or don't exist at

6  the time of the license, you get a freebie or you get a pass;

7  it says, Patentees and persons making or offering for sale or

8  selling within the United States any patented article for or

9  under them should mark, and if they don't, there is a

10  consequence.  It's not like they lose their patent, but they

11  haven't put the public on notice of their patent while there

12  are products that practice the patent out there in the

13  marketplace.  And that's the whole purpose of the statute.

14  It's a public protection statute.

15      So with that I'd like to just turn to the last point that

16  Mr. Lord made that said there was a split of decisions about

17  whether non-asserted claims need to be marked.  I've got two

18  responses to that.  First was, claim 1 was asserted.  It was

19  disclaimed.  It falls squarely within the *Rembrandt* case which

20  holds that claim did need to be marked; it was asserted before

21  it was disclaimed.  But secondly, Your Honor has also held

22  that the statute doesn't apply on a claim-by-claim basis; it

23  says mark with the patent number, and we believe that the

24  logic in that decision is sound.

25          THE COURT:  All right.  Thank you.

1          MR. SOMMER:  Thank you, Your Honor.

2          THE COURT:  Well, with regard to Document 117,

3     Samsung's motion for summary judgment of limitation on damages

4     for failure to mark, it's very clear that there is really --

5     as the Court sees it, there's no question that the '017 and

6     the '067 as continuation patents are licensed under the

7     Motorola license.  The license is clear about that.  It's also

8     clear that Samsung has put MyPort on notice of what it -- what

9     products it believes would be subject to that marking

10    obligation under the statute.  And it's also pretty clear that

11    MyPort has not undertaken to secure marking of those

12    identified products in any way.

13         The real question comes down to was MyPort obligated to

14    pursue that or were they excused from that because of an

15    assertion that the accused products don't practice the claims

16    and the patents that are at issue, and with regard to that

17    issue, it seems that Plaintiff substantially rests its

18    position on the no admission clause, which I do find relates

19    back to the continuation patents, just as the coverage by the

20    license reverts back to that date in the future when the

21    continuation patents issue.  But I cannot find that a lack of

22    an admission is the same thing as an affirmative statement or

23    assertion that we don't -- that our patents don't practice

24    those accused products.  And I think MyPort has failed to meet

25    that obligation under the statute and, consequently, I don't

1    see any alternative to granting Samsung's motion here, and I'm

2    going to grant the motion by the Defendants on the marking

3    statute, Document 117.

4        All right.  Counsel, it's a quarter till 12:00.  We're

5    going take about a 15-minute recess.  You-all may have to put

6    lunch off until some later time, but we're going to come back

7    about noon and start back on the next issue, which will be

8    Samsung's motion for summary judgment of non-infringement,

9    Document 128, and that will be the next item up.  But for

10   about the next 15 minutes we stand in recess.

11                        (Brief recess.)

12              THE COURT:  Be seated, please.

13        All right.  Trying to follow the same order as suggested

14   by counsel, let's turn to Document 128, which is Samsung's

15   motion for summary judgment of non-infringement.  Yes.  There

16   it is.

17        Let me hear from the moving Defendants on this first.

18              MR. PEASE:  Good afternoon, Your Honor.  May it

19   please the Court.  My name is Tom Pease.  I'm from Greenberg

20   Traurig on behalf of the Samsung Defendants.

21              THE COURT:  Mr. Pease, there looks like there are,

22   as I count them, five different subparts to this motion.  The

23   fourth one appears to be the one dealing with the camera

24   interfacing with the external image source, and that's what

25   I'd like you to focus on.  I may be satisfied I can rule on

1    the remainder of this based on the briefing, but I'd like to

2    hear focused argument on this particular dispute.

3              MR. PEASE:  Yes, Your Honor.

4              THE COURT:  I'm not trying to exclude your

5    well-prepared arguments on the rest of it, but I'm trying to

6    telegraph to you this is where I want to concentrate.

7              MR. PEASE:  Okay.  All right.

8        So Samsung has moved for summary judgment on the ground

9    that there's no interfacing of the camera.  The claims as

10   drafted--you know, it was drafted by MyPort--require a camera

11   interfacing with.  It doesn't require, as MyPort did in the

12   context of other limitations, a camera that is interfaceable

13   with.

14       It's pretty clear in the case law that when you talk

15   about something being interfaceable with, when you use that

16   phrasing of a limitation, you're talking about a capability to

17   perform a certain function.  In contrast, when you use the

18   language 'camera interfacing with', as MyPort chose to do

19   here, you're requiring that it actually be interfacing with.

20   And we've moved for summary judgment on that ground because,

21   as sold, these products are not interfacing in the way that

22   the claims require.

23             THE COURT:  And I assume that you don't appreciate

24   that there's really any dispute about that--that they do, in

25   fact -- that they do not, in fact, interface as sold.

1        MR. PEASE:  That's correct.

2        THE COURT:  And this is focused on, I guess, claims

3    6 and 13 primarily of the '017 and the '067?

4        MR. PEASE:  That's correct, Your Honor.  It does not

5    apply to the method claims of the other patent.

6        THE COURT:  Right.  The '066.  Yes.

7      Other than I'll call it the grammatical argument between

8    'interfaceable' and 'interfacing' on the surface of the claim

9    language itself, what's the remaining argument, if any, as to

10   why you think summary judgment's appropriate in this

11   particular.  Is there anything else other than, as any fool

12   can plainly see from the language, it requires that it

13   interface and it doesn't, end of story.  Is that your

14   argument, or is there more?

15       MR. PEASE:  I think there's a little bit more in the

16   sense that we're here on the eve of trial.  We went through

17   the *Markman* process.  These claims have been in existence for

18   quite a while now.  You know, MyPort never sought correction

19   of these patents to correct that language.  They didn't raise

20   this in *Markman*.  Right?  The legions of cases where parties

21   have said that this is obviously a typographical error and,

22   therefore, here is our evidence as to why you as part of

23   the -- your review of the intrinsic record should construe

24   claims a certain way, perhaps at odds with the way it was

25   drafted.  That ship in a sense has sailed.

1    THE COURT:  So are you arguing some kind of waiver

2  here?

3    MR. PEASE:  Not a waiver but, frankly, it's not

4  something they raised.  If they had -- if they wanted to argue

5  that this was an error, for example, that could have been

6  raised as part of *Markman* and we could have addressed it.  I

7  think in the end, though, our answer would have been the same.

8  They chose the language that appears in this claim and they

9  chose to draft it to require interfacing with an image source.

10    THE COURT:  Well, as much as I might like as a trial

11  judge to tell litigants you didn't identify it as an issue for

12  construction at *Markman*, therefore, you can't raise it later

13  in the case post-*Markman* and tell me there's a construction

14  issue I have to address, as much as I'd like to do that,

15  there's this little thing out there called *02 Micro* that tells

16  me I must do it.  And as much as I would prefer not to have

17  that burden, I don't see any way around it.

18    So the fact that it's been raised as it has,

19  post-*Markman*, maybe it could have been raised then maybe it

20  should have been raised then, but that doesn't give me a basis

21  to tell them it can't be raised now, that I'm aware of.  And I

22  think the Court has an obligation to address it whether it's

23  raised as a part of the *Markman* process, which is clearly

24  preferable, or whether it comes later in time, as it has here.

25    MR. PEASE:  And in that -- if Your Honor is inclined

1    to see it as an *02 Micro* issue that you're obligated to

2    resolve, then the question is are you able to resolve it on

3    this record.  Right?  We've addressed it from a

4    non-infringement standpoint based upon what the plain and

5    ordinary meaning of the claims as written says.  Right?  I

6    don't think we've attempted to -- I mean, maybe it reduces the

7    same set of evidence, but we weren't attempting to address it

8    from an *02 Micro* standpoint.

9            THE COURT:  I'm not trying to say that this is

10   solely and only a claim construction issue.  And I do tend to

11   agree with you, whether you call it that or you call it

12   something else, it seems to come down to the same body of

13   evidence.

14           MR. PEASE:  That's correct, Your Honor.

15           THE COURT:  But I guess what I'm saying in a round

16   about way is you can complain about the timing on this and you

17   can wring your hands that it's late in the day and should have

18   been done earlier, and maybe you're well-positioned to do

19   that--I don't think that moves the needle one way or the other

20   on the ultimate issue here.

21           MR. PEASE:  Understood, Your Honor.

22           MR. EDLIN:  Your Honor, I wonder if I might offer

23   one -- as relates to one of the arguments I have.  The other

24   way to look at this --

25           THE COURT:  Well, let me stop you, counsel.  I don't

1    have time for every lawyer in the room to jump in on another

2    lawyer's argument.  If this is Mr. Pease's argument, he's

3    responsible for this motion.

4           MR. EDLIN:  No problem, Your Honor.

5           THE COURT:  He's the one that's going to argue it.

6    If you want to come whisper in his ear or hand him a note,

7    that's fine, but he's going to present the argument.

8           MR. PEASE:  If I could provide some context for

9    that.  There's an overlapping argument here in the context of

10    one of the *Daubert* motions that Mr. Edlin was arguing.

11           THE COURT:  Well, and I understand that a lot of

12    what's at issue here seems to have been briefed in the *Daubert*

13    motion, yet here we have the summary judgment motion where at

14    least some of the lawyers have said, Well, I'll adopt my

15    argument from the *Daubert* motion in the MSJ.  So I understand

16    there's -- to be honest, these arguments really I think are

17    more better -- are better put forward in the MSJ than they

18    would in the *Daubert* context, but I agree they're in both

19    motions, but -- and there may be, you know -- I struggle with

20    the argument could I hear argument on this and the *Daubert*

21    motion at the same time, and I couldn't quite figure out how

22    to do it so we're doing them one at a time.

23           MR. PEASE:  Understood, Your Honor.

24           THE COURT:  When we get to the second one, I suspect

25    it to be short-circuited by what we did in the first one, if

1   that helps.

2           MR. PEASE:  Sure.

3           THE COURT:  So let's get back to the capability

4   issue here.  What else, other than the plain meaning of the

5   claim meaning that's before me, do you want to argue on this

6   issue?

7           MR. PEASE:  I know we made an argument -- I'm trying

8   to remember the briefs.  We made an argument based on the

9   *Parker Vision* case in the *Daubert* context, but I don't

10  remember the specifics of that argument.

11          THE COURT:  Let me suggest we do this.  Let me hear

12  MyPort's response on what's been argued so far and then I'll

13  give you an opportunity to come back, and if there's something

14  you haven't touched on you can raise it then.

15          MR. PEASE:  Okay.

16          THE COURT:  All right?

17      So let me hear response at this juncture from the

18  Plaintiff.

19          MR. RICKETTS:  Good afternoon, Your Honor.

20          THE COURT:  Good afternoon.

21          MR. RICKETTS:  Mickey Ricketts with Skiermont Derby

22  on behalf of Plaintiff MyPort.  May it please the Court.

23      With respect to the camera interfacing limitation, in

24  Plaintiff's view both 'interfacing with' and 'interfaceable

25  with' are drawn to capability, and we believe that this is

1    supported by clear Federal Circuit precedent, such as the *DINT*

2    case we cited in the briefing which makes clear that claims do

3    not need to use any particular grammatical format in order to

4    determine whether they are drawn to capability or require

5    actual performance.  And further, the Federal Circuit has said

6    that the mere use of present tense language, such as

7    'interfacing' that we have here, is not sufficient to require

8    that a claim--or, excuse me--is not sufficient to show that a

9    claim requires actual performance.

10        And, in fact, in the *INVT* case the Federal Circuit

11   addressed its own opinion in *Cross Medical*, which is one of

12   the chief cases that Samsung relies on.  And in the *INVT* case,

13   and that is at 46 F.4d 1372, the Federal Circuit confirmed in

14   *INVT* that its decision in *Cross Medical* was based on the words

15   in the claim 'operatively joined' and its determination that a

16   POSITA would have understood that claim language 'operatively

17   joined' to require actual performance, and that is why they

18   held that the medical anchor at issue in *Cross Medical*

19   required actual connection between the lower bone interface

20   and the bone segment.  It was because of those words

21   'interface operatively joined to'.

22        We don't have that here, Your Honor.  We have a claim

23   that says 'camera interfacing with an image source'.  The

24   claims do not recite 'a camera operatively interfacing with an

25   image source'.  And so we believe that under the clear Federal

1   Circuit precedent, the mere use of a present tense term such

2   as 'interfacing' is not enough to say that 'camera interfacing

3   with' requires something more than a camera with the

4   capability of interfacing with an image source.  And that has

5   consistently been MyPort's position throughout this case that

6   the mere existence of a camera on the accused devices, Your

7   Honor, satisfies this limitation because those cameras are

8   capable of interfacing with an image source to capture an

9   image therefrom.

10          THE COURT:  So you're telling me that a microphone

11  interfaceable in this earlier element and a camera interfacing

12  with an external image source in the next element are

13  effectively the same thing?

14          MR. RICKETTS:  Yes, Your Honor.  MyPort's position

15  is that both of those elements are drawn to capability--a

16  microphone that is capable of interfacing with an external

17  audio source and a camera that is capable of interfacing with

18  an image source.

19          THE COURT:  Well, let's look at the claim as a

20  whole, and I'll talk about claim 6 of the '017 for reference.

21          MR. RICKETTS:  Yes, Your Honor.

22          THE COURT:  You've got a microphone interfaceable, a

23  camera interfacing, a first data converter processing and

24  storing, a media data converter for converting, and then an

25  internal storage storing.  So you've got 'storing', which

seems to be an active word requiring something to be done; and
you've got 'for converting', which doesn't seem to require
actual conversion but the capability to convert; and then
you've got 'processing and storing', which seem to be action
words; and then you've got 'interface', 'interfaceable', and
'interfacing'.

Are you telling me that the act -- that the action words,
the verbs, if you will, in all of these elements in claim 6
are all directed toward merely being capable of and don't
require any action or conduct to actually be taken?  Is -- I
mean, do the rules of grammar just not apply here?

MR. RICKETTS:  Well, I think that we need to look at
this in the context of what the Federal Circuit has said, Your
Honor, about the mere use of present tense language.  I mean,
certainly 'processing', 'interfacing', those words are present
tense and they do suggest actual functionality, but the
Federal Circuit says that's not enough; that is not enough.
The mere use of present tense language is not enough to say
that a claim is drawn--or, excuse me--to say that a claim
requires actual performance and is not drawn to mere
capability.

And we don't have the language like we had in *Cross
Medical* which, again, is one of the chief cases that Samsung
relies on.  Words like 'operatively joined', 'operatively' is
a very functional word, and the Federal Circuit made clear

1    that, you know, when you see a word like 'operatively', a

2    POSITA would naturally understand that something is occurring.

3    And so --

4            THE COURT:  What's the authority from the Circuit

5    that says use of an action word in the present tense does not

6    necessarily mean the action is required but is only required

7    to be capable of?

8            MR. RICKETTS:  Certainly, Your Honor.  That is the

9    *INVT* case at 46 F.4d 1361 and that's a Federal Circuit opinion

10   from 2002.

11           THE COURT:  That's Judge Chen's opinion.  I'm

12   familiar with that.

13           MR. RICKETTS:  Yes, Your Honor.

14       And they said that the mere use of present tense language

15   is not sufficient to require actual performance from the

16   claims.  And the claims, importantly, do not need to adhere to

17   any particular grammatical format in order to determine

18   whether they are drawn to capability or require actual

19   performance.

20       And so at the end of the day, Your Honor, I understand

21   that claims 6 and 13 might use a mix of language that, on its

22   face at least, seems to be present tense active voice

23   language, but I believe that when you look at the claims as a

24   whole and see that they are drawn to a system, it's not clear

25   that the claims require actual performance.  And MyPort's

1   position is that the claims are directed to capability even

2   when it uses a word like 'processing' or 'interfacing' or

3   'storing'; that that is mere present tense language that the

4   Federal Circuit has clarified does not necessarily indicate

5   that actual performance is required.

6       And unless Your Honor has further questions, I don't

7   believe I have anything else on that issue.

8       THE COURT:  Well, I'm not exactly sure who bears the

9   burden here, but other than arguing that 'interfacing' is --

10  though in the present tense, is not requiring actual action

11  and is, in effect, the same as 'interfaceable' used with

12  regard to the microphone, other than arguing language here,

13  what else is it, if anything, that you have from MyPort's

14  standpoint to come forward to show that these do not actually

15  require action to be taken?

16      Is there something else or is it simply the language -- I

17  know you're saying that under the case law Samsung's saying

18  that they are present tense and, therefore, they have to

19  require action is not enough, but do you have something in

20  addition to the language that's here in the claim that would

21  bolster the position that you've taken that capability alone

22  is adequate?

23      MR. RICKETTS:  Beyond the language of the claims and

24  what the Federal Circuit has said about the grammar, no, Your

25  Honor, I don't have anything further on that.

1          THE COURT:  Okay.  All right.  Then let me go back

2    to Samsung and see if they've got additional argument on this

3    issue or if there's something further, Mr. Pease, that you

4    wanted to raise in the context of this motion that you

5    haven't.

6          MR. RICKETTS:  Thank you, Your Honor.

7          THE COURT:  Thank you, Mr. Ricketts.

8          MR. PEASE:  Thank you, Your Honor.

9       I did refresh my recollection, and what the *Parker Vision*

10   Federal Circuit case holds is that words do matter; the rules

11   of grammar, as you put it, do apply, and it's a matter of law.

12   Right?  This is the language they chose to use in the claim,

13   and there's a difference.  'Interfaceable' is different than

14   'interfacing with'.   The *Cross Medical* case is illustrative

15   here.  The *INVT* case --

16          THE COURT:  I mean in *INVT* the court--again, this is

17   judge Chen's opinion--clearly says, "The intervenors argue

18   that simple present tense words are enough to require actual

19   operation.  That is not true."  That's a pretty clear

20   statement.

21          MR. PEASE:  It's a statement in context of a

22   silicon-based computer invention where this piece of silicon

23   doesn't do anything when it's sitting there.  Right?  There's

24   a special understanding that that thing's got to work.  Here

25   we're talking about a camera.  Right?  They could have written

1    'camera interfaceable with'; they wrote 'camera interfacing

2    with'.  And so from the standpoint of direct infringement, the

3    issue that's presented here, we just don't need it.  As a

4    matter of law we just don't do it.

5         THE COURT:  So are you telling me that the *INVT* case

6    is distinguishable on its facts or --

7         MR. PEASE:  Yes.

8         THE COURT:  Why doesn't that pretty straight-forward

9    statement about present tense language not being enough, why

10   doesn't it apply in this context?

11        MR. PEASE:  Because *INVT* would then require a

12   different result in *Cross Medical*, as I recall.  It would

13   require a different result in *Parker Vision*, would it not?

14   *INVT* is a very special instance where you have silicon; you

15   know, a computer-based convention with silicon.  It doesn't do

16   anything but sitting there.  It's just a lump.  You know,

17   there's a special understanding that this thing must be

18   working in some sense.  That's not the case here with a

19   camera.  You know, that's not the case in *Parker Vision*.

20   It's not the case in *Cross Medical*.

21        THE COURT:  A camera's not a lump.

22        MR. PEASE:  Right.  Exactly.

23        THE COURT:  All right.

24        MR. PEASE:  To use formal terms.

25        THE COURT:  Well, I'm not aware of any real argument

1    from MyPort that there's some kind of an unanswered fact

2    question here.  This looks like it's a pretty straight-forward

3    question that the Court's going to have to answer as a matter

4    of law, which is really why I wanted to focus on this as a

5    part of the motion.  There are arguments in the other parts of

6    the motion that fact questions exist, but I really don't see

7    that here, and I gather you're not aware of any argument to

8    that effect in this context.

9           MR. PEASE:  That's correct, Your Honor.

10          THE COURT:  Well, it's your motion, Mr. Pease.  What

11   else do you want to present to me?

12          MR. PEASE:  Well, taking your comments into

13   consideration, the one -- my colleagues remind me a chip is

14   capable of anything; a camera is not.  A chip you can operate

15   different ways, especially a general purpose computer can be

16   operated in many different ways; a camera cannot.

17       But apart from that, I don't want to belabor the entire

18   motion.  We did move on five separate independent grounds.

19   There is one aspect of that motion I would like to address and

20   I'll try and keep it brief.

21          THE COURT:  You're perfectly free to do so.

22          MR. PEASE:  Well, that's our primary argument.  The

23   one we led off with concerns the language that appears in all

24   27 of the asserted claims across the three patents.  Every one

25   of those claims requires a second data converter or a media

data converter.  And every one of those claims requires --

     And with Your Honor's permission, I would like to use the elmo.

     I have up on the screen the language in question.  "A media data converter"--and jump ahead--"to convert the received digital audio to a text-based searchable file as a text context tag."  And we don't think there's any genuine issues of fact presented here.  This is the language of the claim.  And again, this is the language that MyPort itself drafted to describe what they presumably believe was their invention.  You have to convert received digital audio.  What does that mean?  You speak into a microphone, your analog words, the sounds coming out of your mouth are converted into digital audio.  That's in a different limitation, the first data converter.

     And now we are' talking about that received digital audio, and it has to be converted.  This received digital audio is converted to a text-based searchable file as a text context tag.  So converting -- a car's engine converts energy into motion.  I heard lots of stories growing up about water being converted into wine.  There's a conversion.  You're changing one thing into another.  And so what does this claim require?  It requires that the received digital audio be converted to a text-based searchable file.  So I take a picture at the beach, I speak into the microphone and I say

1    'beach'.  The word 'beach' is digitized, and now that digital

2    audio representing the word 'beach' is converted into a

3    text-based searchable file.  You could call that file 1.  And

4    the claim tells us that that text-based searchable file, file

5    1, is the text context tag.  That's what the claim says.

6         If I take another picture later that day of my mother and

7    I use my voice to tag it 'mom', that digital audio is

8    converted into another text based file, you could call it file

9    2, and that in itself is a text context tag.  If I use my

10   voice to create a hundred tags, again, I have a hundred

11   text-based searchable files.  That's what the claims say.  And

12   it's undisputed that Samsung does not convert received digital

13   audio to a text-based searchable file in the way that each and

14   every claim specifically requires.

15        So what does MyPort have to say about this?  Well, their

16   surreply is telling.  I've highlighted it here.  This is page

17   1 of their surreply.  The response -- MyPort's response made

18   clear that the plain and ordinary meaning of the claim

19   language is "the captured audio is converted to text that is

20   then saved in a searchable file."  Well, we're changing the

21   claim here.  The claim requires a conversion.  You have to

22   take the received digital audio and it needs to be converted

23   into a text-based searchable file.  The fact that there might

24   be some file on the phone somewhere where you're storing text

25   is neither here nor there when you apply the claims.

1       Now, there's no -- they're pointing to a database in the

2   Samsung products that stores information, including user tag

3   information.  We don't dispute it, we never disputed that, but

4   that database does not result from the conversion of received

5   digital audio.

6       Now, again, *Markman* was months ago.  If MyPort had

7   believed that the claims ought to be construed in a way that

8   was different than their plain and ordinary meaning, they

9   could have raised it.  They didn't.  And it wouldn't have

10  mattered because there's nothing in the specification, there's

11  nothing in the prosecution history that would allow them to

12  rewrite the claims in the manner they've done here.

13      And to put it in context, taking the language out of

14  their surreply, here we have the claim as written, "to convert

15  the received digital audio to a text-based searchable file as

16  a text context tag" and the way they've rewritten it, "to

17  convert the received data to text as a text context tag that

18  is saved in a searchable file."  That's just not what the

19  claim says.  That's an after-the-fact attempt by them to try

20  and read this language onto what the claim -- onto what the

21  products do.  But they're reading out the requirement that the

22  text-based searchable file result from the conversion of the

23  received digital audio.

24      And I think the reason for that is pretty clear, and I

25  think their expert is Doctor Balakrishnan and he said this

1    during his deposition.  He was asked about this language in

2    the claim.  "It doesn't say to convert the audio to a text

3    context tag, does it?"

4         "I read this and it's converting it -- you can't convert

5    audio to a text-based file.  It makes no sense.  You have to

6    convert it to some text that then is saved as a file."

7         And that's the problem in a nutshell.  The sophisticated

8    products that Samsung offers, they have little resemblance to

9    the idea Mr. Malone had when he was thinking about a box of

10   photos and their lack of organization.  You know, the

11   text-based searchable file approach that he came up with might

12   make sense if you've got a box of photos and you're dealing

13   with a limited number of photos to tag, but in the context of

14   today's sophisticated phones, we just don't do it that way.

15   And there's no dispute that Samsung doesn't do it the way the

16   claims require.  Samsung does not convert received digital

17   audio into a text-based context tag -- have a -- text-based

18   searchable file as a text context tag.

19        So unless Your Honor has any questions, that was all I

20   had on that term.

21             THE COURT:  All right.

22             MR. PEASE:  And then the only thing I would add is

23   on the second argument where at the time we briefed it there

24   were 138 products out of 141, that number reduced slightly

25   since they dropped their infringement allegations as to

1    certain products, but essentially only the three latest

2    products that Samsung offers actually have the capability on

3    the phone to convert voice to text as sold.  If you want to do

4    it, you have to -- on the other products you have a download

5    an offline language pack.  And there's been a lot of argument

6    back and forth about what capability actually resides on those

7    products.  The functionality that allows you to do the

8    conversion is just not there.  You can download it if you're

9    so inclined.  They haven't done that.

10        THE COURT:  All right.  Anything further?

11        MR. PEASE:  The only thing, there's a side issue

12   that came up in these briefs, and I'll defer to Your Honor if

13   you want to hear any argument on it, and that's this notion

14   that of a distinction between claim 6 and claim 13 with

15   respect to the need to perform that conversion on the product

16   versus somewhere else.

17        THE COURT:  I think that's going to have to come out

18   at some point.  I'm happy to hear it now as opposed to hearing

19   it later.

20        MR. PEASE:  Sure.

21        So throughout this case MyPort has read the claims,

22   whether it's claim 6 which has a capture device or claim 13

23   which omits that language 'capture device', they've read the

24   claims on the smartphone itself.  They've never attempted to

25   read the claims based on Samsung's use of the phone in

1    combination with an external network source.  Right?

2         So in the context of briefing, they suggested that

3    there's this distinction between the scope of claim 6 and 13,

4    and pointed to an offhand reference in something their expert

5    cited with respect to claim 6, the claim that clearly on its

6    face requires everything be done on the phone, and said, Aha,

7    see, this refers -- there's a mention there of network and,

8    therefore, that shows that claim 13 as we read it extends not

9    only to things conversion performed on the smartphone but

10   conversion performed using an outside source.

11              THE COURT:  Let me stop you there, Mr. Pease.

12              MR. PEASE:  Yeah.

13              THE COURT:  You know, there is before the Court,

14   and maybe I'm confused, but there is before the Court another

15   Samsung motion to strike what's asserted to be MyPort's

16   undisclosed smartphone plus server theory.  Isn't that really

17   what you're talking about?

18              MR. PEASE:  Yeah, that's true, Your Honor.

19              THE COURT:  And we want to bleed over into that

20   motion, or do you want --

21              MR. PEASE:  I don't need to do so.  I just wanted to

22   make sure you didn't have questions for me now while I'm

23   standing here.

24              THE COURT:  No, not on the summary judgment motion.

25              MR. PEASE:  All right.  Then, Your Honor, that's all

I have.  Thank you very much.

THE COURT:  All right.  Is there anything further from MyPort on this before we move on?

MR. RICKETTS:  Thank you, Your Honor.  Mickey Ricketts for Plaintiff.  Again, just a few points in rebuttal, if I may.

Mr. Pease argued that the *INVT* case was just dealing with a chip.  Well, the cameras in question here on the accused devices are effectively computer chips, Your Honor.  They are sensors on a silicon chip, if you will.  So I'm not sure that there's quite a distinction there that Mr. Pease would like for there to be between the *INVT* case and what we're dealing with here.

But, importantly, I just wanted to circle back to the *INVT* case and point out to the Court again that the Federal Circuit addressed its own decision in *Cross Medical* in *INVT* and effectively distinguished it saying the *Cross Medical* situation is different from what we were dealing with here in *INVT* because of this 'operatively joined' language, which, again, we do not have here.

With respect to the text-based searchable file, Your Honor, I just want to highlight the fact that there is no dispute between the parties that the CMH database MyPort is relying on as satisfying this limitation, one, it contains text; two, it is searchable; and three, it is a file.  Now,

1    the parties' experts have interpreted the facts surrounding

2    this CMH database differently and have come to very different

3    conclusions.  Our expert Doctor Balakrishnan says that the CMH

4    database is a text-based searchable file and Samsung's expert

5    Doctor Bederson agrees that the CMH database is a file, it is

6    searchable, and it contains text; but nevertheless, Doctor

7    Bederson asserts that the CMH database is not the claimed

8    text-based searchable file.

9         Samsung in its briefing mischaracterizes the claim

10   language, Your Honor.  They are effectively inserting the

11   phrase 'that serves as' into the claim language.  They're

12   wanting it to read 'a text-based searchable file that serves

13   as a text context tag', but that's not what the claims say;

14   they say "converting the captured audio to a text-based

15   searchable file as a text context tag," which our expert

16   Doctor Balakrishnan has explained that a POSITA would

17   understand based on the claim language means that the captured

18   audio, which is what you say--you know, I say the word 'mom'

19   or 'dog'--and that is converted to a text context tag which is

20   stored in a text-based searchable file.  And that is different

21   from what Samsung is asserting the claims would require.  They

22   are wanting it to say that the text-based searchable file

23   serves as a text context tag, but that is not what the claim

24   says.  And our expert Doctor Balakrishnan testified that a

25   POSITA would understand that the text-based searchable file is

1    not serving as the text context tag, but that it would contain

2    the text context tag that results from converting the captured

3    digital audio.

4        With respect to the offline language pack issue that has

5    been raised, Your Honor, the parties agree that for claim 6 to

6    be infringed, the captured speech must be converted to text on

7    the device itself.  There's no dispute regarding that.  And

8    MyPort agrees that according to Samsung's discovery responses,

9    apart from the three Galaxy S23 devices, they identified as

10   coming from the factory with an offline language pack that the

11   rest of the devices do not ship from the factory with the

12   offline language pack installed.  However, Your Honor, all of

13   those devices--and I don't believe Samsung would dispute

14   this--all of those devices provide the option of a user

15   downloading and installing an offline language pack.

16       And as MyPort has explained in the briefing, there is

17   code present on those devices from the factory that makes a

18   determination as to whether to convert the captured

19   speech-to-text locally, i.e., on the device itself, or

20   remotely on a server on a network somewhere and that, we

21   believe, makes this analogous to the *Finjan* case where the

22   issue was there were eight software modules that were

23   effectively locked when you acquired them and you could unlock

24   each module individually by purchasing a key.  And in the

25   *Finjan* case, the Defendant there had argued that because the

1    functionality was effectively locked, that it was the same as

2    if the user had never received the source code for those

3    locked features and, therefore, there could never be

4    infringement.  But the court disagreed and found that there

5    was infringement because they found that the--apologies, Your

6    Honor--because the user could unlock the module for use by

7    purchasing a key.  And we believe that that is analogous to a

8    user of a Samsung device downloading and installing the

9    language pack.  We believe that that's analogous to the user

10   having to purchase a key in *Finjan.*

11         With respect to the claim 13 issue, Your Honor, as you

12   noted, there is an overlap between this and their motion to

13   strike, so I don't know if you would like to hear what I have

14   to say about claim 13 in the context of this motion or if that

15   should be saved for --

16         THE COURT:  I'm going to go to the motion to strike

17   next, so we'll hear it then.

18         MR. RICKETTS:  Understood, Your Honor.

19         And I'm happy to address the remaining arguments, such as

20   the providing internal storage, if Your Honor would like me

21   to; but apart from that, I don't believe I have anything else

22   to say in rebuttal to Mr. Pease.

23         THE COURT:  All right.  Thank you, then.

24         MR. RICKETTS:  Thank you, Your Honor.

25         MR. PEASE:  May I respond briefly, Your Honor?

1      THE COURT:  Very briefly.  We still have a lot of

2  ground to cover.

3      MR. PEASE:  Understood, Your Honor.

4  I'll make two points.  On the text-based searchable file

5  issue, you can put aside whether the database that's used in

6  the Samsung phone is a text-based searchable file in the

7  abstract.  Right?  We say it's not; they say it is.  It's

8  neither here for there for the purposes of this motion.  The

9  claim requires that the received digital audio be converted to

10  a text-based searchable file.  And there's no dispute that

11  this database is not the result of a conversion from the

12  received digital audio.  So that's number one.  Even if it's a

13  text-based searchable file in some other context, it's not

14  what the claim requires--the result of a conversion.

15  As to the 138 of the 141, I'll thank Mr. Ricketts for at

16  least simplifying one issue.  He concedes that a user needs to

17  download the offline language pack from an external source, so

18  it's the user that would cause it to infringe in that

19  instance.

20  So the one issue is the *Finjan* case.  The line of cases

21  they sought said that if you have to unlock functionality

22  that's already there on the accused device, that's not enough

23  to get out of infringement; it's there, the functionality

24  resides there, you can be found to infringe.  That's not the

25  case there.  That function -- there's no dispute.  He admitted

1     at the beginning of his oral argument, that functionality is

2     offline somewhere.  Some user has to go get it.  And so it's

3     not there, it's not a matter of just unlocking it.  When

4     somebody buys the Samsung phone, it doesn't have the

5     functionality that the claims would otherwise require, and so

6     it does not directly infringe.

7              That's all I have, Your Honor.  Thank you.

8              THE COURT:  Thank you.

9          With regard to Defendants' motion for summary judgment of

10    no infringement, Document 128, I'm going to carry ruling on

11    this motion, counsel.  Your argument has persuaded me that

12    this bears further review by the Court and a time to reflect

13    on the arguments that you've presented today.  Consequently,

14    I'm going to carry that and I will get you a ruling on this

15    motion at a later date, but I'm not prepared to give you a

16    ruling from the bench today in light of the arguments that

17    I've heard.

18         With regard to Document 194, Samsung's motion to strike

19    this what it calls an undisclosed smartphone plus server

20    theory from its summary judgment briefing and to preclude

21    MyPort from advancing that theory at trial, that's what I want

22    to turn to next, and we'll pick back up, in effect, where we

23    left off with the arguments about the device plus the server,

24    et cetera.

25             And I'll hear further from Samsung on this.

1          MR. SOMMER:  Thank you, Your Honor.

2      May we have the AV, please?  Thank you.

3      I have some slides prepared on this just because the

4  record is a bit complicated on this motion.

5          THE COURT:  Let me ask you this before we get any

6  further.  What I've heard so far have been what I would

7  characterize as substantive arguments on this issue.  It looks

8  like to me that at least a large part of this motion, Document

9  194, is what I would characterize as procedural.  There's

10  arguments about non-disclosures.  There's arguments about

11  lying behind the log and not giving notice.  Are we going to

12  address both substantive and procedural here, or what do you

13  envision presenting to the Court on this motion, just so that

14  between the last one and this one we cover the waterfront.

15          MR. SOMMER:  Your Honor, my purpose of standing up

16  here and arguing this motion is to argue the procedural

17  points --

18          THE COURT:  Okay.

19          MR. SOMMER:  -- which is, is this disclosed, has it

20  been fairly disclosed to Samsung; and if so, then I suppose it

21  should remain in the briefing and our motion should be denied,

22  but if not, which we submit it was not, the motion -- the

23  aspect of that motion should be struck, or the opposition.

24  And we're asking Your Honor for a ruling that it has not been

25  disclosed so that we know what is going to be advanced at

1    trial.

2          THE COURT:  I understand.  Okay.  That helps.  Go

3    ahead.

4          MR. SOMMER:  All right.  So next slide, please.

5      So why did we bring this motion?  I mean, that's kind of

6    the first question that, you know, we should be asking

7    ourselves.  We argued in our brief in support of our motion

8    for summary judgment of non-infringement that Doctor

9    Balakrishnan has not offered any opinion that the combination

10   of a Samsung mobile device and a server is the claimed second

11   data converter.  Two things--phone, server, equals the second

12   data converter.  That was our point.  In the opposition they

13   denied that.  They disagree and then quote exactly what we

14   said.  They -- that means they think he did preserve that

15   theory.

16        Next slide, please.  And the next slide.

17      So in the surreplies this plays out a little bit further.

18   We said they waived any ability to accuse the combination of a

19   smartphone and a network server because it's not in his report

20   and it's not in their contentions.  MyPort then says our

21   discovery responses belie their position that they waived that

22   argument.

23      So it's clear that we have a disagreement between the

24   parties as to whether that theory is preserved, and that

25   played out through the summary judgment briefing.

1     Now, you might ask, Well, why didn't you move to strike

2  Doctor Balakrishnan's report.  Well, we didn't think we had

3  to.  We didn't see this theory in his report.  His report

4  speaks for itself.  It is right there in black and white.  And

5  it didn't play out until the summary judgment briefing that

6  they were going to rely on the combination of a smartphone and

7  a server to meet the second data converter limitation.

8     We then moved to strike.  After meeting and conferring,

9  we disagreed about what the record showed.  And the opposition

10  says we never relied on the combination of smartphone and a

11  server to meet the second data converter limitation.

12     Next slide, please.

13     They've identified the smartphones and tablets

14  themselves.  That's what we've been saying all along, Your

15  Honor.  MyPort does not define the accused product as a

16  Samsung device in combination with the server.  Okay.  Now

17  we're reset to where we were before the summary judgment

18  briefing; at least that was our view.

19     And so the question is what did they disclose, and is the

20  theory that they're advancing now in this opposition to our

21  motion to strike even disclosed, and we submit it's not.  What

22  they have said consistently throughout the case in their

23  contentions and their expert reports--and the expert report is

24  kind of the be-all/end-all of what's going to come in here at

25  trial and what is admissible evidence for the jury to

1    consider--it tells us claims 6 and 13 were being treated

2    exactly the same for the purposes of the infringement

3    analysis.

4         Next slide, please.  Next slide.

5         So this is the contentions; perhaps a little less

6    relevant at this stage of the case, but this is what we

7    prepared our case through discovery -- fact discovery around.

8    They say the exact same thing for claim 13 and claim 6.  It's

9    the Samsung device itself that utilizes speech recognition to

10   transcribe or to copy down the words, the digital data of the

11   users dictated words into text.  This is the device itself--6

12   and 13 treated exactly the same.

13        Next slide, please.

14        So this is an additional description from the contentions

15   themselves.  "A user may use his or her voice to enter the

16   desired tag name, during which the voice input process the

17   received digital audio such as, for example, the captured

18   voice is converted to text."  That's on the Samsung products

19   Okay.  So that's the contentions.  That's the game that we

20   were ready to engage in, we took discovery around.

21        Next slide, please.

22        Doctor Balakrishnan's report.  So this is the time that

23   we get to, Okay, you know, what are they going to offer for

24   trial to the jury in front of -- or through their expert

25   witness.  And he says, "Each accused product"--which now I

guess we all agree is not the combination of a smartphone and

server; it is just a smartphone or a tablet--"utilizes speech

recognition software via relevant portions of a system on the

chip and associated software to convert that audio to text.

The conversion is happening on the product using its silicon

processor to convert the text" -- or "the speech into text."

It's the S23 that initiates the speech-to-text recognition and

converts the spoken word to the textual equivalent.  It's

doing the conversion.  That was the contention.  That is claim

6.  And I heard Mr. Ricketts just say in his other argument

everybody agrees claim 6 requires that to be done by the phone

itself; no dispute.

         Next slide, please.

         Here is the analysis for claim 13.  "See claim 6."

That's it.  That is the extent of the analysis.  Samsung

could not have possibly known he was treating claim 6 and 13

differently if his entire direct infringement analysis for

literal infringement is 'See claim 6".

         Next slide, please.

         Now, MyPort has said in their reply -- or their surreply

that there is a statement in Doctor Balakrishnan's expert

report on infringement that it is important to note that claim

13 of all three of the patents does not preclude performing

the speech-to-text on a conversion on a remote server.  The

claim doesn't preclude it.  And it's important to note that

1    for some reason.

2         Next slide, please.

3         THE COURT:  Let me stop you there, Mr. Sommer.

4    Let's go back in time prior to the generation of these expert

5    reports.

6         Correct me if I'm wrong, but it looks like, at least from

7    what I can see of the record, that in their contentions MyPort

8    defined 'accused products', and after that happened Samsung

9    asked for further clarification, and MyPort reclarified what

10   it meant by 'accused products'.  And in response to that

11   clarification, Samsung responded in writing, and part of that

12   response in writing says, "These products also include the

13   ability to identify and tag certain images using image

14   recognition, and they may, depending on certain scenarios, as

15   outlined in Samsung's other interrogatory responses, be able

16   to send speech to a server for speech-to-text conversion, may

17   allow a user to download an offline language pack to enable

18   speech-to-text conversion on a device."

19        Now, that response from Samsung after MyPort clarified

20   its understanding of 'accused products' at the infringement

21   contention stage well predates the issuance of the experts'

22   reports.  And tell me how Samsung's own statements that

23   include referencing a server for speech-to-text conversion and

24   downloading an offline language pack to enable speech-to-text

25   conversion, how does that not clarify that you were on notice

that this was part of this case way back when before these

experts report came out.  And if you were on notice and you

felt like that notice, be it in correspondence or email or

communication with opposing counsel, was somehow inconsistent

with their infringement contentions, why didn't that put you

to the burden of moving to strike certain infringement

contentions rather than waiting until pretrial and asking me

to summary judgment out or strike altogether this theory?

I mean, it smacks a little bit -- I'm not trying to

accuse anybody of anything, but it smacks a little bit of

lying behind the log and waiting until late in the game when

your own language indicates you had some knowledge that this

theory was out there and you chose at this point not to do

anything about it.  Can you respond to that for me?

MR. SOMMER:  I can.  And there were a number of

issues there, Your Honor.  I'm going to try to respond to them

all.  If I don't, please remind me and I'm come back.

THE COURT:  At the end of the day, as I see it, this

is an issue of fair notice, whether it's in the formal filings

on the docket, whether it's in the communications between

counsel, whether it's in the depositions that come out of the

witnesses, when does a party fairly get notice that the other

side is taking a position.  And it just looks like to me that

occurred here with regard to this issue well before any expert

reports were issued.

1          MR. SOMMER:  So there were several interrogatory

2    responses beyond those that are in the record before Your

3    Honor.  They were all served around this same time.  It was,

4    you know, late spring or moving into the summer after the

5    amended contentions were allowed to be filed by Your Honor.

6          And what had happened was we told them one of our

7    non-infringement positions is these phones do not convert

8    speech-to-text.  Right?  These phones don't even have the

9    engine in the car to do that.  It ships it off to a server.

10   So around the same time that these particular

11   amendments--because that's why we were pointing to other

12   interrogatory responses--we were telling them, Hey, these

13   phones don't infringe for this reason; here's how they

14   actually work.  There's an interrogatory, I think it's either

15   16 or 18, where we actually outline the different usage

16   scenarios.

17         So this text all kind of bundles up with that.  That is

18   a non-infringement argument for us.  They don't have it on

19   there; they ship it off to a server.  That doesn't say, Hey,

20   you're accusing a server.  That's the impetus of our

21   non-infringement case.

22         But, in addition to that, MyPort has the right, as we all

23   know, to accuse us of inducing infringement.  Even if the

24   engine's not in the car, if we tell somebody, Hey, go buy this

25   engine, stick it in your car--right?--we could be liable for

1    causing infringement by instructing somebody how to build the

2    car.  Same is true of the offline language pack.  So all of

3    these products that don't have the offline language pack we

4    told them about and we're telling them how they work.  We're

5    saying that doesn't infringe.

6         So that's the reason for the interrogatory response.  I

7    think perhaps the picture isn't fully developed on the record

8    about what was going on exactly in discovery, but in terms of

9    why -- why are we not on notice, if this server theory was so

10   important to MyPort and it thought it had preserved it through

11   discovery, it should have been in Balakrishnan's report.  It

12   should have been in the good doctor's report and it's not.

13        So there is discovery correspondence.  Yes, we concede

14   there is a letter, and we actually responded to that letter

15   and we said, Not in your contentions anywhere.  So to Your

16   Honor's question about why didn't we move to strike the

17   contentions, I think I would have had to move to strike the

18   letter elaborating on the contentions because it really is not

19   in there anywhere.  You know, I'm not exactly sure what the

20   form of relief would have been in that particular instance.

21             THE COURT:  I've had lots of motion to strike

22   contentions when the contention itself was clarified by later

23   correspondence and the party said they have now said what they

24   meant when these contentions were put out was X and X is

25   improper and it needs to be struck.  That's really not a good

1    excuse for not acting at that time to bring clarity that could

2    have been brought in that earlier context.

3         MR. SOMMER:  Understood, Your Honor.  And it's a

4    learning experience for me.  I appreciate that.  But it should

5    have been in the report at the very least--right?--and then we

6    could have responded to it.  All they said is that the claims

7    are different.

8         Next slide, please.

9         This is where that appears in this argument.  And this is

10   appendix D, and this is an analysis Doctor Balakrishnan does

11   on the differences between various versions of Samsung

12   software.  He says, This exhibit D or appendix D doesn't

13   provide my infringement analysis.  He says, Go back and look

14   at my appendices A, B, and C for my infringement analysis.

15   "The following chart discusses my analysis of the differences

16   between versions of the software that are relevant to my

17   infringement analysis that I provided in these other

18   appendices."  He then goes on to say, "Both S23 and Note8 can

19   capture the audio and convert it from speech-to-text"--the

20   phone itself; not some phone in the server.

21        Next slide, please.

22        According to Samsung, the Note8 is capable of on-device

23   speech-to-text conversion because a language path is

24   available.  Again, it says nothing about sending it off to the

25   server.

1    Then he says something about claim 13 in the scope of the

2    claim.  He says, "It is important to note that claim 13 of the

3    patents does not preclude performing speech-to-text conversion

4    on a remote server."  Well, fine, but that doesn't mean our

5    products infringe in a particular manner because they send

6    speech to a remote server.  To me that's a statement about the

7    scope of claim 13.  That doesn't say how we infringe.  It

8    doesn't offer an opinion that because it doesn't require it,

9    therefore, this functionality in Samsung products leads to

10   infringement.  There's no opinion in his report on that.

11        THE COURT:  Well, let me ask this question.  And

12   maybe I'm missing something here, and if I am, please clarify

13   it for me.

14        If the issue of the devices plus the server as a way of

15   achieving a showing of infringement stays in the case but the

16   expert doesn't opine about it and doesn't offer an opinion in

17   his report about it and, therefore, is not going to be able to

18   testify about it when the case goes to trial, why does whether

19   it stays in the case matter or not if there's not going to be

20   any evidence on it?  What am I missing here.

21        MR. SOMMER:  Because what I think happened is in

22   the opposition to our motion to strike, they said, We're not

23   accusing the combination of smartphone and a server.  That is

24   different than what they said in opposition to the summary

25   judgment motion, and that provoked us to file this motion to

get some resolution on the issue.

So on our read of their opposition to summary judgment we're -- you know, we didn't waive the ability to accuse a smartphone and a server.  In the opposition to this motion they said they never did accuse a combination of a smartphone and a server and their theory all along is that the second data converter of the claim is on the phone and it only needs to be able to send that data off to a server to convert speech-to-text and receive the text back and put it in the text field.  That requires treating claims 6 and 13 differently, and we don't think they've disclosed that in their report.

So now we're like to this other theory that we don't believe is disclosed, because there is nothing that conveys the idea that claim 13 is infringed for a different reason than claim 6 is.

THE COURT:  And you're telling me that the appropriate experts in the case don't opine about a difference between how you infringe claims 6 and 13?

MR. SOMMER:  That's absolutely correct.  What I think they've opined on --

THE COURT:  If the experts aren't going to offer testimony on this issue, why are you worried about it?

MR. SOMMER:  Because they are arguing in opposition to summary judgment that they have summary judgment credible,

1  reliable evidence that they're going to put before the

2  jury--and that this is now the theory--the second data

3  converter is on the phone, it sends it off to a server, that

4  comes back.  This is a complicated issue, as I think Your

5  Honor is appreciating; at least I find it to be complicated.

6  And trying to interrupt the trial for this particular issue, I

7  -- you know, we didn't want to do that.  We didn't want to

8  wait because we didn't want an argument that we had waived

9  this.

10          THE COURT:  Again, I may be missing something, but

11  how is this a real problem if any evidence of this theory has

12  got to come from the expert witnesses who don't opine about it

13  in and address it in their reports?  Because I'm not going to

14  let an expert witness address and testify about a new theory

15  that's not in their report on the witness stand, I can assure

16  you on that.  So if I hold the experts to their reports, how

17  is this a problem for you?

18          MR. SOMMER:  At the end of the day, we don't believe

19  it is, but it's being used to oppose our summary judgment

20  motion on claim 13, and this is the only theory that's being

21  advanced on the summary judgment motion.  So in terms of the

22  procedural aspect of this motion, we'd like that argument

23  struck.  That's what we're asking the Court to do.

24          THE COURT:  Okay.  Okay.  That clarifies where

25  you're coming from for me.

1          What else?

2                    MR. SOMMER:  That is it, Your Honor.

3                    THE COURT:  Let me hear from the Plaintiff, please.

4                    MR. RICKETTS:  Thank you, Your Honor.  Mickey

5     Ricketts again on behalf of the Plaintiff.

6          This is a fairly complicated issue, Your Honor, but I'll

7     try to make it brief and do my best to summarize what I

8     believe is really the parties' dispute here.

9          MyPort contends that the text context tag is something

10    called a user tag, which is a particular type of data

11    structure that is created on the Samsung device itself

12    whenever a user applies a tag to an image.  A tag is not

13    simply text that is the result of converting captured

14    speech-to-text, whether it be locally or on a remote server.

15    And at the time that the device receives the recognized text,

16    whether that is the result of converting it locally or on a

17    remote server, no tag has been created, there's nothing that

18    is searchable; all that happens is the converted text appears

19    in a text box.  That's not the creation of the user tag.

20         What MyPort's expert has explained and what MyPort's

21    position has consistently been is that the device itself

22    infringes because it is the device itself that creates the tag

23    and stores it in the text-based searchable file.  None of that

24    functionality happens on a remote server.  The only thing that

25    the remote server might be used for is to convert the captured

1  word 'dog'--or, excuse me--to convert the captured audio 'dog'

2  to the word 'dog', which is then sent back to the phone, but

3  that's not creating a text context tag and that's not what the

4  claims require.  The claims do not simply recite converting

5  speech-to-text.

6      The parties dispute whether claim 13 differs from claim 6

7  because of its lack of a capture device limitation, Your

8  Honor.  Claim 6 recharacterizes "a capture device having", and

9  the parties all agree, there's absolutely no dispute, that

10 everything that claim 6 recites must happen on the device

11 itself in order for there to be infringement.

12     Importantly, claim 13 does not include that limitation,

13 and MyPort's position has consistently been, and we believe

14 Samsung has been fairly put on notice that this is our

15 position, that claim 13 doesn't preclude the use of a remote

16 server to convert speech-to-text so long as it is the device

17 itself that is actually performing what the claims require.

18     The claims, again, aren't directed to simply converting

19 speech-to-text.  If that were all this was about, then Samsung

20 might have an argument.  But the claims go further.  They

21 don't require just converting speech-to-text; they require the

22 creation of a text context tag that is stored in a text-based

23 searchable file.  That's the CMH database that we identified

24 on the device itself.  There's a table full of user tags.

25 Those get created--using the result, I will admit--using the

1    result of the speech-to-text conversion, but that's all

2    happening on the device, Your Honor; not a remote server.

3        We have consistently accused the Samsung devices

4    themselves as the accused products and have never taken the

5    position that a Samsung product plus a remote server

6    collectively is an accused product.  We don't have to, because

7    it's not the remote server that is infringing the claim, it's

8    not the remote server that is creating the text context tag or

9    storing it in a text-based searchable file; all of that

10   happens on the device.

11       And at the end of the day, Your Honor, regardless of

12   whether the captured speech is converted to text locally on

13   the device or on a remote server, the result is the

14   same--whatever the spoken word is that is recognized, it

15   appears in a text box on the device and then the user tag is

16   created on the device, and that is why MyPort's theory has

17   consistently been that the devices infringe.

18       And with that, Your Honor, if the Court has no questions,

19   I have nothing more.

20            THE COURT:  All right.

21            MR. RICKETTS:  Thank you, Your Honor.

22            THE COURT:  No additional questions.  Thank you,

23   counsel.

24       Anything further from Samsung?

25            MR. SOMMER:  I have a few brief sentences, Your

Honor.

Mr. Ricketts said the dispute is over whether claim 6 and 13 should be interpreted the same way.  I don't think that's actually the dispute.  The dispute is whether or not MyPort's theories of infringement are the same for the claims or not, regardless of whether the scope of the claims is actually different, which presumptively it is.  They are different claims.

So, you know, we believe we've shown that their contentions throughout have been consistent for both claims, and for that reason we think our motion to strike should be granted.

THE COURT:  All right.  Thank you, counsel.

With regard to Document 194 and Defendant Samsung's motion to strike what it characterizes as MyPort's undisclosed smartphone plus server theory from its summary judgment briefing and to preclude MyPort from advancing that that theory at trial, the Court is persuaded that Samsung had reasonable notice of this position from MyPort.  Perhaps it could have been more formally expressed, perhaps it could have been included in clearer format, but from Samsung's own communications raising this issue in response to the amended explanation by MyPort of what its accused products were, it's clear to me that fairly early in the case this issue was raised.  And to not seek -- based on that not to seek to

1    strike it then or to compel something further or to strike

2    their contentions as incomplete or unclear, which easily would

3    have brought this to fruition long before now, Samsung waited

4    until pretrial, brought this motion, and I do not find that

5    there's any unfair surprise or any lack of reasonable notice

6    here.  Therefore, I'm going to deny the motion.

7         Okay.  That brings us to the first of several *Daubert*

8    motions.  The first one looks like it is Plaintiff's motion to

9    strike the opinions of Doctor Bederson regarding previously

10   undisclosed non-infringement theories and contract

11   interpretation, Document 121.

12        And I'll hear from the Plaintiff on this first.

13            MR. LORD:  Good afternoon, Your Honor.

14            THE COURT:  Proceed when you're ready, Mr. Lord.

15            MR. LORD:  Sure.

16        We additionally  -- we initially moved on two bases.  One

17   was that Samsung's expert proffered non-infringement theories

18   that were not disclosed during fact discovery; and second,

19   improper contract interpretation.  We've withdrawn the second

20   basis.  We put that in the email yesterday.  So the only issue

21   I'll be addressing is the first part of our motion about

22   Samsung proffering non-infringement theories through Doctor

23   Bederson that was not disclosed during fact discovery.

24            THE COURT:  All right.

25            MR. LORD:  And this is a very clear-cut case in our

mind, Your Honor.  This is just sort of follow-the-rules type *Daubert*.

In Exhibit A, which is Doctor Bederson's rebuttal report, at paragraphs 98 to 111 he asserts a non-infringement defense based upon the claim first data converter requiring, quote, analog information.  In his opinion in these paragraphs he mentions the word 'analog' quite a bit and explains that the products don't infringe because the output is analog.  And that's fine.  The problem is the word 'analog' in that defense was never disclosed during discovery.  So this is a theme that we've seen throughout today.  It wasn't in an email, it wasn't in a correspondence, it wasn't formal, it wasn't informal.

We served a discovery response, which is in the brief, to identify all non-infringement positions.  That's ROG No. 3. And Samsung supplemented that response throughout the litigation and provided page after page of its non-infringement defenses, and there's many of them in there. So we're not seeking to exclude of them, but what's not in there is this analog defense.  And so under FRCP 26 and 37, we believe the Court should strike this one defense.

Samsung argues in its opposition that, Well, it's semantics, they mention that, but that's not semantics; this is a specific defense that was not disclosed.  They also argue that MyPort failed to show that the accused products meet the first data converter.  That's true in every case.  I mean,

1   they're arguing non-infringement.  We need to know what are

2   the bases of the non-infringement.  And we first learned about

3   this defense of analog in the rebuttal report after discovery

4   of Doctor Bederson.

5       And so they're going to point to generic language in

6   their ROG response and in their disclosures, but the word

7   'analog' is a specific type of defense and it's not mentioned

8   and it was never disclosed.

9       So that's our position, Your Honor.

10          THE COURT:  All right.  Let me hear from Samsung in

11  response.

12          MR. EDLIN:  Good morning, Your Honor.  Richard Edlin

13  with Greenberg Traurig for the Samsung Defendants.

14          THE COURT:  Please proceed.

15          MR. EDLIN:  Thank you, Your Honor.

16      There's really two issues here.  The first issue is do

17  you and I speak in analog, and there's no question in this

18  case that we do, and, in fact, in the patent, as you can see

19  in the highlighted language here, which is page 6 -- column 6,

20  lines 45 to 49.  And the patent says, "One method for

21  collecting the audio information, for example, is to utilize a

22  microphone that will capture the information and then digitize

23  it in a digitizing block utilizing an analog-to-digital

24  converter," because, Your Honor, when we speak we don't speak

25  in digital; we speak in analog.  And there's really no

1   question that everybody understood that.

2       There are two experts that Samsung -- that MyPort has

3   proffered in this case.  This is Doctor Bang, and this was his

4   questioning at his deposition.

5       Question:  "So I'd like to talk a little bit about

6   microphone 210"--the one I just referenced from the

7   patent--"in figure 2 the of the '017 Patent.  Microphone 210

8   is interfaceable with an external audio information source.

9   Is that correct?"

10      Answer:  "Give me a second, please.

11      "So microphone 210 can capture audio information."

12      Question:  "From an analog source like a human voice."

13      And his answer is, "Yes."

14      This is MyPort's expert.

15      And then also from Doctor Balakrishnan, question--talking

16  about the same thing, Your Honor, "So these audio waves,

17  whatever they happen to be, ambient noise, speech, they're

18  analog before they're captured by the microphone; is that

19  fair?"

20      His answer is, "In general, yes.  It may also be digital

21  information in the sense that something is generating a

22  digital pulse that the audio microphone could pick up, but

23  that would be what in our field they would call an edge case

24  scenario, not the normal course of things."

25      Question:  "Sure.  Everything we're saying here today,

that's analog audio.  Right?"

Answer:  "I think that's fair."

Question:  "If I say the word 'tree', that's analog audio."

"As you say it, yes."

So, Your Honor, there is no question from the patent, there is no question from the experts that are put on by MyPort that the audio that is captured by the microphone that's referred to in the patent is analog, and that term is extremely well-known and, in fact, used by MyPort's experts.

Now, the only other question is, is there notice that was provided.  And so aside from the fact that you don't have to put people on notice of what they already know and what their burden of proof is, the fact of the matter is, is that we did provide notice.

Now, in our opposition brief, Your Honor, at page 5, we quote our interrogatory responses that follow their amended contentions, and what we clearly tell them is that we are putting them on notice that we do not believe that the first data converter, as they interpret it, satisfies the claim limitation.  Why does that matter?  First of all, it's notice.  But secondly, Your Honor, Doctor Bederson, in response to Doctor Balakrishnan's expert report, simply says what everybody knows, and what everybody knows is, is that when Doctor Balakrishnan identified on the system on the chip in

1  the Samsung phones, he picked something that does not convert

2  analog to digital; he picked something that converts digital

3  to digital.  And when -- or uses digital.

4      And so when Doctor Bederson responded to Doctor

5  Balakrishnan's report, Doctor Balakrishnan clearly knows that

6  the spoken voice is analog, because he testified to it, and

7  the inventor of the patent clearly understood that we speak in

8  analog because the converter, that first converter is an

9  analog-to-digital converter, all doctor Bederson did was to

10 point out that what you said is the first data converter,

11 which is required to convert analog to digital, doesn't, it

12 doesn't convert analog into digital.

13     There is no question in this case that anybody is

14 confused about whether the first data converter converts

15 analog because it's not -- it's there to convert analog.  So

16 all Doctor Bederson does is he says, Hey, Doctor Balakrishnan,

17 what you picked doesn't do the job that you say it does, and

18 you have not pointed to an infringing aspect of the system on

19 the chip.  That's all that's going on here.

20     And now the folks at MyPort are saying, Well, you didn't

21 use the word 'analog'.  I didn't have to use the word

22 'analog'.  The patent uses the word 'analog'.  The experts use

23 the word 'analog'.  The whole purpose of putting them on

24 notice that we don't think that you have identified anything

25 about this chip that is infringing, well, that chip is there

1    to do one thing, which is to convert analog to digital.

2              THE COURT:  All right.  What else?

3              MR. EDLIN:  That's it.  Thank you, Your Honor.

4              THE COURT:  All right.

5              MR. EDLIN:  I'm sorry, Your Honor.  One other thing.

6         The Rule 37 analysis I think, Your Honor, fails because

7    there's simply nothing that's been undisclosed, so I think

8    there's no reason to reach it.

9         If you'd like to hear more on that, I'd be happy to.

10   Thank you.

11             THE COURT:  No, I think that's adequate.

12             MR. EDLIN:  Thank you, Your Honor.

13             THE COURT:  All right.  What's the position from

14   MyPort?  Anything further on this?

15             MR. LORD:  Just two points, Your Honor.

16        Counsel directed the Court to its response to ROG 3.

17   That speaks for itself.

18        They say they didn't have to mention the word 'analog',

19   but why is it mentioned so often in Bederson's report at the

20   paragraphs for the first time in the rebuttal report?

21        And second, yes, the human voice is analog, but the

22   claims have the first data converter capturing audio

23   information from the microphone, not necessarily from the

24   human voice.  The microphone does that.  So the microphone

25   takes the voice -- or receives the voice, the audio, and then

1    the first data converter captures that from the microphone.

2    And so counsel was stating that the first data converter

3    captures it from the human voice.  That's not the way the

4    claims are written.

5        But argument is really about notice, Your Honor, and we

6    don't believe that they've shown that it was adequately

7    disclosed.

8        That's it, Your Honor.

9        THE COURT:  All right.  Thank you.

10       With regard to Document 121 and Plaintiff's motion to

11   strike and exclude opinions of Doctor Bederson, I'm going to

12   deny this motion.  I don't find a basis that Doctor Bederson

13   should be struck as to these identified paragraphs, and the

14   Court concludes that denial is the proper result here, so

15   that's going to be the Court's ruling.

16       All right.  Next let's go to MyPort's *Daubert* motion to

17   exclude certain opinions of Dr. Robert Vigil, Document 124.

18       And let me hear from the moving Plaintiff MyPort.

19       MR. LORD:  Good afternoon, Your Honor.

20       THE COURT:  Go ahead, Mr. Lord.

21       MR. LORD:  Sure.

22       So Document 124 is MyPort's *Daubert* motion to exclude

23   certain opinions of Doctor Vigil.  It's really two narrow

24   opinions.

25       By way of background, MyPort has a survey expert and a

damages expert, and its survey expert is Doctor Savage and its

is Mr. Bergman.  And Doctor Savage prepared a conjoint survey

last summer.  And conjoint surveys, as the Court's aware, at a

high level estimate the value of certain features.  We

submitted a report from Doctor Savage and we've offered him

for deposition and he will testify at trial.  Doctor Savage's

survey tested the customer's willingness to pay for the

patented technology.  And because it's open court I don't want

to give the numbers, but that's been disclosed.

Doctor Vigil is Samsung's expert, and in his report he

attacks Doctor Savage's survey and he says that the survey's

unreliable and it's flawed.  And the reason why, in his

mind--and this is at paragraphs 51, 184 through 189, and

212--was, quote, "Mr. Bergman's royalty analysis relies upon a

survey which educated respondents about the at-issue feature."

He then goes on to say, "Educating respondents on the at-issue

feature during the survey allows respondents to consider that

feature when making their choices within the conjoint

exercise."  And he goes on and on.  And this is

186--"Educating respondents on the at-issue feature can bias

their choices," and so forth.

And so he attacks the idea that the conjoint survey

should not have an introduction of the features to the

respondents.  So he's attacking the way the survey was

designed and the way it was created, and he believes that the

respondent should not have been told about the at-issue

feature, which is here the keyboard plus voice tagging.

So that's really the issue here Your Honor--does Doctor

Vigil have any experience to criticize the way surveys are

designed.  Now, they have a rebuttal survey expert in Doctor

Weber.  We're not talking about Doctor Weber; we're talking

about Doctor Vigil.  And from his deposition he made clear

that he has little to know experience in designing surveys,

and so he should not be permitted under FRE 702 from telling

the jury that the way the survey was conducted was improper.

We attached deposition transcripts at Exhibit B where we

asked him about his experiences on surveys, and he's been

there 25 years as a professional, and I asked him, "How many

conjoint surveys have you authored?"

He said, "One, and it's still ongoing.  There's no formal

title to it.  The results have not even been published."

And so he has no experience in designing surveys.

And with respect to his education, he has no education in

designing surveys.  His Ph.D. dissertation doesn't relate to

surveys.

So Samsung's argued, Well, he's very credentialed.  And

listen, we're not attacking his qualifications.  He is a Ph.D.

His credentials are acceptable.  What we're attacking is the

specific testimony regarding designing conjoint surveys.

That's the criticism he wants to put before the jury.  And he

did testify, and Samsung cites to this, that, Yes, survey

design falls under my experience--that's what he said; but

when pushed and drilled down, that's when he's basically

exposed to say, Well, I don't have a lot of experience in

designing surveys; I've only done one in my 25-year career.

So that's the first part of our *Daubert* motion, just to

exclude that limited testimony regarding Doctor Savage's

survey.

The second part of Doctor Vigil's report that we'd like

stricken is the MMI agreement, which we saw earlier in the

context of the marking.

And so just by way of background, Your Honor, MyPort's

predecessor assigned three licenses in the 2011-2012 time

frame, and we saw one of them with Motorola.  There were two

others--one with RIM, Research in Motion, and one with Huawei.

Those were the three total.  None of them mention the asserted

patents because they hadn't been issued yet.

Doctor Vigil is not relying on the comparability of the

RIM or the Huawei; only on Motorola.  So why?  Why isn't he

relying on RIM and Huawei?  Well, he states in his report

Exhibit A at paragraph 85, quote, "Because the RIM license

and settlement agreement was entered into as settlement of

litigation, I do not find this agreement to be comparable to

the hypothetical license."  And that's true--RIM was signed

after litigation was filed.  And so Doctor Vigil has his rule

1    that if it's in litigation, I'm not going to rely on it.

2         Same thing with respect to the Huawei.  This is at

3    Exhibit A, which is Doctor Vigil's report at paragraph 79.

4    "Because the Huawei settlement and patent license was entered

5    into as settlement of litigation, I do not find this agreement

6    to be comparable to the hypothetical license."  And Huawei was

7    signed after litigation was filed.

8         So it's pretty clear that he sort of draws the line on

9    litigation settlements not being comparable for his analysis.

10   Whether or not that's true for Federal Circuit law is really

11   separate from his own internal line in the sand.

12        And so why is he viewing the Motorola agreement as kind

13   of passing this initial step of the not being a litigation

14   settlement agreement?  Why is he even considering it in the

15   first instance when he didn't consider RIM and Huawei?  His

16   testimony is, Well, because Motorola is not a litigation

17   settlement agreement and, therefore, I can jump over that

18   first hurdle and I can then analyze the comparability.

19             THE COURT:  Let me ask you this, Mr. Lord.  Doesn't

20   Doctor Bergman take the opposite view and doesn't -- isn't

21   this really a battle of the experts on what is and isn't

22   comparable here?  I mean, this is not where one side gets to

23   tell a story that the other side doesn't get to address.

24   Correct?

25             MR. LORD:  This is a battle of the experts, Your

Honor, and we did consider not bringing the motion and just

attacking the credibility of him on the stand.  The one issue

is that the MMI agreement has a low value number, and I think

that's why Samsung wants to get it in to anchor the damages

number.  And so if, in fact --

THE COURT:  That may be why they want it in and that

may be why you want it out, but still this is a battle of the

experts, isn't it?

MR. LORD:  Well, it's a battle of the experts if, in

fact, it's viewed as a comparable agreement.  And we believe

that, as we mentioned here, that Doctor Vigil is not putting

forward the other two licenses that are comparable solely

because they were litigation settlement agreements.

THE COURT:  But it is a battle of the experts as

to comparability, because one expert is going to say it's not

comparable because it's a settlement license and the other

side is going to say that's not enough to keep it from being

comparable and it's otherwise comparable, and the jury's going

to have to decide who to believe and not to believe.  Correct?

MR. LORD:  That's correct.

THE COURT:  Okay.

MR. LORD:  And so those are our two arguments on

Doctor Vigil, Your Honor.

THE COURT:  All right.  Let me hear from Samsung in

response, please.

1          MR. UNDERWOOD:  Good afternoon, Your Honor.  May it

2     please the Court.

3          THE COURT:  Good afternoon.  Please proceed,

4     Mr. Underwood.

5          MR. UNDERWOOD:  The Court can deny this motion,

6     which is based on two grounds, as the Court just heard, for

7     the very same reason, and it's a reason that the Court seized

8     upon in its questions just now of Mr. Lord when Your Honor was

9     asking isn't this really just the battle of the experts.  And

10    we would submit that with respect to both grounds, the

11    opinions are admissible such that the testimony should come in

12    and it should be a battle of the experts, and their complaints

13    go to the weight of the evidence, not the admissibility and,

14    as such, must be addressed only on cross examination.  So I'll

15    take their two complaints in turn.

16         Turning first with respect to the survey and the opinions

17    relating to the survey, Mr. Lord explained at a high level the

18    posture we're in--they have a survey expert, and then their

19    damages expert relies upon the results from the survey in

20    formulating his ultimate damages opinions.  We're in a similar

21    posture.  He mentioned we have Doctor Weber, our survey

22    expert, and she critiqued the survey.

23         And then we also have our damages expert, Doctor Vigil,

24    who's the subject of this motion.  And what Doctor Vigil did,

25    he didn't create his own survey, he didn't design a survey, he

didn't say, Well, your survey is designed this way, but really it should have been designed this other way; instead, what he did is he critiqued their damages expert's reliance and the way in which he relied upon the survey. And just as their damages expert can rely upon a survey and is qualified to rely upon a survey, our damages expert is qualified to opine on how that reliance on the survey results is not appropriate.

And I think it's quite telling, Your Honor, that in this case they've actually admitted that Doctor Vigil is, in fact, qualified to opine on survey results, to analyze survey results, to interpret survey results, and fundamentally that is what he has done in this case. Their complaint appears to be that in the course of analyzing and responding to their expert's reliance on survey results, they appear to say that Doctor Vigil, in doing this and in discussing the results of the survey, at times veers into a discussion of certain of the design elements of the survey. Again, he didn't design a survey himself, he didn't even set forth the explicit parameters that a survey should have had, but at times in critiquing the reliance on the results of the survey, elements of the design do come up.

But I would submit to the Court that based on their admission that he is, indeed, qualified to opine on the results, analyze the results of a survey, that that requires some fundamental understanding of generally the way that these

surveys are designed.

And I think it's telling that they haven't put forward a single case that draws such fine a distinction. The one case they relied on from this Court, Your Honor, I believe it's the *Convolve* case from about 12 years ago, and in that case the record was completely absent of any evidence at all with respect to credentials relating to surveys. Here Doctor Vigil has consulting experience that he's disclosed in his CV, he's published an article on the misapplication of conjoint surveys, he's authoring a chapter in a book on it, and as Mr. Lord acknowledged, he's actually designed one himself. So the one case they've put forward the distinguishable. All of their complaints go to the weight.

With respect to the second complaint that they've lodged, Your Honor, and this relates to the MMI agreement --

THE COURT: Comparability.

MR. UNDERWOOD: Yes, Your Honor.

So the MMI agreement, as the Court observed earlier today in its comments with respect to one of the earlier motions, it includes a license to two of the patents in this lawsuit, and I think it would be a highly unusual case where a license that includes patents to the lawsuit, a license which our damages expert has actually spent I believe it's 12 pages in his report analyzing, analyzing the comparability of it, I think it would be an unusual case in which the expert's discussion

1    of that license is excluded.

2          And so, Your Honor, again, what we believe is that this

3    goes to the weight of the evidence, not the admissibility.

4    They may have issues with respect to the way in which he has

5    done his analysis, done his comparability analysis, but as the

6    Court observed at the outset, that's a battle of the experts.

7    Their expert says one thing, ours says the other, but

8    ultimately, Your Honor, the jury should be able to consider

9    both experts' opinions on the MMI license.

10          If the Court has any other questions, I'm happy to

11   address them; otherwise, that's all I have.

12               THE COURT:  All right.  Thank you, counsel.

13          Anything further from Plaintiff?

14               MR. LORD:  Nothing further, Your Honor.

15               THE COURT:  Okay.  On Document 124, Plaintiff's

16   *Daubert* motion to exclude opinions of Dr. Robert Vigil, I'm

17   going to deny this motion.  It clearly looks to me as a matter

18   that goes to weight and doesn't rise to the level of outright

19   exclusion.  I see no basis why vigorous cross examination is

20   not fair and adequate here, so I'm going to deny the motion.

21          Counsel, let's take about a 10-minute recess and then

22   we'll reconvene and move onto the next matter.

23          The Court stands in recess.

24                         (Brief recess.)

25               THE COURT:  Be seated, please.

1    Counsel, before we go onto the next disputed motion, let

2    me get one thing clarified on the record.

3    Some of the correspondence you've had with the Court

4    regarding the pretrial indicates that the parties have reached

5    an agreement regarding Samsung's 11th affirmative defense of

6    license, and in light of other agreements between the parties,

7    Samsung's agreed to withdraw its license defense, and that

8    withdrawal renders MyPort's summary judgment motion Document

9    119 moot.  Is that, in fact, correct, and can we clarify that

10   on the record?

11              MR. PEASE:  Yes, Your Honor, that's correct.

12              MR. HARTSELL:  Yes, Your Honor.

13              THE COURT:  All right.  Then the license defense by

14   Samsung is withdrawn and Document 119 is denied as moot.

15   All right.  Let's go on, then, to the next disputed

16   motion, and that is Document 125, Samsung's motion to exclude

17   opinions of Dr. Scott Savage and Jim Bergman.

18   Let me hear from the moving Defendants on this, please.

19   Whenever you're ready, Mr. Pease.

20              MR. PEASE:  Thank you, Your Honor.

21   May it please the Court.

22   Samsung has moved to exclude the testimony of Scott

23   Savage on two grounds.  I guess I'll start with him.  Now, as

24   a preface to this motion, there are many aspects of the

25   opinions of Doctor Savage as well as Mr. Bergman that we think

1    will provide a rich source for cross examination at trial.  In

2    filing this motion, we tried to limit it to several aspects of

3    the testimony that we thought were so speculative and so

4    untethered to any legitimate economics inquiry that they

5    warranted exclusion.

6         Doctor Savage is an economist.  He did a conjoint survey.

7    We recognize, Your Honor, that conjoint surveys are often

8    permitted for damages purposes and come in all the time.

9    We're not challenging it on the ground that it's simply a

10   conjoint survey.  But the purpose of a statistical survey or,

11   as Doctor Savage calls it, a discreet choice survey, which I

12   think is -- the difference is not germane for this purpose,

13   you're supposed to assess how consumers value the patented

14   invention.  You need to tie the proof of damages to the

15   claimed invention, and you do that by deriving the incremental

16   value a consumer would be willing to pay for the patented

17   technology, and the way you derive that incremental value is

18   you compare the patented invention to the next best

19   non-infringing alternative.

20        Now, there's some suggestions in the briefs, including

21   ours, that the experts are like two ships passing in the

22   night.  Ours picked one non-infringing alternative; they

23   picked another.  That's actually not correct.  MyPort's expert

24   Doctor Balakrishnan addressed this in his report at paragraph

25   93, and in his report he notes that Samsung in its first

1   supplemental response to Interrogatory No. 4 had contended

2   that the ability to disable the functionality permitting users

3   to enter text using speech-to-text application is a

4   non-infringing alternative.

5       He went on and he said, "In my view, this would be

6   non-infringing and would be technically feasible to implement.

7   And of the alternatives provided by Samsung, I view this one

8   as the next best alternative to infringement."

9       So far so good.  The parties are actually perfectly

10   aligned on the next best non-infringing alternative.  But then

11   he goes on in paragraph 96 of his report and he says, As to

12   that next best non-infringing alternative, Samsung didn't

13   mention whether they were also disabling image recognition or

14   not.  He goes, In my view, this non-infringing alternative, if

15   it included image recognition, would not be the best

16   non-infringing alternative because there are certain issues

17   surrounding image recognition tagging; it doesn't work so

18   well.

19       So the problem we have with that fundamentally is that

20   the invention that we've been looking at here when we looked

21   at the claims requires two things.  In addition to a camera, a

22   microphone, and photo management software, it requires the

23   ability to tag photos in both of two ways--one is through

24   image recognition and one is through voice-to-text conversion.

25       And so there's no dispute that Samsung's freely used

voice-to-text alone or in combination with so-called keyboard

tagging under the patent.  There's no dispute that Samsung is

free to use image recognition either alone or with keyboard

tagging under the patent.  It's the ability to do both that's

the focus of this invention.  And I think that's something

that came up when we were arguing § 101 earlier today.

So if it's actually true, as Doctor Savage in combination

with Doctor Balakrishnan asserts, that image recognition

tagging has zero or negative value, well, then we wouldn't

need to get rid of voice-to-text tagging at all.  Right?  It's

an acute problem.

Doctor Balakrishnan has essentially said that image

recognition works so poorly, that it either has no value or

has a negative value; it actually makes things worse.  And so,

in our view, he's arbitrarily required for the purposes of his

next -- of his next best non-infringing alternative argument

that both types of image -- both types of tagging required by

the patent be eliminated--image recognition and voice-to-text.

And when you remove both of those, you are necessarily

increasing the delta between the value of the patented

invention and the value of the so-called next best

non-infringing alternative.  Doctor Savage admitted that

during his deposition that would cause the value to be

overestimated.

We -- in a nutshell -- I won't belabor this point on this

1    part of the argument.  In a nutshell, we think it's purely

2    arbitrary and done purely to inflate the value of the delta

3    that incremental value between the patented invention and the

4    next best non-infringing alternative, that they require that

5    it be eliminated.

6        Our second ground, our second challenge against Doctor

7    Savage has to do with statistical significance.  We are

8    talking about a statistical survey here.  Statistical

9    significance is what guarantees that the sample you've done is

10   actually likely to encompass the population value you're

11   trying to measure.  You're taking a sample and you're trying

12   to extrapolate that out to a population.  In this case it's

13   the value of the invention based on the survey of a set number

14   of consumers.

15       And so at the outset of his analysis, Doctor Savage chose

16   to use what's called a 95 confidence interval, 95 percent.  In

17   other words, what that means is if you were to repeat his

18   experiment 95 times, you could be confident that the actual

19   population value fell within whatever range he got 95 percent

20   of the time.  That's the measure that he chose to use when he

21   set out to do his survey.

22       And what he found, though, and we see it right in his

23   results, he obtained a confidence interval that spanned zero.

24   In other words, it was significantly insignificant.  The

25   survey he generated does not prove anything at a 95 percent

confidence interval, the interval he chose to use when he set out.

So what did he do?  Did he go back to redo the experiment?  Did he choose a different approach?  No.  He simply after the fact said, All right; well, then I'm going to use a 90 percent confidence interval; I'll be less strict about it and, therefore, I get results that are statistically significant under that changed value; therefore, it proves what I've set out to prove.

And so our view is if he had chosen a 90 percent confidence interval from the start and justified why that was an appropriate reason for his survey, then I think we'd be hard-pressed to knock it out on *Daubert* grounds.  You know, that would be a battle of the experts.  But we think it's -- if you choose a 95 percent confidence interval, run your results and they don't show what you sought to show, you can't then go back and change the measure that you chose.  Right? It's bad science--either do a new experiment or, you know, throw out those results as inconclusive.  You can't change the targets after you've run the survey.  And that's what our second ground is with respect to Doctor Savage.

As for Mr. Bergman, we have three grounds.  The first is simply that he's relying on Doctor Savage.  And so I'm not going to repeat the same arguments, but it's the same arguments I just made a second ago.

1    The second argument, the second basis for challenging

2    Mr. Bergman is that -- is with his treatment of the method

3    claims.  Mr. Bergman is an accountant who's doing the actual

4    damages numbers in this case, and he assumes that all accused

5    products that were sold are being used to perform the

6    method--a hundred percent perfect compliance, and yet he has

7    absolutely no basis for that.  He does no analysis and he

8    doesn't rely on analysis by anyone to show that the accused

9    method claims are infringed by all customers of the accused

10   smartphones.  In fact, within his same report he notes that 50

11   percent of users do nothing with the stored videos and photos

12   on their phones.  He notes that another two thirds of the

13   users have unorganized camera files on their smartphones.  So

14   there's no basis for him to say that a hundred percent of the

15   sales that were made by Samsung would have been used to

16   infringe those methods.  Right?

17       Now, in the briefing, MyPort suggested that we're

18   arguing that they need to show -- that we need to go to all

19   133 million of those sales and show each one that actually got

20   used to perform the method.  We're not saying that at all.

21   What the case law shows is that you have to -- there has to be

22   a correlation between the damages you're seeking and the

23   performance of the method.  They don't have to get it exact.

24   But the *Lucent* case that they site requires that you have a

25   correlation, a reasonable justification.  Just an arbitrary

1    assumption that a hundred percent or 50 percent or some number

2    actually performs this method is not enough; they bear the

3    burden of proving damages and they failed to do so when it

4    comes to these method claims.

5          As a matter of fact, the one case -- there was the *Lucent*

6    case, but there was also the *Lone Star* case, and Judge

7    Schroeder said the concrete evidence, not mere speculation, is

8    needed to show actual performance of this method claims.

9          So again, we're not saying they need to figure out which

10   exactly of the 133 million sales exactly would have performed

11   that method, but they've got to have some correlation.  They

12   can't simply assume a hundred percent when other parts of the

13   report clearly show that it couldn't possibly be a hundred

14   percent.

15         And then the last challenge we have to Mr. Bergman has to

16   do with this profit split that he uses.  Now, profit splitting

17   is something that has been accepted in patent cases in some

18   cases and in other cases it has not, and it depends on whether

19   the profit splitting is linked to the facts of the case.

20         So in his report in paragraph 349, Mr. Bergman notes that

21   a comparison of how the parties have shared revenue and

22   profitability on a variety of similar contexts is highly

23   informative as to how Samsung and MyPort would agree to split

24   the incremental benefits.  Samsung produced actual IP license

25   agreements in this case and MyPort itself, as we heard

earlier, not only produced the Motorola agreement but also produced the RIM and Huawei licenses. And yet Mr. Bergman when he did his profit splitting analysis didn't look to any of the actual IP license agreements that either party had entered into. What he did is he chose the distributorship agreement that governs the relationship between Samsung Electronics Corporation of Korea and Samsung Electronics America.

The United States is a very large place, and if you buy a Samsung phone in the United States, that's because Samsung Electronics America has distributed that to all ends of the United States. It's a huge undertaking and, as a result -- in fact, I believe they spend over $10 billion a year in marketing and distributing the accused Samsung phones.

And so to look at the -- to derive a so-called profit split between Samsung Electronics of Korea and Samsung Electronics of America based on this distributorship agreement, which has nothing to do with the licensing of IP rights, has nothing to do with any sort of hallmark for how a licensor and a licensee of IP rights would split their profits, is subject to exclusion. There's no basis whatsoever in Mr. Bergman's report for his reliance on a distributorship agreement. It seems to have been picked solely to inflate the profit split to make MyPort's damages higher. There's no case that we're aware of that has ever allowed a distributorship

1    agreement in this context to serve as a basis for profit

2    splitting.

3        And as I noted, the Federal Circuit takes a hard line on

4    profit splitting.  In the *VirnetX* case where the expert

5    decided to start at the 50/50 split and work from there, they

6    said that was no good and tossed it out.  So in this case

7    there's no legitimate justification for a profit split derived

8    from the distributorship agreement between Samsung Electronics

9    and Samsung Electronics America.

10             THE COURT:  All right.  What else?

11             MR. PEASE:  That's it from my part, Your Honor.

12             THE COURT:  Let me hear from MyPort, please.

13             MR. HARTSELL:  Good afternoon, Your Honor.  Steven

14   Hartsell here on behalf of MyPort.

15       I'll start with counsel's arguments about Doctor Savage.

16       First, regarding their allegation that MyPort allegedly

17   used the wrong NIA, I heard Mr. Pease say that Samsung in

18   their interrogatory responses identified the next best

19   non-infringing alternative.  That's not true.  Samsung

20   identified several non-infringing alternatives, but they never

21   identified one that they considered the best non-infringing

22   alternative.

23       Doctor Balakrishnan, MyPort's technical expert, looked at

24   all the non-infringing alternatives, and based on the evidence

25   in the record he determined -- he came up with what he

1    believes are the next best non-infringing alternative based on

2    the facts of this case.

3        What Mr. Pease didn't mention but what is mentioned in

4    our briefing is there are documents that Samsung has produced

5    about how their auto image tagging, there's a lot of ping

6    points, not a lot of their photos get -- are tagged if they're

7    low quality, and there was other testimony from some of their

8    witnesses to this effect.  At the end of the day, Doctor

9    Balakrishnan came up with his opinion on what is the next best

10   non-infringing alternative.  That opinion has not been

11   challenged by Samsung.  Doctor Balakrishnan is going to be

12   able to come into court and tell the jury what his next best

13   non-infringing -- what his opinion is of the next best

14   non-infringing alternative.  Doctor Savage is entitled to rely

15   on that opinion.  It hasn't been excluded.

16       At best -- and I understand what Mr. Pease is

17   saying--this is a difference in the delta--but again, this is

18   really just a difference in the assumptions that the experts

19   make and the experts are making, and this goes to the -- this

20   goes to the weight, not the admissibility.  It's common that

21   experts disagree on different facts or what weight should be

22   given to one fact versus another.

23       Now, as far as the confidence interval argument, I think

24   Mr. Pease is conflating a couple of things.  Doctor Savage

25   testified repeatedly that there is no standard confidence

1  interval in economics, and so it's reported -- people report

2  different things just to -- kind of depending on what the data

3  shows.

4      Now, Doctor Savage has -- his report has two components.

5  There's a demand-side analysis, which is the willingness to

6  pay, and he calculated that and that came out to be reported

7  at a 95 percent confidence interval; but the second part of

8  his report, the supply-side analysis, Doctor Savage has to

9  calculate what is the statistical -- what is the deviation.

10  And he does this through -- we mentioned in the footnotes it's

11  the Monte Carlo method of 200 random draws, and it takes

12  apparently weeks to run all these calculations.  And the data

13  at the end of the day there showed it could be reported at a

14  90 percent confidence interval.

15      Doctor Savage testified repeatedly at his deposition he

16  did not go into this project trying to make the data fit any

17  particular confidence interval.  He said the data speaks for

18  itself.  At the end of the day, you have to look at the data

19  and you find out does it fall within a 95 percent confidence

20  interval, does it fall within a 90 percent confidence

21  interval.

22      At the end of the day, there is no -- Samsung has cited

23  no cases that say that surveys must adhere to a specific

24  confidence interval.  Again, at the end of the day, this winds

25  up being something, again, that is fodder for cross

1    examination.  If I they don't think that Doctor Savage's

2    supply-side figures -- if they have a problem with that,

3    they're free to address that in front of the jury, but they

4    haven't identified any methodological problems with his

5    analysis.  He followed the analysis from a very well-respected

6    journal, *The American Economics Review* that's been used by

7    many other economists, and we showed several other papers of

8    other people using that same method and reporting at a 90

9    percent confidence interval.

10        Now, on to Doctor -- on to Mr. Bergman, again, their

11   first point is Doctor -- Mr. Bergman relies on Doctor Savage.

12   Doctor -- Mr. Bergman is relying -- is entitled to rely on

13   Doctor Savage's opinion.

14        As far as their first I guess substantive argument has to

15   do with the method claims, as we note in our -- as we note in

16   our briefing, the Federal Circuit has never laid down a rigid

17   rule as to what's required there.  The Federal Circuit has

18   said in the *Exmark* case, which we cited in our briefing, that

19   the essential requirement is that the reasonable royalty award

20   must be based on the incremental value that the patented

21   invention adds to the end product.

22        Now, here Samsung -- we asked Samsung to produce whatever

23   metrics or statistics or data it has regarding the image

24   tagging functionality, and they produced a couple of

25   spreadsheets, and those spreadsheets show that I think in

1   May -- they show what they call events, which I understand to

2   be like when a user says -- hits the add tag button, but

3   Samsung apparently has no further vision into what happens

4   after that, how many tags are added, how many photos are

5   tagged, or whatnot, but they do have some indication that

6   people are pushing the add tag button.  And I believe in May

7   2023 it was like over 33 million instances of that, and they

8   produced data going back for a year or two or whatnot.

9        Mr. Bergman looked at all that data, but unfortunately

10  because it's -- I doesn't have everything that he would need

11  to do any kind of apportionment analysis, there is data

12  missing on which particular phones they are, where they are,

13  all that other kind of stuff; he examined all Samsung's data

14  but he wasn't able to use it.  At the end of the day, though,

15  he's relying -- his -- the input to Mr. Bergman's model is

16  Doctor Savage's analysis -- his survey which calculates the

17  willingness to pay, which inherently includes the value of the

18  patented technology to a consumer; So inherent within that --

19  inherent within that is the incremental value.

20       The last thing to do with the profit split analysis, now,

21  Samsung's original briefing said that -- their original

22  position in their opening brief was that Mr. Bergman's profit

23  split analysis was arbitrary and not tied to the facts of the

24  case.  Doctor -- Mr. Bergman spends I think five pages in his

25  report talking about his whole profit split analysis, and it's

1    -- the profit split analysis is based on Samsung, who is a

2    party to the hypothetical negotiations, sharing the profits,

3    samsung sharing the profits for the accused products in this

4    case and only for the accused products, Mr. Bergman's

5    consideration and adjusting of the bargaining split to reflect

6    the differences in the parties, and his *Georgia-Pacific*

7    analysis.  This is not a situation where Mr. Bergman has, you

8    know, started at 50/50 or picked something arbitrarily; he's

9    looked at the relationship between SEC and SEA, because they

10   are basically in some respects like a promoter or reseller

11   within the *Georgia-Pacific* factors, and Mr. Bergman has

12   analogized how that would relate to MyPort.

13       Furthermore, and this is tied -- the profit split

14   analysis, though, is tied to the facts of the case.  It's tied

15   based on the profits that Samsung takes -- that Samsung Korea

16   takes when it sells a phone versus what SEA takes in America.

17   So his bargain split analysis is not arbitrarily -- not

18   arbitrary; it is tied to the facts of the case.  And again,

19   this seems to be another issue that goes to -- at most it

20   would go to the weight, not the admissibility.

21       Unless Your Honor has anything further.

22           THE COURT:  No.  Thank you, Mr. Hartsell.

23           MR. HARTSELL:  Thank you.

24           THE COURT:  Anything further from Samsung?

25           MR. PEASE:  Yes, please, Your Honor.  I'll be very

1    brief.

2        So on the method claim issue, Mr. Hartsell mentioned that

3    they had asked Samsung for data and Samsung produced the data

4    it had to the extent it reflected people, you know, clicking

5    the button to set a user tag.  Samsung doesn't have

6    information reflecting how many users once they get the phone

7    are actually using voice-to-text tagging or image recognition

8    tagging.  You know, we gave them what we have.  It's not

9    Samsung's fault that it doesn't have the data that they

10   wanted.

11       Now, it doesn't give Mr. Bergman license to assume a

12   hundred percent use of the patented methods by each and every

13   sale that Samsung has made.  There's no tethering there

14   whatsoever.  You especially can't do that when his own report

15   notes 50 percent of users do not -- do nothing with their

16   stored videos and photos.

17       You know, if they ran a survey, they could have done a

18   survey to try and ferret out, if possible, the extent to which

19   customers were actually using these methods.  They didn't.  He

20   just simply and arbitrarily chose a hundred percent, and that

21   can't possibly be justifiable.

22       On the profit split, I won't belabor it because we

23   touched on it earlier, but Mr. Hartsell mentioned that it's

24   tied to the facts of the case.  It's only tied to the facts

25   of the case in the sense that they arbitrarily chose this

distributorship agreement between Samsung Electronics and

Samsung America to try to use as a model for the way that

Samsung and MyPort, being Mr. Malone, would share profits.

Mr. Malone is not going to go out and market Samsung phones

across the entire country.  There's absolutely nothing

comparable in the relationship between Samsung and MyPort on

the one hand and Samsung Electronics of Korea on the one hand

and Samsung Electronics of America on the other hand.

     If he had wanted to do a profit split, he could have

looked to any of the licenses in this case and started there,

perhaps.  He chose not to.  There's simply no justification to

rely on a distributorship agreement that's not IP related and

not in any legitimate way tied to the facts of this case as a

basis for this profit split.

          THE COURT:  All right.  Thank you, Mr. Pease.

          MR. PEASE:  Thank you.

          THE COURT:  With regard to Document 125, Defendants'

motion to exclude opinions and testimony of Doctor Scott

Savage and Mr. Jim Bergman, I'm going to deny this motion.  I

don't find any flaws or irregularities raised by the Movants

to be so severe or material as to warrant outright exclusion,

and I do find that vigorous cross examination is a fair and

accurate remedy for the matters complained of by Samsung, so

I'm going to deny the motion, and that will be the ruling on

this.

1          All right.  That brings us to Samsung's motion to exclude

2     the testimony of Doctor Balakrishnan.  This is document 127.

3          Let me hear argument from the moving Defendants, please.

4          MR. EDLIN:  Thank you, Your Honor.  Richard Edlin

5     with Greenberg Traurig again for Samsung.

6          THE COURT:  Before we go any further, Mr. Edlin, my

7     understanding is that the references to the Google Voice

8     Typing and Google Voice Input, are those moot at this point?

9          MR. EDLIN:  They are, Your Honor.

10          THE COURT:  Okay.  So we've got the camera

11     interfacing and we've got the state of mind issues.  Right?

12          MR. EDLIN:  That's correct, Your Honor.

13          THE COURT:  All right.  Thank you for that

14     clarification.  With that, go ahead, please.

15          MR. EDLIN:  Thank you, Your Honor.

16          Your Honor, I'm just putting back up something that we

17     looked at a little bit for this claim 6.  The patent doesn't

18     work very well for MyPort in this case.  And you can take a

19     look at 'microphone interfaceable', 'camera interfacing', we

20     looked at some of this language a little bit earlier, and I

21     think it's fairly clear that 'interfaceable' does not mean the

22     same thing as 'interfacing'.  And Doctor Balakrishnan

23     recognized the pickle that he was in, and so what he says is,

24     Look, this is a system claim and, therefore, all that's

25     required is capability, and he states that as a legal

1    principle. And what he's really doing, Your Honor, is he's

2    engaging in claim construction, because he's saying this is

3    what the word means because it means something different than

4    what it says, because a camera interfacing is active; a camera

5    interfaceable is not active. We sell and ship a camera that

6    is interfaceable but it's doing nothing in the box.

7    So they recognize this problem, and Doctor Balakrishnan

8    conjures a legal principle that doesn't exist. The legal

9    principles that do exist are from the Federal Circuit. *Parker*

10   *Vision* looks at words like this and says the words matter. In

11   fact, they're crucial. And then when we take a look at the

12   application, the animation of that principle in a case like

13   *Cross Medical. Cross Medical* is the case where you had the

14   spinal attachment that needed to be attached to the spine, not

15   just merely capable of being attached to the spine, and *Cross*

16   *Medical* makes that distinction because the device doing,

17   nothing unattached to the spine, not operatively connected,

18   doesn't -- didn't violate the patent. And because the doctor

19   was required to attach it to the spine, the manufacturer in

20   the Federal Circuit was relieved of the ruling of infringement

21   from the lower court. So this is very critical stuff.

22   Now, we were talking about *INVT* earlier, and Your Honor

23   raised the question, Well, what about this case. And this is

24   one of the ways in which the law can be very elegant, because

25   *Cross Medical*, *Parker Vision*, they're talking about things

1  made out of atoms--stuff, cameras, cars--but what happens when

2  you've got a silicon computer chip that is capable of being

3  programmed to do almost anything.  So capability alone in this

4  unique context, now, it's a big exception because there's a

5  lot of computer chips out there, but it is an exception for

6  something that can be programmed to do almost anything.  The

7  Federal Circuit said and limited its reasoning to that

8  particular set of circumstances where to really describe the

9  functionality of that chip, you had to describe, you know,

10  what it's going to be doing; otherwise it could be capable of

11  anything.  So the controlling Federal Circuit principles here

12  are from *Parker Vision* and *Cross Medical*.

13         THE COURT:  Are you equating the silicon chip in

14  *INVT* with some kind of commodity or some kind of material

15  that's yet to be turned into something?  I mean, it has atoms,

16  too, just like a camera and a car does.

17         MR. EDLIN:  Yes, But it's a special device, because

18  it can -- you can program it to do almost anything.  You can

19  program it to do any number of things.  The camera here just

20  like -- sorry.

21         THE COURT:  What it's programmed to do may be

22  innumerable, but its programming function and the transmission

23  of electrical impulses over that silicon chip may be pretty

24  similar whether what is programmed is one thing or something

25  different.

1          MR. EDLIN:  But how would you describe it?  And this

2     is really the point of *INVT*.  You describe the chip as capable

3     of doing something, and that's why that voice is used to

4     describe those chips and why they didn't limit -- that's why

5     they didn't utilize the distinction of *Cross Medical*, because

6     they said in this particular context you typically describe

7     that chip which is capable of doing almost anything.

8          We're not talking about a computer chip here; we're

9     talking about a camera, just like in *Cross Medical*, a device

10    that could be operatively attached to do a thing, and what is

11    going on in this patent is the camera is interfacing, it's

12    actually involved; whereas right above, the microphone,

13    interfaceable, is doing nothing but waiting.

14         The same thing, Your Honor, that you noticed a little

15    earlier below, two paragraphs below, a media data converter

16    for converting is a different state than converting.  And

17    *Parker Vision* says these words matter, and nobody would

18    rightly confuse doing something with being capable of doing

19    something.

20         When I was out in the hallway, I was capable of talking

21    to you, and presumably couldn't get into any trouble for what

22    I said, but now I'm talking to you.  It's a different state of

23    affairs, and all that's going on here --

24         THE COURT:  And a different level of volume, but

25    anyway.

1    MR. EDLIN:  All that's going on here, Your Honor, is

2    something very, very unremarkable, which is just recognizing

3    that there are differences.  *Parker Vision* says the words

4    matter.  *Cross Medical* says these two states of action are

5    different and very critical for the purposes of infringement

6    analysis.  *Cross Medical* reversed a finding of a lower court

7    directly on the point that we're arguing to you that until

8    it's actually in a state of doing anything, it's not

9    infringing.

10    THE COURT:  Let me say this, Mr. Edlin.  I carried

11    the motion for summary judgment on infringement because I'm

12    convinced that there is support under one line of cases for

13    one side of this argument and there's another line of cases

14    for support on the other side of this argument, and I'm not

15    prepared as I sit here today to draw a line, elegant or

16    otherwise, between *INVT* and *Cross Medical* and *Parker Vision*.

17    I want some time to reflect on that.

18    MR. EDLIN:  Understood, Your Honor.

19    THE COURT:  And it looks like to me that this issue

20    under this motion is going to rise or fall with that

21    determination.  So I'm going to carry this part of this

22    motion, and both the motion for summary judgment and this

23    portion of the motion to exclude are going to go the same

24    direction, and you-all will be getting some kind of direction

25    from me on those issues together as soon as I can practically

 1     get it out the door.

 2               MR. EDLIN:  Thank you, Your Honor.  I appreciate

 3     that.  And the relationship --

 4               THE COURT:  Maybe that will save us some time today.

 5               MR. EDLIN:  Yes.  I just wanted to -- I was itching

 6     to have a chance to --

 7               THE COURT:  No, it's an interesting question.

 8               MR. EDLIN:  It is.

 9               THE COURT:  And I want the benefit of going back

10     and studying both lines of cases more closely than I can do

11     sitting here.

12               MR. EDLIN:  Yes.  And I think when you reflect on

13     it, Your Honor, and if you were asked the question which line

14     of cases controls, I think the simple answer to that would be

15     what are we talking about; are we talking about --

16               THE COURT:  I think that is the question I am being

17     asked--which line of questions controls.

18               MR. EDLIN:  Are we talking about computer chips or

19     things that do stuff.

20          Okay, Your Honor.

21               THE COURT:  Let's go onto the state of mind issue.

22               MR. EDLIN:  Yes.  So Doctor Balakrishnan was put in

23     to be an expert on the things that he's testified to.  He's

24     certainly not being put forth as an expert on psychology or

25     sociology.  He has absolutely no insight because he hasn't

1   talked to anybody about Samsung's particular state of mind,

2   and there is no evidence in the record about anybody's state

3   of mind.  It would be mind boggling for an expert on, let's

4   just call it, you know, stuff about computers, but in any case

5   it would be mind boggling for an expert to then sit and give

6   an expert opinion to a jury about what Samsung had in its mind

7   about anything.  So I don't think that this is something that

8   really should leave us to tarry too much on whether or not

9   this expert can give testimony about that type of activity

10  which would require an entirely different expert who had an

11  entirely different set of facts before him maybe including a

12  conversation with someone from Samsung.

13          THE COURT:  Well, there is, in my view, a difference

14  between an expert opinion based on information gathered and

15  considered by that expert and a witness purporting to testify

16  as to matters on which they have personal knowledge, and

17  certainly Doctor Balakrishnan doesn't have personal knowledge

18  of the mental state of Samsung.

19          MR. EDLIN:  Correct.

20          THE COURT:  I don't know that that prohibits him

21  from offering opinions based upon what he's reviewed as to

22  what he believes or he opines their state of mind would have

23  been.  To me those are different things.  And he does say in

24  paragraph 84 of his report, "The following evidence, in my

25  view, establishes that Samsung had knowledge of," and it seems

to me that the structure of his report comes down more on the side of offering an opinion.  Whether it's well-founded or not, whether it's persuasive or not I don't know, but it seems to come down more on that side than he's purporting to offer personal knowledge of something he can't possibly have personal knowledge of.

MR. EDLIN:  But he can't have an expert opinion about it either.  He is here as an expert.  That's his only function in this court is to testify about something that he has knowledge and experience that the jury does not have.  Now, he has no knowledge, no experience, no nothing that differentiates him from any other common juror on what they would like him to testify to.  I could get an expert--and this would be a perilous task, in my view, Your Honor--I could get an expert to come in and say, you know, I've taken a look at these patents and I believe, based on the filings that I have seen, that Mr. Malone was acting in bad faith when he filed these patents because he didn't disclose all these other things to the Patent Office, including something that we'll talk about with Carnegie-Mellon.

THE COURT:  And I have had equitable issues tried to the bench in patent cases where the expert gave that same kind of testimony.

MR. EDLIN:  You were the finder of fact in this case.

1          THE COURT:  It was tried to the bench.

2          MR. EDLIN:  So here, Your Honor, it would be -- to

3    swear someone in as an expert and to give that patina to

4    anyone's testimony and have them testify about something they

5    are not an expert on and expect the jury to be able to draw

6    those types of distinctions clearly falls, if not only into

7    non-expert testimony, but it clearly rolls directly into 403

8    material, because it's very prejudicial to Samsung to anoint

9    an expert.

10         And let's face it--juries pay attention to experts when

11   they say things like this, but he's not offered for that

12   testimony, he is not offered for Samsung's state of mind, and

13   he is not an expert in Samsung's state of mind.  And his

14   experience with those issues is no different than any average

15   juror's.

16         Now, we have not contested his expertise as it relates to

17   what he has testified to in his report because that's the

18   subject of good old fashioned cross, but to extend that expert

19   umbrella to things that he is not being put forward as an

20   expert, not only is it, I don't think, allowable as a matter

21   of expert testimony, but it's plainly prejudicial.

22         THE COURT:  All right.  What else?

23         MR. EDLIN:  That's it, Your Honor.  Thank you very

24   much.

25         THE COURT:  Let me hear from MyPort, please.

1    MR. RICKETTS:  Thank you, Your Honor.  Mickey

2  Ricketts again on behalf of MyPort.

3    I understand that Your Honor has carried the portion of

4  this particular motion related to the 'camera interfacing

5  with', but if I may, Your Honor, I have one very brief

6  statement just to rebut something that was said earlier

7  regarding the *INVT* case.

8    THE COURT:  That's fine, Mr. Ricketts.

9    MR. RICKETTS:  Thank you, Your Honor.

10    So in the -- this is from the *INVT* opinion, and this

11  begins at 1373, and this is the Federal Circuit writing, "The

12  intervenors argue that simple present tense words are enough

13  to require actual operation, but Silicon Graphic shows that is

14  not true.  In fact, based on just claim language, we see very

15  little significance in the difference between a limitation

16  that might recite a data obtaining section for demodulating

17  and decoding"--which the Federal Circuit refers to as *Finjan*

18  style--"and a claim that recites a data section that

19  demodulates and decodes"--which was the claim language at

20  issue here in this case--"for determining on which side of the

21  capability actual operation line the claims fall."

22    So as we discussed earlier, Your Honor, we understand

23  that the claims do use a mix of language--interfaceable,

24  interfacing, storing, for performing--but as the Federal

25  Circuit has made clear, there is really little distinction

between a claim that says something for demodulating and a

claim that says something that demodulates in determining

whether the claims are drawn to performance or mere

capability. So that is that with respect to the 'camera

interfacing with'.

With respect to Doctor Balakrishnan's opinion as to

Samsung's state of mind, as Your Honor pointed out, Doctor

Balakrishnan's expert report in paragraph 84 says, "The

following evidence, in my view, establishes that Samsung had

knowledge of or was willfully blind to the asserted patents."

And so we agree, Your Honor, that it would be improper for

Doctor Balakrishnan to testify as to the ultimate conclusion

of whether Samsung had the requisite knowledge or belief, but

it's clear also, Your Honor, that courts in this district have

allowed expert testimony in this very context. And that would

be the *Atlas Global* case, for example, a very recent case from

July of last year, where this Court precluded an expert from

testifying as to the ultimate conclusion of whether a

defendant had the requisite knowledge or intent for indirect

infringement but, nevertheless, permitted that expert to

testify as to underlying facts that in his opinion might show

the defendant's state of mind.

And similarly in the *Gree* case, this was an opinion by

Judge Payne where he held that, "Although it is improper for

an expert to opine as to the subjective belief or intent of a

1    corporate entity, experts can opine, however, on the

2    underlying facts that may show a party's state of mind."

3        And that is what Doctor Balakrishnan is doing here, Your

4    Honor.  He is opining on the four pieces of evidence there

5    discussed in paragraph 84 of his expert report that in his

6    opinion may show that Samsung was willfully blind to the

7    asserted patents.

8        And so we believe that to the extent the Court does see

9    fit to strike any portion of the Doctor Balakrishnan's expert

10   report, Samsung has argued that it sees no practical way of

11   separating Doctor Balakrishnan's opinion regarding the state

12   of mind from his discussion of the underlying facts, but a

13   simple examination in paragraph 84, Your Honor, reveals that

14   it would be a simple matter, if the Court were so inclined,

15   for the Court to strike the sentence of Doctor Balakrishnan's

16   opinion that I just quoted where he says, "The following

17   evidence, in my view, establishes;" simply strike that and

18   leave Doctor Balakrishnan's discussion of the four pieces of

19   evidence below.

20       And so unless the Court has further question, I have

21   nothing further, Your Honor.

22           THE COURT:  All right.  Thank you.

23           MR. RICKETTS:  Thank you, Your Honor.

24           THE COURT:  Anything further from Samsung?

25           MR. EDLIN:  I'll be very brief, Your Honor.

1    With respect to the state of mind issue, aware that the

2    Court is filled with discretion in this area, you really have

3    to, I think, take into account what is fair and what is fair

4    to Samsung is not to have an expert come in and say, Hey, I

5    looked at these four things, one of which is the complaint,

6    and say based on that I, Doctor Balakrishnan, believe that

7    Samsung's state of mind was to willfully infringe.  It's a

8    stretch under any sense.  But at the end of the day it's just

9    not fair to allow that testimony, and I think Your Honor

10   should exercise discretion in that regard.

11       With respect to *INVT*, which I'm sure we'll take up

12   quite a bit of conversation in chambers, I simply would like

13   to point out that that decision does, in fact, speak to and is

14   focused on the nature of the technology.  And when it goes to

15   make its findings in its discussion, it focuses very much on

16   the distinction between generic objects that have just a

17   purpose and things that can be interchangeably programmed, and

18   that in the nature of computers, because of that

19   interchangeability, their function is often defined in the

20   active voice.  It's just really not the circumstances of a

21   camera or a medical device or an engine.

22       Thank you, Your Honor.  Appreciate your time.

23           THE COURT:  I know you think that's distinguishable,

24   and I'm going to look at that.

25           MR. EDLIN:  Thank you so much.

1          THE COURT:  Thank you.

2      All right.  With regard to Document 127, Samsung's motion

3  to exclude the testimony of Doctor Balakrishnan, concerning

4  the three constituent parts of this motion, the references to,

5  quote, 'a camera interfacing with', I'm going to carry any

6  ruling on that portion of this motion which, as I've indicated

7  previously, should logically rise or fall with the Court's

8  decision it's carried on the motion for summary judgment

9  regarding the infringement issue.

10      Concerning the references to Google Voice Typing and

11  Google Voice Input, the Court's going to deny that as moot,

12  recognizing that the parties have confirmed on the record that

13  that's no longer active here and is, in fact, moot.

14      With regard to the Samsung state of mind issue set forth

15  in paragraphs 82 through 84 of Doctor Balakrishnan's opening

16  report, I'm going to deny the motion.  I'm certainly not going

17  to let this witness testify as if he has personal knowledge of

18  the subjective state of mind of Samsung, and if he purports to

19  do that, I expect an objection to be raised which I'll

20  sustain.  But I don't know how I can keep or should keep an

21  expert who identifies multiple facts in evidence as leading

22  him in his view to conclude a party knew or should have known

23  of something from testifying to that, given familiarity with

24  the area and precise disclosure of the supporting facts, even

25  if one of them happens to be, among others, the complaint

1  filed in this case.  I think that's something that's subject

2  to vigorous cross examination, and I don't know how those

3  issues are ever proven up because there certainly isn't going

4  to be somebody with personal knowledge of the subjective state

5  of mind of another party, and I don't expect Samsung to

6  testify to their own subjective state of mind and open that

7  door.

8      I don't see any practical way to get at this issue unless

9  it's based upon a qualified expert who sets forth their basis,

10  which basis is subject to vigorous challenge on cross

11  examination, and couching their ultimate conclusions in the

12  clear language of 'in my view' and 'in my opinion', which is

13  something altogether different than an expert or any party or

14  witness purporting to testify about having some way -- having

15  actual knowledge, personal knowledge of another person or

16  party's state of mind.  I'm going to deny the motion as to

17  that part of the motion.

18      Okay.  That brings us to what looks to be the last

19  substantive motion in dispute, which is Samsung's motion to

20  exclude opinions and testimony from Doctor Bang, however, it's

21  pronounced, Document 118.  There apparently also is a motion

22  for leave to file supplemental briefs regarding this, which is

23  Document 195.  That to me is subsumed in the underlying

24  argument, and to the extent it needs to be ruled on it's

25  probably moot, but I want to hear substantive arguments on the

1  motion to exclude with regard to Doctor Bang.

2      And I'll hear from Samsung first on this.

3          MR. SOMMER:  Thank you, Your Honor.  Andrew Sommer

4  again on behalf of Samsung.

5      Doctor Bang construes two claim terms in rendering his

6  opinion on validity, and he does so in a way that are at odds

7  with the infringement opinions and the views of the claims

8  taken by MyPort's infringement expert Doctor Balakrishnan.

9          THE COURT:  First data converter and media data

10  converter, second data converter.

11         MR. SOMMER:  That is absolutely correct, Your Honor.

12         THE COURT:  Okay.

13         MR. SOMMER:  As to the first data converter, his

14  opinion is that means a secondary data converter.  That cannot

15  possibly be the plain and ordinary meaning of the word

16  'first'.  And, you know, I think I could probably stop there

17  on that particular issue, but we can actually look at how he

18  reaches this conclusion in his report.

19         THE COURT:  You could stop there, but you're not

20  going to.

21         MR. SOMMER:  Your Honor, if I've got you at 'hello',

22  I will stop.

23      But he walks through the specification, he says this term

24  has no meaning in the context of computer science except for

25  something that converts data, and then he goes and looks for

an enlightened meaning from the specification.  This is clear
and unambiguous claim construction.

He says a POSA would look to the specification to
determine the scope of the patent's recited data converters;
the patent defines primary data converter, secondary data
converters, and tag generators; and then he uses this to tease
out a definition, and he says first data converter means
secondary data converter as defined in the patents.  This is
textbook claim construction.

And as to the motion to supplement briefing, I'll just
briefly touch on that.  They've offered this as claim
construction opinion at the PTAB, and they said in a reply
brief -- or it's a surreply actually that they filed on the
day that we filed our reply in support of our motion to
exclude these opinions, and said, We're invoking an exception
to the plain and ordinary meaning.

So we didn't have that available to us at the time.  It's
that particular statement that we want to bring to the Court's
attention.  They are saying that this is all a plain meaning
opinion here.

If you look at Doctor Bang's expert report, compare that
to his declaration on this particular issue at the PTAB and
compare it to the brief that they filed in support, it's
nearly verbatim the same.  There are very subtle
differences--challenge claims versus asserted claims, for

1    example.

2        So we think that this is absolutely a claim construction

3    opinion.  MyPort says in its briefing, Hey, you know, you

4    should be able to tease this out on cross examination; you

5    should vigorously cross examine our witnesses.  The question

6    underlying that particular proposition is to what end.  Are we

7    going to have the jury pick which one of those two experts,

8    Doctor Balakrishnan or Doctor Bang, is correct on the meaning

9    of the claims?  That's clearly inappropriate.

10        So in terms of 'media data converter', we think this

11   issue is also fairly clear.  He invokes some claim

12   construction doctrine by going to the specification and trying

13   to interpret what he calls malformed sentences in the

14   specification to say that it precludes user input.  We put

15   the question to Doctor Balakrishnan, who very clearly for his

16   infringement read requires the user to press a button on the

17   phone, and we said, Hey, you know, look at Doctor Bang's

18   opinion; I do agree with that.  He says, Not for the purposes

19   of my analysis.  He requires user input.  Doctor Bang says he

20   would not.

21        Now, MyPort's brief says, Oh, that's only talking about

22   the image recognition portion which the user doesn't get

23   involved with, but we can look at the heading of the report in

24   which that opinion appears and it's talking about converting

25   captured digital audio to a text-based searchable file as a

1    text context tag.  It's not discussing the image recognition

2    portion.

3        And with that, we think that Doctor Bang is engaging in

4    inappropriate claim construction, which is clearly

5    inappropriate in front of the jury, and ask that the Court

6    grant our motion.

7             THE COURT:  All right.  Thank you.

8        Let me hear from the Plaintiff.

9             MR. LORD:  Good afternoon.

10            THE COURT:  Go ahead, Mr. Lord.

11            MR. LORD:  Sure.

12        Counsel's brief and counsel's argument leaves out

13    important points, Your Honor.  Doctor Bang--I call him doctor

14    Bang--Doctor Bang's report where these opinions appeared was a

15    rebuttal report.  Okay?  And so if you look at the broader

16    context, it's obvious that Defendants opened the door by

17    submitting an invalidity report and left it to Doctor Bang to

18    rebut that report.

19        And so the way that the first data converter element came

20    about is that Doctor Bederson stated that a reference called

21    Fuller disclosed an A/D converter, and Doctor Bederson said

22    that A/D converter, which is an analog-to-digital converter,

23    meets the first data converter as claimed in the patent, and

24    that's part of his invalidity analysis.

25        Doctor Bang disagrees with that.  Doctor Bang submitted a

1    report saying that Doctor Bederson failed to disclose in

2    Fuller the presence of a first data converter.  So he's just

3    rebutting Doctor Bederson's report.  That's all he's doing.

4    And in doing that, he's saying that the first data -- well,

5    the A to D converter in Fuller does not meet the element in

6    the claim.

7         So this term was not construed by the Court and Doctor

8    Bang is allowed to differentiate and distinguish the prior

9    art.

10        Samsung's relief here is to exclude all opinions

11   regarding Doctor Bang's opinion as to why Fuller doesn't

12   render obvious or anticipate the claims, and they're trying to

13   get a freebie here, Your Honor.  And Doctor Bang is certainly

14   allowed to rebut Doctor Bederson's opinion as to why Fuller

15   does not meet this claim element, and that's all that's going

16   on here.

17        With respect to claim construction, we cited in the brief

18   -- I mean, Doctor Bang stated in his report--this is at

19   paragraph 186--"Without reading the '017 specification, it is

20   my opinion that a POSA would understand that an A to D

21   converter can not be the recited first data converter."

22        And so that's really what he's saying here is that he

23   doesn't believe that the A to D converter in Fuller meets the

24   claim element.

25        There's no basis to strike an opinion.  This is classic,

1    classic expert opinion.

2         The same thing with the second data converter, Walker is

3    the reference, not Fuller, and Walker is a system where you

4    have to talk into the device and the device asks you a

5    question, and so -- well, so you take a picture and the device

6    will say, Is this Jane or is this a dog, and then the user has

7    to provide its own input into why -- or how that question

8    should be answered, and then the tag is created.

9         And so Bang, then, with respect to Walker, said, Listen,

10   that disclosure in Walker does not meet the second data

11   converter.

12        So in both instances he's distinguishing the prior art

13   and just explaining why those elements and these references do

14   not meet the claims.  There's no claim construction going on

15   except to the extent that he's distinguishing the prior art.

16        The cases that Samsung has cited are specific cases where

17   the Court has construed the claim, for example, to mean X, Y,

18   Z, and then the expert comes back and says, No, it means minus

19   X, minus Y, or minus Z.  That's not what's going on here.

20   These terms were not construed, the plain meaning applies,

21   Doctor Bang is free to distinguish the prior art based upon

22   the plain meaning.

23        We cited the *Greer* case, Your Honor, which I think is

24   applicable here, and there the court denied defendant's motion

25   to strike expert report for improper claim construction on a

1     similar basis here.

2          So we think Samsung's relief to exclude this testimony

3     and prohibit our expert from distinguishing the prior art is

4     improper, especially because they opened the door with their

5     invalidity report and we are allowed to rebut it, Your Honor.

6               THE COURT:  Let me ask you this, Mr. Lord.  If the

7     Court were to grant the relief that's requested here by

8     Samsung and carve out or exorcise from the reports these

9     opinions about first data converter being, in effect, a second

10    data converter, et cetera, are you telling me that that would

11    totally eviscerate this rebuttal report, or would there be, in

12    effect, a surviving portion of that report that would go to

13    the rebuttal issue you're raising?  Because I'll be honest

14    with you.  I am concerned about what's put forward here

15    usurping the Court's role for claim construction purposes.

16    And it's certainly too late in the game to deal with it

17    otherwise.

18         But I want to know does this, in effect, kill the

19    entirety of his rebuttal report, or is there a portion, a

20    modicum of it that's left that really does join issue in a

21    rebuttal sense with the invalidity report you're concerned

22    about.

23              MR. LORD:  There may be a way to do that, Your

24    Honor, but if you look at -- this is on page 3 of Docket 118,

25    which is Samsung's brief at the top.  This is what they're

1    moving to strike, in my understanding.  It says, "Doctor

2    Bang's claim constructions opinions regarding the claim 'first

3    data converter' appear in paragraphs", and then they list 166

4    to 191, 255, 278, 282, 286, 290, 331 to 356, 400 -- and you

5    can read it yourself, and I haven't added it up, but we are

6    talking about a hundred paragraphs they're looking to exclude

7    here.  So it's a substantial swath of his report.

8         So I'm not sure if there's a way to surgically strike, if

9    the Court's inclined to do that, specific elements of Doctor

10   Bang saying that it's a secondary data converter, but

11   Samsung's asking for a lot more than that here.

12        And again, these terms are not construed by the Court,

13   and so both experts -- right?  Because their expert's doing

14   the same thing.  Their expert is saying why does Fuller

15   disclose the reference.  Both experts are applying the plain

16   meaning and reaching different conclusions.  So it would seem,

17   in my mind, unfair, Your Honor, to allow Doctor Bederson to

18   opine as to his conclusion as to the plain meaning of that

19   term but not allow our expert, because both experts are, in

20   essence arguing--not arguing--providing opinions as to why one

21   reference meets the claim and rebutting why it doesn't.

22             THE COURT:  All right.  Anything further, Mr. Lord?

23             MR. LORD:  Just briefly with respect to the

24   supplemental brief issue, I'm a little bit confused.  Doctor

25   Bang has submitted one declaration in the IPR.  That was in

1    July.  He didn't submit a new one.  And so they've been on

2    notice since July of what his opinions are.  There's been no

3    supplemental declaration.  This term was not construed in

4    litigation, but it was entirely proper in the IPR, you know,

5    to do so.  And so we're a little bit unclear as to what

6    generates the -- Samsung's ability to have additional briefing

7    here.  They are on notice of Doctor Bang's opinions since

8    July.

9         That's it, Your Honor.

10         THE COURT:  All right.  Thank you.

11    Let me hear from Samsung, please.

12         MR. SOMMER:  Certainly, Your Honor.

13    I'll address the merits of the motion, not the motion for

14    supplemental briefing at this point, but there are only three

15    points I want to speak to and then --

16         THE COURT:  Let me ask you this first, Mr. Sommer.

17    What I hear Mr. Lord saying is you've raised a point here and

18    if they should -- if you should be able to persuade the Court

19    you're right on that point, you've asked for -- you've grossly

20    overreached for relief here.  You've asked to strike tons of

21    paragraphs out of this report when really the basis for that

22    is this discreet issue about whether 'first data converter'

23    could be 'second data converter'.  What's your response to

24    that?  Because this is a very long list of paragraphs.

25         MR. SOMMER:  I appreciate that, Your Honor, and I

1  think they are justified, and let me kind of explain the long

2  list of paragraphs in that there are six buckets of

3  claims--claim 6 and 13 of each patent.  They all have the same

4  issue.  They all have the same claim term.  So the opinion is

5  just repeated time and time again throughout the report for

6  each one of those limitations.  It's a copy and paste, and

7  then, you know, just revising the -- to change the citations

8  to be the correct paragraph -- or the correct patent.  So it

9  looks long; that's absolutely correct.

10      And the claim construction opinion in the declaration

11  itself is long.  So, for example, just the claim construction

12  section, a POSA would look at the patent specification, the

13  patent defines these types of data converters, the first data

14  converter recited in the asserted claims is a secondary data

15  converter, that opinion spans paragraph 166 to 191, and that's

16  only one instance in which he repeats this in his report.

17      Then he goes on to apply that inappropriate claim

18  construction in rendering his opinions about why what Fuller

19  discloses is not a first data converter.  Obviously if he's

20  applying an inappropriate claim construction, it's our view,

21  Your Honor, that those have to come out too; that he can't

22  just get up there -- because the foundation of that opinion

23  is, well, first data converter is a secondary data converter,

24  and Fuller doesn't disclose the secondary data converter.  And

25  those opinions are 192; 193; 194 is really just quoting what

1   Doctor Bederson says; 195 through 202 is all about Fuller's

2   A to D converter upon which Doctor Bederson relies cannot be

3   the first data converter as recited in the claims.

4        So, you know, if you look at 198, he goes back to this

5   secondary data converter concept to distinguish a way for

6   Fuller.

7        So, you know, it is a lot of paragraphs.  We concede

8   that.  And I think it's a way that the -- you know, in a way

9   it is because of the way the report is structured and the

10  length of this claim construction opinion and kind of the way

11  that he has to meander through the specification to get

12  through to the place where he goes.

13       With respect to -- did that answer your question, Your

14  Honor?

15            THE COURT:  They brought it on themselves is what

16  you just told me.

17            MR. SOMMER:  If I could have gotten away with saying

18  that, I would have saved a lot of breath, yes.  But I think

19  it's a vestige of how the report is written.

20       There was an argument that we opened the door to this

21  issue.  Fuller and this -- there's no argument these theories

22  were not disclosed in their invalidity contentions in October

23  2022.  I mean, these have been disclosed all along.  And

24  Mr. Lord said, you know, Doctor Bang rendered these opinions

25  in the PTAB in July.  You know, I don't think we brought this

1  on ourselves in any respect or opened the door to these

2  opinions.  He says all that's going on is Doctor Bang is

3  rebutting an invalidity opinion by Doctor Fuller.  What Doctor

4  Bang should have done is explained why Fuller doesn't disclose

5  a first data converter; not why it doesn't disclose a

6  secondary data converter.

7  And then paragraph 196, without looking at the

8  specification language, if you look at what he's doing in

9  this particular paragraph without looking at the

10 specification, he then goes on to say, A person of ordinary

11 skill in the art would notice, hey, the camera doesn't have a

12 data converter and starting thinking, well, why is that.  And

13 so he starts using surrounding claim language to reinforce his

14 position that the first data converter can't be equivalent to

15 the -- Fuller's A to D converter cannot be equivalent to the

16 first data converter.  And that's using surrounding claim

17 language and drawing inferences like a digital camera isn't

18 claimed as having an analog-to-digital converter, even though

19 everybody, you know, in the industry would know you've got to

20 convert analog to digital to take a digital photograph.

21 So with that, Your Honor, we submit that our motion

22 should be granted.

23       THE COURT:  All right.  Thank you, Mr. Sommer.

24       MR. LORD:  Just briefly, Your Honor.

25       THE COURT:  Let's make it brief, Mr. Lord.

1          MR. LORD:  Sure.

2          THE COURT:  Time's getting away from us.

3          MR. LORD:  Okay.  Just really quick, Your Honor,

4    again, the swaths of paragraphs he's seeking to strike include

5    a lot of information besides the secondary data converter.

6    Our expert should be allowed to distinguish the prior art and

7    explain why the data converter in Fuller is not disclosed in

8    the claim, and he did explain, for example, the first data

9    converter in the claim stores audio; the one in Fuller

10   doesn't.  He explained that the first data converter in the

11   claims can receive digital and analog information; it doesn't

12   have to just be analog.  So there's other information that our

13   expert should be allowed to talk about, Your Honor.

14       That's it.

15          THE COURT:  Okay.  Thank you.

16          MR. LORD:  Thank you.

17          THE COURT:  With regard to Document 118, Samsung's

18   motion to exclude certain opinions and testimony of Doctor

19   Bang, including proposed claim construction and reliance

20   thereupon, I am persuaded that in this context this expert

21   does cross the line into the purview of claim construction,

22   which is reserved for the Court.  However, I am not

23   comfortable striking in their totality all these multiple

24   paragraphs listed in the motion, and I'm not inclined to go

25   back and spend my time going through each paragraph and

1    redlining what can stay and what can go.

2        What I am going to do is this:  Within Doctor Bang's

3    rebuttal report and concerning his opinion therein that a

4    person of ordinary skill in the art would have understood that

5    'first data converter' recited in the claims is a secondary

6    data converter as defined in the patent specification, that is

7    struck from the report, and I'm going strike it topically, not

8    by all these paragraphs being wiped out with the stroke of a

9    pen.  If, in fact, Defendant is right that it's just

10   repeatedly cut and paste over and over again, then that

11   topical or substantive claim, which I find to be unacceptable

12   or impermissible claim construction by the expert, is going to

13   come out.  But to the extent those paragraphs that Defendants

14   seek to strike contain other information and opinions that are

15   more of a rebuttal in nature, those are going to be preserved.

16       And the same thing is going to apply with regard to

17   'media data converter' and 'second data converter'.  To the

18   extent Doctor Bang construes those as precluding a data

19   converter from accepting any user input, that is excluded and

20   struck as a subject or as a topic.  Particularly, he says a

21   person of ordinary skill would interpret the media data

22   converter recited in claims 6 through 9 as a hardware/software

23   component which does not receive any user input to perform its

24   conversions.  That language and that conclusion is struck as

25   impermissible claim construction.

1     But to the extent any of the literally hundreds of

2     paragraphs that are itemized by Movant, to the extent those

3     paragraphs contain other conclusions or assertions or opinions

4     that are not topically tied to and a part of these claim

5     construction opinions, then they survive and they are not

6     struck.

7     And to the extent both sides can't agree on what survives

8     and what comes out, then I'll have to take that up with you at

9     a later date.  Again, I'm not prepared to do it today.  There

10    is no reason why competent and qualified counsel as I have on

11    both sides in this case can't and shouldn't do that, and I

12    expect that to happen.  But I've been surprised before, and if

13    I'm surprised, again, I'll ultimately resolve those issues,

14    but I would very much like to avoid having to do it on a

15    paragraph-by-paragraph basis throughout this long list.

16    But I think that the Plaintiff's entitled to the benefit

17    of the doubt that there may be material that should survive

18    this motion in these paragraphs that's not corrupted by this

19    attempt at claim construction by the expert.  But to the

20    extent these paragraphs contain that effort by the expert,

21    which I find to be impermissible claim construction, they are

22    excluded.

23    Everybody clear on the Court's ruling?

24         MR. LORD:  Yes, sir.

25         MR. SOMMER:  Yes, sir.

1          THE COURT:  Now, that should complete each of the

2     substantive motions that have been brought before the Court,

3     and that should bring us to motions in limine.

4          As you're aware, the Court has a standing order on the

5     approach and procedure for disputed motions in limine in

6     patent infringement cases.  My understanding is that we're

7     down to approximately three disputed motions in limine, give

8     or take, and that's what I want to turn to next.

9          Let's see.  Let me find the right place in my notes.

10         With regard to Plaintiff's proffered motions in limine,

11    MyPort's disputed motions in limine, my understanding is that

12    Plaintiff's Motion in Limine No. 3 is still at issue.  Are

13    there other motions in limine Plaintiff has proffered that are

14    in dispute other than No. 3?

15         MR. HARTSELL:  Just No. 3, Your Honor.

16         THE COURT:  Okay.  Just for the record,

17    Mr. Hartsell, what's the disposition of 1, 2, and 4 as

18    either agreed or withdrawn?  I want to be clear on the record

19    as to what happened with the ones that aren't in dispute.

20         MR. HARTSELL:  Samsung will correct me if I'm wrong,

21    but I believe with respect to MyPort MIL No. 1, to preclude

22    them from calling Tim Kowalski at trial, I understand they

23    have withdrawn their motion.

24         With respect to No. 2, samsung will not introduce

25    evidence, argument, or testimony that Samsung cannot simply

1    -- that Samsung cannot infringe simply because it has its own

2    patents. We've agreed on language, and that was, I believe,

3    in the document that we submitted to the Court last night.

4          THE COURT: Okay. I have a note that that was

5    agreed to in some fashion.

6       No. 3 is still in dispute.

7       What about No. 4?

8          MR. HARTSELL: Samsung will not introduce arguments

9    regarding non-comparable licenses. I believe they've

10   withdrawn that one as well -- or we've withdrawn that one as

11   well in light of our other agreements.

12        THE COURT: So you're withdrawing your --

13        MR. HARTSELL: In light of our agreements, yes.

14        THE COURT: All right. Just a minute. Let me

15   recite what I understand and then you can chime in,

16   Mr. Sommer.

17       No. 4 is withdrawn by the Plaintiff, No. 3 is in dispute,

18   No. 2 has been agreed to with agreed language that's being

19   submitted to the Court, and what I'm not completely clear on

20   is Plaintiff's MIL No. 1. What's your understanding there?

21        MR. SOMMER: There is a witness they objected to

22   that we have withdrawn from our list and --

23        THE COURT: It's effectively moot.

24        MR. SOMMER: It's moot, yep.

25        THE COURT: Then let's focus on Plaintiff's MIL

No. 3 where are MyPort seeks a limine order that would

preclude Samsung from introducing evidence, testimony, or

argument that Plaintiff's damages is capped by the actual use

of the image tagging or that Plaintiff must prove the number

of customers that actually performed the claim method.

I think it's more accurate or more effective if I hear

the Defendants' objection to the MIL first and then I'll hear

from Plaintiff.

MR. PEASE:  Thank you, Your Honor.

THE COURT:  What's your position, Mr. Pease?

MR. PEASE:  We oppose the MIL.

THE COURT:  And why?

MR. PEASE:  If you go back a half hour ago when we

were arguing our motion to preclude Doctor Savage and

Mr. Bergman, one of the issues we raised is that Mr. Bergman

had assumed, without any basis to do so, that a hundred

percent of the sales of the accused products were used to

perform the patented methods.  And the argument against that,

and I think what the Court adopted in denying that motion, is

that these were all issues that were subject -- should be

subject to vigorous cross examine of the experts at trial.

Now, almost in a very similar motion, MyPort is seeking

to preclude Samsung and its experts from arguing that the

damages should be based, including for those method patents,

on actual use or non-use of the methods, and we think there's

1    no legitimate basis for this motion.  MyPort bears the burden

2    of proof on damages.  § 284 points out that it's damages to

3    compensate for the use of the patented inventions, and so they

4    bear the burden of proving that use.

5         Now, this was alluded to I think in the last argument

6    and in their briefs.  Their position seems to be that because

7    Samsung didn't have documentation that would specifically

8    identify exactly which purchasers of the accused products

9    used them in this particular way, whether they practiced the

10   methods or not, Samsung should be precluded from challenging

11   their assertion that a hundred percent of the methods are

12   performed, but there's no basis for that.

13        We gave them what we had.  We weren't required to have

14   that data in the ordinary course of business.  There's no

15   legitimate -- if they want to prove that the method patents

16   are used, then their expert should be able to come up with

17   some basis to say the extent to which they've been used within

18   the confines of the reports he served.

19        You know, as I mentioned earlier, Mr. Bergman's assuming

20   a hundred percent -- applying a hundred percent rule of thumb

21   that all uses -- all purchases give rise to uses of the

22   methods, when his own report said that 50 percent of users do

23   nothing with their stored photos or videos.

24        So the burden is on them.  They need to correlate --

25   again, we're not requiring a one-to-one precision, but it's

1    their burden to correlate uses of the method to the sales.

2              THE COURT:  All right.  What's MyPort's position?

3              MR. HARTSELL:  Your Honor, the title of the motion,

4    unfortunately, I don't think matches the substance of the

5    motion, and we tried to reach out to Samsung after the

6    briefing to talk about this.  What MyPort is really seeking

7    is, as we discussed earlier and as we put in the briefing,

8    Samsung has said that they do not keep statistics on how often

9    this image tagging is done.  Their 30(b)(6) witness said, We

10   don't maintain these types of statistics.  What MyPort is

11   concerned about is what we've seen from communications from

12   Samsung and what we've seen in their expert reports is their

13   experts are arguing this feature is never used, and we've seen

14   that several times throughout the reports.

15        What we're -- what we're really seeking is to preclude

16   Samsung from coming in and saying, This feature is not used,

17   when they have admitted that they don't have the data to back

18   that up.  We don't think -- we think it would be unduly

19   prejudicial for Samsung to be able to come in and tell the

20   jury, Hey, nobody uses our feature, but in reality they've

21   admitted in their interrogatories and other deposition

22   testimony that they don't actually have the data to do that.

23        So we're just seeking to preclude them from coming in and

24   saying this feature is rarely or infrequently used as a means

25   to, I mean, to be blunt, drive down the damages number when

1    they've admitted in their interrogatories and through their

2    deposition testimony that they don't have that data.

3              THE COURT:  So tell me why the first question on

4    cross examination of Samsung's corporate representative

5    shouldn't be, You don't have any data to show how much or how

6    little these features are used, do you, Mr. So And So or

7    Ms. So And So?  I mean, why can't you get that admission,

8    consistent with your discovery responses that you've received,

9    on the record from their corporate representative right off

10   the bat, which will make their experts look pretty silly if

11   they testify to something different, and which, if the expert

12   somehow deviates from what you've gotten in discovery

13   requests, you can impeach their credibility first thing on

14   cross examination with those responses?  Why does this need to

15   be curtailed by a MIL from the Court when it really ought to

16   be part of your practice in the case?

17             MR. HARTSELL:  It could be, Your Honor, but we think

18   this becomes an issue of kind of like you can't unnecessarily

19   unring the bell.  If Samsung and its experts come in and start

20   saying, Oh, this is infrequently used or whatnot--I mean,

21   they're the people who, you know, manufacture the products and

22   all that--we worry that's just something that's going to be

23   difficult, you know, to pull the jury back from at the end of

24   the day.

25             THE COURT:  Well, their experts aren't going to be

1  their first witnesses.  I mean, there's going to be a

2  representative of Samsung, I'm sure, that will testify first,

3  and I wouldn't be shocked if you didn't call their

4  representative as your last witness adversely, but you're

5  going to have an opportunity to establish what you say their

6  discovery answers provide as far as usage or any data

7  regarding usage, the absence of any data regarding usage right

8  off the bat.  And I, quite honestly, don't think I need to

9  take on that burden for you; I think that's something you need

10 to do, and you ought to be able to do it, or you ought to be

11 able to make the other side look pretty foolish if you have

12 the kind of impeachment material you are telling me you have.

13      And in another respect, this almost strikes me as a back

14 door *Daubert* issue.  You're really asking me to *Daubert* their

15 experts because they say they don't keep that kind of data

16 when you represent that the experts are going to say something

17 different.  If that's, in fact, the case, I don't know why

18 that shouldn't have been raised as a *Daubert*.  Maybe to some

19 extent it already has.  This wouldn't be the first time I had

20 counsel effectively take a second bite at the *Daubert* apple

21 through MIL practice.

22      But I don't see a basis to grant this.  I think you are

23 perfectly capable of addressing what you've laid out as your

24 real concern through your practice and through your cross

25 examination of their witnesses, and I just have some concerns

1    that I may be otherwise curtailing proper testimony by

2    granting this here.  I'm going the deny the motion.

3             MR. HARTSELL:  Thank you, Your Honor.

4             THE COURT:  Okay.  Let's go to any disputed motions

5    in limine proffered by the Defendants.

6         I have 1, 2, 3, and 4 before me.  Which of these are in

7    dispute and which of these are not?

8             MR. EDLIN:  No. 3 and 4.

9             THE COURT:  So 1 and 2 are not.

10        Can somebody clearly enunciate on the record how 1 and 2

11   were disposed of or resolved such that they're not before the

12   Court as disputed issues now?

13            MR. SOMMER:  Certainly, Your Honor.  Andrew Sommer.

14        We negotiated resolution whereby MyPort agreed -- MIL 1 I

15   believe was Google Voice Typing, and we agreed to some

16   language that they would not refer to that as part of their

17   infringement case.  I'm paraphrasing; I don't have it in front

18   of me.  And then MIL No. 2 was Bixby dictation, and we agreed

19   to a parallel MIL on that issue.  So those are embodied -- I

20   believe they are in the final pretrial order as agreed MIL.

21            MR. LORD:  That's correct, Your Honor.

22            THE COURT:  All right.  I just want to make sure I

23   have the proper and final language to include in any MIL order

24   that I'm going to enter.  I'll refer back to the final

25   pretrial order.  It may be that my staff may need to contact

1    you for clarification on exact language, but I know where to

2    look now.

3        All right.  Let's turn to Defendants' MIL No. 3, and

4    we'll follow the same approach, which is I want to hear from

5    Plaintiff first as to why they believe this MIL is improper,

6    and then I'll hear from Defendants as to any contrary view.

7                MR. LORD:  Yes, Your Honor.

8        With respect to Samsung's MIL No. 3, we oppose.

9    Essentially, MyPort has included website materials from

10   Samsung affiliates, such as Samsung UK and Samsung Australia,

11   that are marketing and instruction documents showing how

12   Samsung instructs its users to apply tags, both via a keyboard

13   and through voice.  This is necessary to show an inducement.

14   It's central to our case in chief.

15       Samsung is basically saying these are foreign documents,

16   but these are Samsung documents.  They're trying to run away

17   from what the documents say.  They're saying this is not a

18   Samsung document.  These are Samsung documents.  They're not

19   challenging the authenticity of them.

20       Myport has named two Defendants in this action.  They're

21   both parties to this case.  There's the parent, who is Samsung

22   Electronics Company, which Your Honor's very familiar with,

23   who's the parent company; and then we also have Samsung

24   Electronics America.  And so because we have the parent

25   company, Samsung documents showing how it instructs its users

1    to apply tags are fair game and they should not be excluded.

2        As an example, we put in our brief there was a UK

3    document at NP26360 which was at Exhibit 2.  We asked the

4    witness about this document.  This is a 30(b)(6) Samsung

5    witness.  SEC designated this witness as a 30(b)(6) witness.

6    And we put this document before the witness and we asked the

7    witness questions about it.  And he acknowledged what the

8    document said.  He said, Yes, this is a document that teaches

9    users how to apply tags.

10       And then I asked, "Is this a document from Samsung?"

11       He said, "Correct."

12       I asked if "Exhibit 99 was a guide from Samsung showing

13   users how to add a tag.  Correct?"

14       And he said, "Correct."

15       And there's another line of questioning where the witness

16   said this was a guide from Samsung.

17       And in that deposition--of course, it's a 30(b)(6)--the

18   witness confirmed that Samsung Electronics designated him to

19   speak with respect to certain topics.

20       And so we don't think that they can run away saying,

21   Well, these are different Samsung documents; these are Samsung

22   documents.  They're necessary for our case in chief, there's

23   no objection to authenticity, and they fall under the Samsung

24   corporate parent docs.

25            THE COURT:  Now, are these Documents, do they speak

1   to the infringement issue as to how everything operates and

2   works because it would work the same in Australia because it

3   works in the United States, or are these damages documents

4   they are going to talk about quantity and usage and things

5   like that?  I've not seen the documents.  You need to clarify

6   what they go to for me.

7           MR. LORD:  It's the former.  And Samsung -- it just

8   instructs users how to tag an image, how to open up the menu,

9   what the click, where to type and how to create a tag.  It has

10  nothing to do with damages, Your Honor.  It goes strictly to

11  inducement for the infringement case.  And I believe one of

12  them is attached as an exhibit; Exhibit 2 as an example.

13          THE COURT:  And these relate to accused products in

14  this case, albeit that products may be sold in a different

15  country.

16          MR. LORD:  That's right.  And they were seen by --

17  they were addressed to users in the U.S.; I mean, they're own

18  websites, and any user in the U.S. can access them.

19          THE COURT:  All right.  Let me hear from Samsung,

20  please.

21          MR. EDLIN:  Thank you, Your Honor.  Richard Edlin of

22  Greenberg Traurig.

23      So these documents, Your Honor, are being introduced for

24  indirect infringement, that they're being used to encourage

25  and induce users in the United States, and none of these

1    documents are from any company in the United States.  These

2    are from Australia, from the United Arab Emirates, from the

3    UK.  And here's the issue here.

4         Would I be able to have the elmo put up?  Thank you so

5    much.

6         What it says here is, "Please note:  This guide is

7    designed for Australian variant Galaxy devices.  If you have

8    an international device or require further support, click here

9    to get in touch with your Samsung subsidiary."  For the

10   perspective of this, a foreign device would be the United

11   States.

12        So there's absolutely no evidence that anybody in the

13   United States produces any of these documents.  None of these

14   corporate -- none of these companies have been shown to be any

15   corporate subsidiary of the parent.  There's been no evidence

16   that's been introduced to that.  There has been absolutely no

17   piercing of the veil, no effort to show that what the

18   Australian subsidiary does should be the responsibility of the

19   corporate parent and the Australian subsidiary just --

20             THE COURT:  Did the corporate parent not designate

21   an expert on these that was deposed and talked about these

22   different documents?

23             MR. EDLIN:  Not on these, I don't believe, Your

24   Honor.  I believe they may have been asked a question, but I

25   don't believe they were designated on these documents.

1          THE COURT:  All right.  I may have misunderstood the

2     earlier argument.

3          MR. EDLIN:  I think he was asked a question about

4     them, but I don't think it was -- unless I'm mistaken, I don't

5     think it was a topic upon which he was designated.  He may be

6     a 30(b)(6) witness.

7          THE COURT:  Whoever he is was selected by the parent

8     company to speak for them on whatever issues he was noticed

9     on.

10          MR. EDLIN:  Whatever issues there were, but I don't

11     believe they were on -- unless I am mistaken, and I look to

12     counsel to see if I am --

13          THE COURT:  Let me ask you this, Mr. Edlin.  Is your

14     concern about these that they may reference countries outside

15     the U.S., be it Australia or the United Arab Emirates or the

16     UK or South Africa, is there some kind of prejudice you're

17     concerned of that will inadvertently paint Samsung as a global

18     behemoth that will prejudice you before this jury because

19     these are the countries are referenced here, or is it simply

20     these are instructions for users in those countries?  I mean,

21     there could be multiple ways you might be worried about these.

22          MR. EDLIN:  Yes.

23          THE COURT:  In today's world the fact that some

24     country from the Middle East may be flashed on the screen in

25     front of the jury might be a concern.  If that's the driver

1   here, I need to know about it if.  It's not, if it's the

2   substance of what they say, then that's different.  That's

3   what I'm trying to get at.

4        MR. EDLIN:  Yeah.  So I don't -- I'm not precluding

5   anything because I don't know how they're going to use it.  I

6   don't think that Your Honor will allow them to say Samsung's a

7   big global behemoth and, therefore, you can tag them with

8   whatever number you feel like.

9        THE COURT:  That is why I have standing limine

10  orders.

11       MR. EDLIN:  However, this is not -- these are not

12  the Samsung entities that are being sued here.

13       THE COURT:  But these are the Samsung accused

14  devices that are on trial.

15       MR. EDLIN:  I don't know if they are the Samsung

16  accused devices.  How do we know that?

17     We also have a hearsay objection lodged against these

18  documents.  There is nobody who is going to be able to put

19  these documents into evidence.  And when you take a look at

20  this, all this says are variant Galaxy --

21       THE COURT:  I understood your opposing counsel to

22  say these related to the accused products in this case.  I

23  thought that was not in dispute, but apparently it is in

24  dispute?

25       MR. EDLIN:  I don't know how that representation can

1    be made.  If you take a look at this document, this says --

2    this is just a community discussion.  I don't know who

3    Mitzibichu (ph) is or any of the other folks that are there,

4    but this is from the UAE, it's community discussion, and all

5    it references is Galaxy Note.  I have no idea what he's

6    talking about.  And there's not going to be anybody who's

7    coming in here who is going to talk about that because there

8    is no witness anybody is going to put on because none of these

9    companies are defendants in this case.

10           THE COURT:  Well, I'm not going to take up disputed

11   exhibits in limine practice.  This is not the time or place to

12   deal with evidentiary or admissibility issues.  And if there

13   is a basis to either exclude or include these under a limine

14   analysis where there's some kind of pervasive effect or

15   prejudice, that limine would be appropriate to address.

16   That's really what I want to hear about.  If there is a

17   hearsay objection or there is objections based on the rules

18   of evidence, then that should come later on an individualized

19   basis.

20           MR. EDLIN:  Yes, Your Honor.  I was just pointing

21   out that we did make that with respect to these documents.

22   And the fact of this matter is, Your Honor, that these

23   documents prove absolutely nothing and have no probative value

24   of any kind with respect to what Samsung has or has not done

25   to encourage any user to do anything with respect to these.

1    These are not directed into the United States.  These do not

2    come with the phones that are sold.  These are not the subject

3    of any advertisement that takes place in the United States,

4    and there is no evidence that a single user in the United

5    States has ever seen any of these or that Samsung has directed

6    any of these documents to a single user in the United States.

7         These are sold, as the Australian document shows, for use

8    in Australia for Australian phones, and it has absolutely no

9    probative benefit and no probative weight of any kind with

10   respect to what Samsung does or doesn't do in the United

11   States, but it's being introduced to support Plaintiff's

12   theory of indirect infringement that Samsung encourages its

13   users in the United States--because that's all they care

14   about--that Samsung encourages its users in the United States

15   to tag and download photos, tag photos.  And there is no

16   probative value that something that is directed into Australia

17   with no connection between Australia and the United States, no

18   connection between the UAE and the United States, there's just

19   nothing to connect them.

20        THE COURT:  Okay.  Well, I'm persuaded, as I sit

21   here and hear your arguments, that the basis for Samsung's

22   objection here is purely evidentiary and that these are going

23   to have to be addressed on an individualized basis, and this

24   really is beyond the scope of what ordinary limine practice is

25   meant to cover.

1     So I'm going to deny the motion in limine, but I

2  certainly expect these documents, whatever they are and

3  however many of them there are, to be scrutinized under the

4  exhibit practice that will follow.  And if there are

5  evidentiary objections and they're well-founded, then they'll

6  be well-founded, but I'm not going to wave a broad brush and

7  say everything is in or everything is out.  These are going to

8  have to be addressed under the rules of evidence as proposed

9  exhibits, to the extent Plaintiff has them as proposed

10  exhibits on their exhibit list.  I don't know.  But this is

11  not something that's appropriate under limine practice.

12     So for that extent, without foreclosing the ability to

13  object to them on an evidentiary basis as proposed exhibits,

14  I'm going to deny Defendants' mill --

15          MR. EDLIN:  All right, Your Honor.  We'll take them

16  up on a document-by-document basis.  Thank you.

17          THE COURT:  What's the dispute, Plaintiff, with

18  regard to Defendants' proffered MIL No. 4?

19          MR. HARTSELL:  So just as a little background, Your

20  Honor, after the close of expert discovery, Samsung came to

21  MyPort and said, In light of some of the testimony of Doctor

22  Balakrishnan, it seems to us that there are 14 products that

23  you can't continue to accuse of infringement because they

24  relied on Bixby, and Doctor Balakrishnan testified he's not

25  relying on Bixby.  We agreed with them and we said, Okay, we

1    are remove the 14 products.

2         Now, when it came time to meet and confer with -- on the

3    day these motions were due, we had a meet and confer with

4    Samsung and they told us they were raising this for the first

5    time, that they don't want to have these 14 products in their

6    -- in our model anymore.  And that's fine.  We're willing

7    -- we told them we're willing to take the 14 products out and

8    have Mr. Bergman, you know, just rerun his calculations.  And

9    Samsung in their motion seems to also say that it's something

10   that we should do.

11        Where we seem -- where the crux of the dispute seems to

12   be right now is in Doctor -- in Mr. Bergman's report, as you

13   may recall, he relies on Doctor Savage, and Doctor Savage

14   calculates a 3.99 percent decrease in profits.  That's what

15   came out of his survey and that's what Mr. Bergman uses as the

16   input to his report.  So that means you are taking 3.99

17   percent decrease in profit for each phone.  Of course, that

18   varies by phone.  That could vary within a model over given

19   time depending on operating expenses and all that other kind

20   of stuff.

21        In his report he reports a rate, but that rate is the

22   aggregate weighted rate of all these different phones.

23   Samsung, to my understanding, doesn't seem to have a problem

24   with us submitting another report taking out the product so

25   that the royalty base changes and goes down, but Samsung, my

1  understanding, wants us to maintain the same rate.  The

2  problem is the phones that are being dropped are lower margin

3  phones and, therefore, by math are pulling down the weighted

4  average.  So when you take these phones out of the base -- out

5  of the royalty base and you recalculate, because since

6  Mr. Bergman's working on a change in profits, the rate is

7  going to be different because we have a different mix of

8  products.  So it seems -- my understanding is Samsung --

9           THE COURT:  How much is the rate going to change?

10  Have you done the math?

11           MR. HARTSELL:  I don't have the math.

12           THE COURT:  Somebody should have done the math.  We

13  need to know if it's 4.01 from 3.99 or 17.5.

14           MR. HARTSELL:  I can tell you the rough estimate was

15  I think it's 1.10 right now in the current report, and the

16  damages expert I believe is going to be like 1.2 at the end of

17  the day.  At the end of the day, though, we've already

18  established that like the total damage ask is going to

19  decrease by $12 million by taking these out.  So to me the

20  dispute seems to be Samsung wants to kind of have its cake and

21  eat it, too--it wants us to reduce the royalty base, which

22  we're willing to do, we're willing to take them out, but they

23  also want us to use a royalty rate that is now no longer going

24  to be tied to the product mix that's actually going to be

25  going before the jury.

1          And then I guess as a subsequent I guess smaller issue,

2     when the reports were filed, Samsung hadn't given -- didn't

3     have data for the last two months of the image period.  I

4     spoke to them last night and I understand that they are going

5     to be -- that they're in the process, I believe, of gathering

6     revised data that will actually -- the actual data for the

7     last two months which Mr. Bergman projected.  And assuming

8     that's the case, it seems to MyPort that we should just file

9     an amended or report that actually includes --

10          THE COURT:  I don't know why this is coming to me as

11     motion in limine.

12          MR. HARTSELL:  I'm responding to it as a motion in

13     limine, Your Honor.

14          THE COURT:  Well, it seems like to me what there

15     should be is a motion for leave to supplement the expert's

16     report in this discreet way for those discreet reasons, and

17     then we can argue about it as a motion.  But it's before me

18     now.

19          MR. HARTSELL:  And Your Honor, we did -- and because

20     Samsung did bring it up that we hadn't requested yet, we did

21     request in our briefing that, to the extent necessary, we are

22     requesting leave to file a supplemental report that removes

23     the products as they requested and will apply the rate,

24     whatever it is, whatever it comes out to be by removing the

25     products.  And we'd also like to use the actual sales data,

1    because the last two months were projected because Samsung

2    didn't have it at that time since the patents are expired.

3            THE COURT:  Have you received that actual sales

4    data?

5            MR. HARTSELL:  No.  I spoke with Samsung's counsel

6    last night and they said they were in the process of gathering

7    it, but I don't have an ETA on when they're going to produce

8    it.

9            THE COURT:  Once you get that more current sales

10   data, do you have any estimate from your expert as to how long

11   it will take to revise his reports in those discreet ways?

12           MR. HARTSELL:  He thought it would take only a

13   couple of hours.

14           THE COURT:  All right.  Let me hear from Samsung,

15   please.

16           MR. LORD:  I hate to jump in.  Should we mark this

17   under seal because we're talking about confidential

18   information?  We're talking about damages numbers.

19           MR. PEASE:  Not a problem from our side.

20           THE COURT:  If you want the transcript sealed, you

21   need to ask me to seal the courtroom.

22           MR. LORD:  Okay.  I withdraw the request.

23           MR. PEASE:  Thank you, Your Honor.  Tom Pease for

24   Greenberg Traurig.

25           THE COURT:  Yes.

1      MR. PEASE:  So I'll start with why we filed this as

2  a MIL as opposed to a *Daubert* or something else.  This came up

3  in mid-November after *Daubert*s had been filed, and we were not

4  alerted to this issue.  The way this all played out is we saw

5  that they were not accusing -- there are certain products that

6  have something called Bixby Voice on them, and we saw through

7  the expert --

8      THE COURT:  I can assume that you found a basis to

9  say these 14 products shouldn't be pursued and they agreed.

10      MR. PEASE:  Right.

11      THE COURT:  And now we have an issue with how to

12  change the damages numbers to reflect that agreement plus the

13  updated market numbers.

14      MR. PEASE:  Exactly.  At the tail end of

15  Mr. Bergman's report, he sets forth a per-unit royalty for

16  smartphones and a per-unit royalty for tablets, so we assume

17  that they -- when they dropped these products the numbers

18  would go down by let's say 40 million, because that --

19  supplying those per-unit royalties that they put in the

20  report.  And then we get an email from counsel -- that's all

21  we've got.  We don't know how to recreate this ourselves.

22  It's a black box into which our expert has processed these

23  numbers and out come his damages calculations.  In theory the

24  reports show how to do it, but we have no ready means to do it

25  ourselves.

1    And so we were surprised when we got an email saying the

2    numbers had fallen by let's say 10 million as opposed to 40

3    million, and the answer was, Well, this is a very complicated

4    analysis where you start with the analysis that Doctor Savage

5    did and you propagate that out through, you know, one

6    cascading level after another to get to these bottom-line

7    numbers and, therefore, if you want to know what the damages

8    are that we're going to ask for at trial, you know, you need

9    to go through this exercise.  And we haven't, we have no means

10   to do, and there's not an expert report that even sets forth;

11   we've just got an email from counsel saying here is what the

12   updated numbers are.

13   And so -- you know, and taking a step back, I mean, the

14   whole point of this analysis is supposed to reflect what the

15   parties would have entered into in a hypothetical negotiation,

16   and now all of the sudden by dropping products, the

17   hypothetical negotiation apparently results in different

18   per-unit royalty rates.  Right?  It seems there's something

19   very artificial about it.

20            THE COURT:  You deposed Plaintiff's damages

21   expert --

22            MR. PEASE:  We did.

23            THE COURT:  -- before these 14 devices --

24            MR. PEASE:  Yes, that's correct.  That's correct.

25            THE COURT:  Okay.  Well, we've got a report that

1    includes 14 devices that both sides apparently agree shouldn't

2    be accused, so that's not where we need to be.

3         MR. PEASE:  Right.

4         THE COURT:  Given the mutual agreement from both

5    sides that those 14 devices should not be in the damages

6    calculation and should not be accused products in the case, it

7    seems to me what should happen is the real-world data for the

8    last two months that the expert previously projected ought to

9    be furnished by Samsung, because you're the only ones that

10   have that, and then the expert ought to produce a supplemental

11   or an amended report that takes out those 14 devices, adds

12   that last two months of real-world sales data, and then

13   Samsung needs to be able to depose that expert on this new

14   amended report.

15        And that ought to happen quickly.  I mean, we're not

16   set to trial until the 5th of February, but that 30-day

17   interval between then and now is going to go by quickly and

18   there's a lot to be done on both sides that I don't need to

19   tell you about between now and then.

20        So if the expert can do it in a matter of hours once they

21   get that two months real-world data, how long will it take you

22   to get that real-world two months data to the Plaintiffs,

23   Mr. Pease?

24        MR. PEASE:  The answer is unless there's updated

25   information, we looked -- started to look into it last night

1    to see if that financial data is even closed for the period

2    yet, and I don't know if we have an answer to that yet.

3            MR. SOMMER:  I do have an answer.  This is Andrew

4    Sommer.

5        We have it from the U.S. subsidiary.  We're still waiting

6    for a response from Korea.  It's the middle of the night.  So

7    I suspect that data, we can probably get it to them in a week

8    to 10 days, but I need a commitment from the finance people

9    because people we've actually reached -- recently reached out

10   to have just not been in the office, probably because of the

11   holiday or something.  So I will investigate that and we will

12   make it as expeditiously as possible.

13           THE COURT:  Is this a holiday period in Korea?

14           MR. SOMMER:  I don't know.  I know it is for some of

15   our client contacts over there.  They have family in the U.S.

16           THE COURT:  Christmas and New Year's and Hanukkah

17   are over here.

18           MR. SOMMER:  Yes, they are.  They are.

19           THE COURT:  I don't know why it should take 10 days

20   to get that.  And the quicker this gets done the more it

21   benefits Samsung so you have time to see this new report or

22   amended report and depose them.

23       You need to get that updated data for both entities to

24   Plaintiff's counsel within five days, and then within 48 hours

25   of receipt of that data you need to generate that amended

1    report.  And as soon as that amended report is generated, then

2    you-all need to agree upon a date when the expert can be

3    deposed solely on that amended report and those changes, and

4    that deposition shouldn't go more than three hours.  That's

5    probably more time than you need, but out of an abundance of

6    caution I'll afford a deposition up to three hours.  And then

7    we should be back to where we ought to be.  And we don't need

8    an order in limine to do any of this.

9        MR. PEASE:  And as far as the amended report or

10   supplemental report that they're preparing, is it based on

11   the new data?  It's not leave to go back and change everything

12   else.

13       THE COURT:  No, it's not an open door; it's an

14   opportunity to remove these 14 devices, to add the last two

15   months of real-world data in place of the projections, and to

16   run the same type of mathematical calculations that you've run

17   previously with those changes and generate an amended report.

18   And then you get to test it under deposition with that expert,

19   and that needs to happen -- the complete process I would think

20   should not take more -- you should have the deposition behind

21   you and understand exactly where we are well within the next

22   two weeks.  And if you can do that, that should not cause us

23   problems with the February 5th trial date.

24       Okay?  That's what I'm going to order.  And in light of

25   that, I'm going to deny as moot Defendant's MIL No. 4.

1          MR. HARTSELL:  Thank you, Your Honor.

2          MR. PEASE:  Thank you.

3          THE COURT:  All right.  Those appear to be all the

4    disputed motions in limine.  That brings us to the disputes

5    between the parties as to exhibits to be pre-admitted for use

6    before the jury during the trial.

7          It's almost 4:00 p.m., and I made you-all work through

8    the lunch hour.  It seems to me there should be a fair amount

9    of additional guidance you now have from the Court that you

10   didn't have when we started this morning that should greatly

11   streamline the process of deciding which exhibits ought to

12   come in, which exhibits ought to stay out.

13         I'm going to recess for the day.  I'm going to direct

14   you-all to meet and confer on exhibit disputes in light of the

15   guidance the Court's given you.  The only thing I've carried

16   is an MSJ and related materials on infringement.  That should

17   not drastically impact any of your understanding as to what

18   the appropriate exhibits should be.  And for this purpose if

19   there are any exhibits that relate to that carried motion in

20   limine, then you ought to assume the broadest result, which I

21   guess would be to assume that that would be denied.  I'm not

22   telling you whether it's going to be granted or denied, but

23   you don't need to let that be an impediment to working through

24   the exhibit disputes.

25         And I want you to -- if you need to go down to

1    Mr. Underwood's office, if you've got space here, you need to

2    in-person meet and confer on exhibits starting now through the

3    remainder of the day, and I'll see you back in front of me at

4    9:00 in the morning.  And at 8:00 in the morning you need to

5    email my office with where you are and what's left.  And I

6    would very much love to get an email that says, We resolved

7    all of our exhibit disputes, in which case you don't have to

8    come back at 9:00 tomorrow morning.

9         The weatherman says it's going to rain here all day long

10   tomorrow.  I might as well spend it with you in the courtroom

11   than to do something else, but I can certainly find other

12   things I'd rather do.  So work diligently, take the guidance

13   I've given you, narrow your disputes on exhibits as completely

14   as possible, if not completely resolve them.  And to the

15   extent you need guidance from me on exhibits, I'll hear from

16   you at 8:00 a.m. by email, and I see you at 9:00 if necessary

17   tomorrow morning.

18        Any questions?

19             MR. PEASE:  May I ask just a follow-up question on

20   the expert report issue?

21        It occurs to me that hopefully there won't be any issues,

22   but should our expert Doctor Vigil respond to any new issues

23   raised by it so he's able to talk about the issues in the new

24   report.

25             THE COURT:  Well, if your experts -- unless your

1    expert's opinions reacting to the Plaintiff's damages expert

2    include specific numbers or things that would have to be

3    altered based on the mathematical changes that are going to

4    come out in this amended report, then no.  If there is some

5    basis upon which you think your expert needs an opportunity to

6    issue something supplemental, in which case the Plaintiff is

7    then going to want to depose your expert, then you're going to

8    have to come back to me and explain to me why and we're going

9    to have to see what we can or can't do.

10    I would hope and I would assume that's not going to be

11    necessary.  I'm not going to just unilaterally foreclose the

12    door to that because I don't know what's going to happen or

13    what's going to come out, as neither of you know what's going

14    to come out when you see this amended report.

15    And, quite honestly, I assume that's why you're on your

16    feet now.  If there's a good faith bona fide effort or bona

17    fide basis to say your expert ought to get an opportunity to

18    issue something in light of what they produce, then I'll hear

19    your request in that regard.  I would say the odds ought to be

20    very high that's not going to happen.  This should not be

21    anything more than removing 14 devices that shouldn't be

22    there, adding two months of real-world sales numbers, and

23    running the same mathematical calculations that are set forth

24    in the original report.  And if that's what comes out of this

25    process, I can't see any basis upon which you'd need to issue

1  another supplemental or responsive report and take -- and let

2  your guy be deposed again.  But I'm not going to tell you

3  that's impossible, because neither you nor I have seen what

4  you're going to produce.

5       Okay?  Any other questions?

6            MR. LORD:  Not from us, Your Honor.

7            MR. EDLIN:  No, Your Honor.

8            THE COURT:  Work hard on these exhibits, counsel.

9  I've got lots of other things I'd rather do than spend the day

10  with you tomorrow going through exhibits, so please try to

11  narrow them completely.  But I will hear from you in the

12  morning if necessary and see you tomorrow if necessary.

13       Otherwise we stand in recess.

14                 (End of day.)

15

16

17

18

19

20

21

22

23

24

25

1        I HEREBY CERTIFY THAT THE FOREGOING IS A

2    CORRECT TRANSCRIPT FROM THE RECORD OF

3    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4    I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5    FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6    COURT AND THE JUDICIAL CONFERENCE OF THE

7    UNITED STATES.

8

9    S/Shawn McRoberts              01/10/2024

10   _____DATE_____
     SHAWN McROBERTS, RMR, CRR
11   FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25